```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:20-cr-18
                                  )
 4              Plaintiff,        )
                                  )
 5        v.                      )  Alexandria, Virginia
                                  )  February 22, 2022
 6   ROBERTO CARLOS CRUZ MORENO,  )  9:10 a.m.
     et al.,                      )
 7                                )
                Defendants.       )  Volume 1
 8   _____ )  Pages 1 - 177

 9

10                    TRANSCRIPT OF TRIAL

11          BEFORE THE HONORABLE ANTHONY J. TRENGA

12             UNITED STATES DISTRICT COURT JUDGE

13                      AND A JURY

14   APPEARANCES:

15   FOR THE PLAINTIFF:

16        NICHOLAS U. MURPHY, II, ESQUIRE
          NICHOLAS J. PATTERSON, ESQUIRE
17        AMANDA LOWE, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
18        2100 Jamieson Avenue
          Alexandria, Virginia  22314
19        (703) 299-3700

20   FOR DEFENDANT ROBERTO CARLOS CRUZ MORENO:

21        THOMAS B. WALSH, ESQUIRE
          PETROVICH & WALSH, PLC
22        10605 Judicial Drive, Suite A-5
          Fairfax, Virginia  22030
23        (703) 934-9191

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1   APPEARANCES CONTINUED:

 2   FOR DEFENDANT KEVIN PEREZ SANDOVAL:

 3        JOSEPH R. CONTE, ESQUIRE
          LAW OFFICE OF J.R. CONTE PLLC
 4        400 7th Street, N.W., Suite 206
          Washington, D.C.  20004
 5        (202) 638-4100

 6   FOR DEFENDANT MARVIN TORRES:

 7        JONATHAN R. OATES, ESQUIRE
          KRUM, GERGELY & OATES, LLC
 8        4103 Chain Bridge Road, Suite 401
          Fairfax, Virginia  22030
 9        (703) 988-3711

10   FOR DEFENDANT JOSE ROSALES JUAREZ:

11        ADAM M. KRISCHER, ESQUIRE
          DENNIS, STEWART & KRISCHER, PLLC
12        2007 15th Street N, Suite 201
          Arlington, Virginia  22201
13        (703) 248-0626

14   DEFENDANTS ROBERTO CARLOS CRUZ MORENO, KEVIN PEREZ
     SANDOVAL, MARVIN TORRES, AND JOSE ROSALES JUAREZ IN
15   PERSON

16   TERESA ROMAN, MIRIAM DEUTSCH, MARIA HORVATH, AND MANUEL
     PRADO, SPANISH INTERPRETERS
17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2                                                        PAGE

3   Opening Statement by Mr. Patterson              75

4   Opening Statement by Mr. Walsh                 100

5   Opening Statement by Mr. Conte                 100

6   Opening Statement by Mr. Oates                 103

7   Opening Statement by Mr. Krischer              114

8   WITNESS                    EXAMINATION           PAGE

9   Edgar Blanco Torres    Direct by Mr. Patterson    122
10                         Cross by Mr. Walsh          162
                           Cross by Mr. Conte          173
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           (The jury is not present.)

2                THE CLERK:  Criminal Case 1:20-cr-18, *United*

3    *States v. Roberto Carlos Cruz Moreno, Kevin Perez*

4    *Sandoval, Marvin Torres, and Jose Rosales Juarez.*

5                Counsel, will you please note your

6    appearances for the record.

7                MR. MURPHY:  Good morning, Your Honor.

8    Nicholas Murphy, Nicholas Patterson, and Amanda Lowe on

9    behalf of the United States.

10               THE COURT:  Good morning.

11               MR. WALSH:  Good morning, Your Honor.  Thomas

12   Walsh on behalf of Roberto Cruz Moreno, who is present

13   in court, Judge.

14               MR. CONTE:  May it please the Court.  Joseph

15   Conte on behalf of Kevin Perez Sandoval.  Good morning,

16   Your Honor.

17               THE COURT:  Good morning.

18               MR. KRISCHER:  Good morning, Your Honor.

19   Adam Krischer on behalf of Jose Rosales Juarez, who is

20   present.

21               THE COURT:  All right.

22               MR. OATES:  Good morning, Your Honor.

23   Jonathan Oates on behalf of Marvin Torres, who is

24   present.

25               THE COURT:  All right.  Welcome, everyone.

1              We're prepared for trial.  I have a number of

2    issues that I want to go through, including some of the

3    motions that have been recently filed.  Other than

4    those, are there any other issues the government wants

5    to take up?

6              MR. MURPHY:  Not that the government is aware

7    of, Your Honor.

8              THE COURT:  All right.  Defense counsel, any

9    other preliminary issues you want the Court to take up

10   at this point?

11             MR. WALSH:  I don't think so.  No, Your

12   Honor.

13             MR. OATES:  Your Honor, I'm sorry.  At the

14   last moment, I filed a request to allow my computer to

15   come in.

16             THE COURT:  I signed that.

17             MR. OATES:  Thank you, Your Honor.  I

18   appreciate that.

19             THE COURT:  Also, let me recognize our

20   interpreters.  Thank you for your service here today.

21   If you would, identify yourself and be sworn, please.

22             INTERPRETER ROMAN:  Teresa Roman, federally

23   certified court interpreter.

24             INTERPRETER DEUTSCH:  Miriam Deutsch,

25   federally certified court interpreter.

1          (The interpreters affirm.)

2              THE COURT:  Have each of you satisfied

3    yourselves that you and these defendants are able to

4    communicate?

5              INTERPRETER ROMAN:  Yes, Your Honor.

6              THE COURT:  All right.  Very good.

7              Let me first take up an issue that was

8    partially addressed by way of pretrial motions and I

9    think was highlighted by some of the suggested *voir*

10   *dire* that one counsel has asked for.  The Court had

11   previously severed Count 16 relating to the immigration

12   charge against -- I believe it was Mr. Juarez.

13   Count 15 also alleges against Mr. Moreno, that he was

14   an alien in possession of a firearm.

15             Mr. Murphy, how do you see that factoring

16   into any other charge in the case?

17             MR. MURPHY:  Well, as the Court noted,

18   Count 15 against Cruz Moreno is not a severed count,

19   and the government would have to put forth evidence

20   establishing that he wasn't a legal alien.

21             Counsel for Defendant Rosales Juarez raised

22   an issue with respect to Government's Exhibit 25-12,

23   which is a Facebook conversation between defendant

24   Rosales Juarez and a coconspirator who will be a

25   cooperating witness testifying for the government.

1  That conversation does not refer to Defendant Cruz

2  Moreno.

3           THE COURT:  I understand that.  You have a

4  separate count in Count 14 against Mr. Moreno for

5  possession of a firearm in connection with a drug

6  trafficking offense.  It just seems to me that 15

7  really is an outlier with respect to the rest of the

8  case.

9           Go ahead.

10          MR. MURPHY:  Is 15 referring to -- I

11  apologize.  I don't have the Indictment in front of me.

12  Is 15 the possession of the firearm, Your Honor?

13          THE COURT:  By an illegal alien.

14          MR. MURPHY:  That is very much not an outlier

15  in the case, Your Honor.  That firearm was recovered on

16  April 20, 2019, a little over a month after the

17  shooting of Victim 2 in this case.  That firearm, the

18  government's evidence will show at trial, was the exact

19  same firearm used to shoot that victim in the case.

20          THE COURT:  Well, it seems to me that

21  evidence would be admissible in any event irregardless

22  of Count 15.  I'm just concerned about interjecting the

23  immigration issue into the case when it really has no

24  relevance to any of the other charges.  I don't see how

25  the government is prejudiced, frankly, by severing that

1  count, as well as 16.

2       MR. MURPHY:  Well, Your Honor, as you just

3  stated, that evidence would be admissible anyway.  So

4  that evidence is going to come into trial whether or

5  not that count is severed or not.

6       THE COURT:  Right, but not his immigration

7  status.

8       MR. MURPHY:  No, Your Honor.

9       THE COURT:  Right.  All right.

10       MR. MURPHY:  Then with respect to the exhibit

11  identified by Defendant Rosales Juarez, the government

12  has already redacted that exhibit to redact the portion

13  of that exhibit in which he says -- I believe the term

14  is like deported or something like that.  That exhibit

15  otherwise would be admissible from the government's

16  perspective because it discusses his involvement in the

17  very crime before the Court, Your Honor.

18       THE COURT:  All right.  The Court on its own

19  motion is going to sever Count 15.  It will be tried

20  separately.

21       Let me deal with these motions.  We have

22  Mr. Murphy's motion for counsel to proceed out of

23  order.  That's consistent with what the Court had

24  suggested to counsel.  That motion will be granted.  I

25  assume you-all have conferred among yourselves about

 1  how to proceed with respect to various witnesses.

 2           Let me take up Defendants Torres' and

 3  Juarez's motion to exclude uncharged murders, which

 4  relates to the July 24 murder of Julio Urrutia in

 5  Alexandria and the December 2016 murder of Christian

 6  Rivas in Dumfries.

 7           Who would like to argue that one?

 8           Mr. Oates.

 9           MR. OATES:  Yes.  Good morning, Your Honor.

10  Jonathan Oates on behalf of Marvin Torres.

11           Having received much more discovery in this

12  case, as well as, you know, what the government expects

13  expert witnesses to testify to -- they're also going to

14  call a witness, Sergeant Claudio Saa, who is going to

15  be an expert in MS-13.  I believe we received several

16  transcripts from his previous testimony opining about

17  MS-13, that it's an international organization, sort of

18  how they work and operate and the structure.

19           That combined with the evidence that we know

20  that is applicable to these defendants about two

21  attempted murders, as well as a completed murder in

22  July 2017, I think any additional evidence about

23  murders that are outside of the scope of the Third

24  Superseding Indictment that don't involve or have

25  really any connection to these defendants is

1    cumulative.  It's prejudicial, and it doesn't really

2    have any probative value in showing what the government

3    needs to show.

4         So based on that, Your Honor, we would ask

5    that the government exclude evidence about those

6    murders.  They're not relevant, and they're cumulative,

7    frankly, as to the overall evidence.

8         THE COURT:  Well, I'm not sure they're

9    cumulative.  They, obviously, relate to the underlying

10   charged pattern of racketeering activity.  The question

11   I have is what kind of foundation the government is

12   going to lay that these murders are associated -- and

13   this may relate to the expert testimony -- but the

14   murders committed by these people were associated with

15   the same enterprise as the enterprise that these

16   individuals are charged with.  That just goes to the

17   structure of the enterprise.

18        But let me hear from Mr. Murphy or other

19   counsel.

20        MR. MURPHY:  Yes, Your Honor.  As the Court

21   is aware from the government's filing on this, the

22   government has a burden to prove beyond a reasonable

23   doubt that MS-13 is an enterprise that was engaged in

24   racketeering activity.  While I appreciate, you know,

25   the defense counsel venturing their opinions as to how

1   the government should go about proving those elements

2   beyond a reasonable doubt, it is not up to them to

3   determine how the government can satisfy its burden to

4   demonstrate that MS-13 is an enterprise engaged in

5   racketeering activity.

6           THE COURT:  As I understand it, based on the

7   brief information the Court has been provided on these,

8   these two murders in 2014 and 2016 were committed by

9   members of a clique other than the clique that these

10  defendants are accused of belonging to.

11          MR. MURPHY:  That's correct, Your Honor.

12          THE COURT:  As I indicated, I assume you're

13  going to lay a foundation that the enterprise -- even

14  though they're different cliques, the enterprise is, in

15  fact, the same.  I think you're going to have to do

16  more than simply establish that they both refer to

17  themselves as MS-13.

18          MR. MURPHY:  Understood, Your Honor.

19          THE COURT:  All right.  Thank you.

20          I'm going to deny the motion without

21  prejudice to reconsidering it once I hear the

22  government's foundation that they lay with respect to

23  those two other murders.  It clearly relates to, as I

24  understand the government's theory, the pattern of

25  racketeering activity with respect to the enterprise

1   that's charged in several of these counts.

2           Let me take up the government's motion to

3   preclude cross-examination of cooperating witnesses on

4   the basis of uncharged prior bad acts, which is

5   Document No. 310.  These are the murders in

6   El Salvador.

7           MR. MURPHY:  Correct, Your Honor.  As the

8   Court noted and as counsel raised, the government

9   intends to introduce evidence that MS-13 was a

10  racketeering enterprise -- excuse me -- an enterprise

11  engaged in racketeering activity by demonstrating that

12  pattern of racketeering activity via two murders that

13  occurred in the Eastern District of Virginia and via

14  witnesses who had direct participation in those

15  murders.

16          What the government's motion, however, seeks

17  to preclude is those witnesses are from El Salvador.

18  They were MS-13 gang members, remained MS-13 gang

19  members before they came to the United States.  And via

20  the disclosures made by the government, the government

21  identified that each of those individuals relayed

22  information that they had participated in other bad

23  acts that were not charged in El Salvador, a different

24  country, not in this district.

25          It's the government's position that --

1          THE COURT:  But according to the government,
2  the same enterprise?
3          MR. MURPHY:  Correct, Your Honor.  But
4  they're uncharged acts in a different country, and so
5  it's the government's position that while it is
6  certainly fair to inquire about charges or convictions
7  by which these individuals have participated in, there
8  is no basis to inquire on cross-examination about
9  uncharged criminal conduct in a different country, Your
10  Honor.
11          THE COURT:  The only aspect of this that
12  occurs to me deserves consideration is with respect to
13  their motivation for cooperating.  As I understand it,
14  they will be testifying as cooperating witnesses.
15          MR. MURPHY:  Correct, Your Honor.
16          THE COURT:  Obviously, they hope to get some
17  benefit from that.  The benefit they hope to get, I
18  suspect, is evaluated from their perspective based on
19  the exposure they face and certainly at sentencing, I
20  would think, all their conduct would be relevant
21  conduct whether it occurred here or in El Salvador.
22          MR. MURPHY:  That may be true, Your Honor,
23  but we're not dealing with those individual sentences
24  before the Court.
25          THE COURT:  No, but you're dealing with their

1   motivation to cooperate.

2           MR. MURPHY:   The government will be

3   addressing via direct their motivation to cooperate,

4   including the fact that they are seeking, for example,

5   reductions in their sentences, including, for example,

6   that they had been -- that there had been discussions

7   and conversations about the Witness Protection Program.

8   So that would certainly be addressed on direct.

9   Certainly, there is every ability by defense counsel to

10  address on cross those motivations.

11          But again, the relevance of, you know,

12  uncharged crimes in El Salvador that might come up at

13  their sentencing before, you know, their judge here in

14  the district really isn't a basis to include that

15  material in the trial because they're not on trial --

16  or they're not at their sentencing in which that

17  information would be relevant.   That would be included

18  in their PSRs that go in front of the sentencing court,

19  but it's no reason to engage in that line of

20  questioning here before the Court where the jury should

21  be focused on the charged acts, which they will be

22  testifying concerning here at trial, and any charged

23  crime for which they've actually been convicted here in

24  this country, not uncharged crimes which have not been

25  the subject of any conviction in El Salvador.

1            THE COURT:  All right.  Who would like to

2    respond to this?

3            Mr. Walsh.

4            MR. WALSH:  I'd like to respond to that.

5            So as the Court recognizes, on

6    cross-examination, we can get into the issue of their

7    cooperation, the reason why they cooperated.

8            THE COURT:  I will tell you:  I'm not sure it

9    helps to bring out that these cooperating witnesses

10   committed other murders as part of the government's

11   enterprise that they're claiming is here, but go ahead.

12           MR. WALSH:  It's a double-edged sword.  The

13   issue becomes this:  If they're cooperating because

14   they don't want to be deported for a couple of reasons.

15   They're either going to get killed when they're

16   deported, or they're going to be arrested and

17   prosecuted for murders.  So that gives them the

18   incentive to say what the government wants them to say,

19   to make false statements, to make inconsistent

20   statements.  So I think it does go to that.  It is a

21   double-edged sword because it puts out the violent

22   nature of the alleged gang.  But on the other hand, I

23   can't remember the witness talking about having prior

24   versions.  Either he is going to go back and get killed

25   or be arrested and prosecuted.  I think it was four

1   murders he was alleged to be involved in, which goes

2   right to the motive of why they want to cooperate and

3   stay in the United States and not be deported and have

4   the government help them and everything else.  They're

5   going to say whatever the government wants to hear.

6                THE COURT:  All right.  Thank you.

7                Anyone else for the defense?

8        (No response.)

9                THE COURT:  All right.  Mr. Murphy, anything

10  else you want to say on this?

11               MR. MURPHY:  I just want to note --

12               THE COURT:  I'm sorry.  Did we have another

13  defense counsel?

14               Yes, Mr. Krischer.

15               MR. KRISCHER:  Thank you, Judge.

16               I just wanted to add.  Just with the criminal

17  enterprise instruction that is not to be used to

18  determine any of our clients' guilt, not to suggest

19  what the government should do.  But any concern about

20  the jury being confused could also be addressed through

21  an instruction that any testimony elicited regarding

22  uncharged conduct should only be judged as to their

23  veracity.

24               Not to keep repeating, but again, it's the

25  stakes that become important.  If all they're going to

1   do is be deported, that's one thing.  But if they're

2   going to be deported and prosecuted in their own

3   country, that's something entirely -- but a jury

4   instruction would solve the problem that the government

5   is talking about.

6           THE COURT:  All right.  Mr. Murphy.

7           MR. MURPHY:  Just two quick points on the

8   deportation issue.  As defense counsel is aware, each

9   of these individuals is serving a life sentence for the

10  crimes that they committed in this district.  So they

11  are not -- there is not a scenario at this point in

12  time where they are going to be released from prison

13  and deported to El Salvador.  Certainly, the defense

14  has not established at this point that they would be

15  deported and prosecuted in El Salvador for crimes that

16  occurred years ago, Your Honor.  So there's no basis --

17  at this point, this is entirely speculative with

18  respect to whether there would be two individuals who

19  are serving life sentences would be deported to

20  El Salvador and then, if and when that should happen,

21  they would be prosecuted by government authorities in

22  El Salvador for crimes that occurred years ago, Your

23  Honor.

24          THE COURT:  We're talking about one witness?

25          MR. MURPHY:  Two witnesses, Your Honor.

1          THE COURT:  Two witnesses.

2          MR. MURPHY:  Yes.

3          MR. WALSH:  If I may respond?

4          THE COURT:  Yes.

5          MR. WALSH:  One witness -- and I have to look

6    through my notes -- is not serving a life sentence.  He

7    is a cooperating witness.  He's, I assume, a strong

8    witness for the government against us.  He's involved

9    in both attempted murders, and he is doing no jail

10   time.  And he's asked for papers from the government

11   not to be deported.  I think it's because he has a

12   chance of getting killed or prosecuted.  I don't know.

13   I think it's fair for us to ask him and get into that.

14          He is not serving a life sentence at all.  As

15   a matter of fact, I think -- he's a juvenile prosecuted

16   with 179 days in jail with 179 suspended.  Yet, he

17   committed both attempted murders.

18          THE COURT:  All right.  I think that the

19   conduct of these individuals, including their conduct

20   in El Salvador, is relevant to their motivation to

21   cooperate and could be viewed as affecting their

22   willingness to testify and what they testify to with

23   the hopes of getting benefit in connection with the

24   sentencing and deportation issues.  So the Court is

25   going to deny the government's motion.

1          Let me take up a related one, and that is the

2  motion to preclude cross-examination concerning an

3  unresolved internal administrative investigation.  I

4  read the opposition.

5          Mr. Murphy, it's unclear to me who we're

6  talking about and what we're talking about.

7          MR. MURPHY:  With respect to the OPR

8  investigation, Your Honor?

9          THE COURT:  Yes.

10          MR. MURPHY:  This is a government witness,

11  Forensic Analyst Jeff Wise, with HSI.  He conducted

12  cell phone extractions in this case, Your Honor.

13          THE COURT:  Oh, I see.  He is not a

14  cooperating witness.

15          MR. MURPHY:  No.  And the government

16  vis-a-vis fulsome in its *Giglio* disclosures disclosed

17  the fact that he had an ongoing internal investigation

18  that was not relevant to his veracity and had no

19  relation to this case.  The government disclosed that

20  he filed a whistleblower complaint on a completely

21  unrelated matter.  There is an OPR investigation

22  concerning whether or not the information he disclosed

23  was consistent with HSI's policies and regulations.  It

24  bears no relevance in this case, but the point is --

25          THE COURT:  Right.  This is all unadjudicated

1    at this point.

2              MR. MURPHY:  Correct.  And that's the point.

3    Whether it's relevant to this case or not is the point.

4    It is not a final finding of any adverse behavior on

5    the part of Mr. Wise.  So they are not permitted to

6    inquire about nonfinal, unadjudicated ongoing

7    investigations.  That was the point of the government's

8    motion, Your Honor.

9              THE COURT:  All right.

10             Who wants to respond to this, if anyone?

11             Mr. Krischer.

12             MR. KRISCHER:  Thank you, Judge.

13             That was my response.  You know, I think what

14   we just learned now is more information than was

15   provided to defense counsel, that it was regarding --

16   whether or not he followed regular policies.  That's

17   not information I had at the time that I filed the

18   motion.

19             However, again, I'm not sure what those

20   policies are, but I'm sure there are also policies

21   related to the analysis that he did.  If there's a

22   question about whether or not he is following some

23   policies, certainly --

24             THE COURT:  Well, you can get into that

25   without getting into the fact of an internal

1    investigation.

2                MR. KRISCHER:  That's correct, Judge.

3                Again, that information was not provided to

4    counsel.  All we had was this information that he had

5    difficulty concentrating and there was an OPR

6    investigation.  So it was difficult to agree to that or

7    not oppose it without the information provided today.

8                THE COURT:  All right.  The Court is going to

9    grant the government's motion and not permit

10   cross-examination based on that internal administrative

11   investigation.

12               Defendant Juarez's motion to redact

13   information pertaining to immigration status, I think

14   the government has indicated that's already been done

15   with respect to the exhibit that would reference that.

16   So that motion is moot.

17               The government's request for judicial notice,

18   any objection from defense counsel on that?

19       (No response.)

20               THE COURT:  The Court will grant that motion

21   to take judicial notice that the Counties of Prince

22   William, Fairfax, and the City of Manassas are in the

23   Eastern District of Virginia; Eastern Daylight Time is

24   four hours behind Coordinated Universal Time, and

25   Eastern Standard Time is five hours ahead of Universal,

1  UTC, Time.

2          Let me take up Torres' first motion in limine

3  to exclude irrelevant evidence of prior bad acts, which

4  relates to Facebook messages.

5          MR. OATES:  Thank you, Your Honor.

6          Mr. Torres is charged with conspiracy to

7  distribute cocaine in Count 5.  The Indictment goes on

8  to say also conspiracy to distribute marijuana from the

9  period of time from January 2019 to August 2019.  The

10  government has introduced exhibits that it plans to

11  introduce showing marijuana, but basically pictures of

12  marijuana going back and forth with another person in

13  early to mid-2017.  Based on the charge that he has,

14  they aren't relevant to any charge that he has in the

15  conspiracy to distribute cocaine or marijuana from

16  January 2019 to August 2019.

17          In the government's response, they state that

18  it's something that's part of the racketeering scheme

19  that begins in 2017, and it's encompassed by that.  I

20  don't think that -- I mean, the government has to

21  lay -- in order for those things to be admissible, the

22  government has to lay the foundation that any Facebook

23  messages about marijuana in 2017 were related to the

24  gang and that Mr. Torres was even participating in the

25  gang around that time and that any pictures of

1   marijuana sent through Facebook were related and in

2   advance of the gang.  So without that foundation, Your

3   Honor, we would ask that the Court exclude those

4   exhibits.

5          THE COURT:  How many exhibits are there?

6          MR. OATES:  There's a lot.  I mean, there's,

7   frankly, approximately 50 to 60 pages of Facebook

8   records sort of going back and forth.

9          THE COURT:  You want excluded the reference

10  to marijuana and the pictures of the marijuana baggies;

11  is that right?

12         MR. OATES:  Yes.  I mean, any reference to

13  marijuana or the pictures going back and forth in the

14  baggies, correct.

15         THE COURT:  All right.  Mr. Murphy or other

16  counsel?

17         MR. MURPHY:  Yes, Your Honor.  To be clear,

18  what counsel is referring to are eight Facebook

19  exhibits which contain messages between Marvin Torres

20  and other individuals on Facebook.  To be very clear,

21  not all of those messages discuss drug distribution.

22  Some of those messages discuss, for example,

23  identifying rival gang members and, for example, using

24  a machete to attack rival gang members.  To be clear,

25  not all of the exhibits within those eight exhibits --

```
 1              THE COURT:  As I understand, he's talking
 2   only about pictures and messages regarding marijuana
 3   between June and July of 2017.
 4              MR. MURPHY:  There is one picture of a bag of
 5   marijuana that is exchanged in those eight exhibits.
 6   To be very clear, the government has never alleged that
 7   those exhibits pertain to his conspiracy to distribute
 8   narcotics in 2019.
 9              THE COURT:  Right.
10              MR. MURPHY:  What the government very clearly
11   set forth in the RICO and VICAR charges with which
12   Marvin Torres is charged in this case is that MS-13 is
13   an enterprise that engages in racketeering activity and
14   has done so since at least 2017.  The Indictment
15   identifies drug distribution very specifically as a
16   racketeering activity that MS-13 engages in.
17              That evidence, whether or not Marvin Torres
18   was involved or not, would be indicative of MS-13's
19   involvement in the racketeering activity of drug
20   distribution, particularly in light of the fact that
21   the government will be admitting evidence -- seeking to
22   admit evidence at trial of Marvin Torres' own
23   statements, in which he identified himself as a *chequeo*
24   in MS-13 for over two years.  And this was in 2020.
25              The government's evidence will establish that
```

1  you don't walk into MS-13 as a *chequeo*.  There are

2  ranks, two ranks, in fact, that you have to achieve

3  before you become a *chequeo*.

4        So the government's evidence will very

5  clearly establish that in 2017, Marvin Torres was

6  associated with the MS-13 gang and was distributing

7  marijuana on behalf of the gang.

8        But, again, the point of those exhibits is

9  not about Marvin Torres.  It's that those involved and

10  associated with MS-13 participate in the racketeering

11  activity of drug distribution.  And on that basis,

12  there is no basis to exclude the exhibits the

13  government seeks to admit, Your Honor.

14        THE COURT:  What specific exhibits are we

15  talking about?  Do you have the numbers?

16        MR. MURPHY:  These are Exhibit Nos. 28-3A

17  through 28-10A, I believe -- 10B, Your Honor.

18        THE COURT:  All right.  I'll look at those

19  exhibits and make a ruling.

20        All right.  Let me take up the motion to

21  exclude the photos of the victims.  It would be, I

22  believe, Defendant Moreno's motion, 306.

23        MR. WALSH:  That is correct, Your Honor.

24        THE COURT:  Before we do that, Mr. Murphy,

25  how many photos are we talking about?  Are we talking

1  about photos of each of the victims?

2          MR. WALSH:  I can explain to the Court.

3          THE COURT:  All right.

4          MR. WALSH:  So Government Exhibit 4-5A

5  through 4-5X.

6          THE COURT:  Hold on.  4-5A through?

7          MR. WALSH:  4-5X.

8          THE COURT:  All right.

9          MR. WALSH:  Guevara, he is the victim in the

10 2017 murder.

11         THE COURT:  He's the Charlottesville murder.

12         MR. WALSH:  The Charlottesville murder.

13         It's 24 pictures.  The government responded

14 that I was moving to exclude both crime scene photos

15 and autopsy photos.  My motion was generally for

16 autopsy.  I've tried some cases before.  Generally,

17 autopsy pictures don't come in.

18         THE COURT:  These are the autopsy photos that

19 you've mentioned?

20         MR. WALSH:  Yeah, those are the autopsy.

21         And I think there's repetitive or cumulative

22 crime scene photos that we should address.  The other

23 one is Government's 59-5A through P, and that's Rivas'

24 autopsy pictures.  There's 16 of those, Judge.

25         THE COURT:  Whose are they?  Guevara's?

1              MR. WALSH:  No.  It's Rivas.  That the 2016
2  Christian Rivas murder, Judge.

3              THE COURT:  Right.

4              MR. WALSH:  So it's basically 24 photos and
5  then 16 photos.

6              The Court -- I, obviously, did research on
7  this, and the government is right that they have a
8  right to show various factors of the murder.  However,
9  some of these photos are just -- they're cumulative,
10 and the relevance is outweighed by the substantial
11 unfair prejudice.  They appear to be -- I don't want to
12 say -- but they are going to arouse the sympathy and
13 prejudice of the jury.  They're just offensive.  One of
14 the pictures is basically a liver in a bowl.  I know
15 it's pictures taken because there's a laceration in the
16 liver.  But at this point in time, the medical
17 examiners will be testifying.  So they can describe
18 what they need as to the injuries.

19             If the Court looks at these pictures, again,
20 they're cumulative and highly prejudicial.  You know,
21 one of -- as we've all seen autopsy pictures, the scalp
22 is cut open.  They peel it back.  They cut the skin
23 back, peel it back, go in the scalp, take the brain
24 out.  There's one where the torso is just wide open.
25 Obviously, those are, you know, pictures taken during

1   the autopsy.  You know, the victim wasn't cut open with

2   a torso ripped open.  That was done by the medical

3   examiner as she or he -- I think it's all shes --

4   proceed.

5           So my basis is it's going to be shocking to

6   the jury.  It's cumulative.  Like I said, the ME is

7   going to be a witness.  The ME can describe to the jury

8   the injuries without having to display these gruesome

9   pictures.

10           THE COURT:  All right.  Mr. Murphy.

11           MR. MURPHY:  Your Honor, as the government --

12           THE COURT:  Do you agree that that's the

13   universe of the photos that we're talking about,

14   Exhibits 4-5A through 4-5X and 59-5A through P?

15           MR. MURPHY:  It's also the government's

16   understanding -- and it was certainly put forth in the

17   motion anyways -- that he was seeking to exclude crime

18   scene photographs, which would also include

19   Government's Exhibits 1-1 --

20           THE COURT:  I understand he's not pursuing

21   that.

22           MR. WALSH:  Well, Judge, I've got to be

23   honest with you.  I did put it in the motion, but there

24   are some gruesome crime scene photos.  I didn't

25   identify those for the Court.  If the Court gives me a

1  second, I can go back and look at them.  I have the
2  exhibits here.
3          THE COURT:  All right.  Go ahead, Mr. Murphy.
4          MR. MURPHY:  So it is the government's
5  understanding that he is seeking to exclude not only
6  just autopsy photos but crime scene photographs, which
7  would be Government's Exhibits 1-1A to 1M, as well as
8  1-2A to 1M.
9          As the government set forth in its motion,
10 however, not every exhibit identified on the
11 government's exhibit list does the government intend to
12 introduce at trial.
13         For example, some of those medical examiners
14 may need to review some of those photos, which are
15 never entered into evidence but which to testify about.
16         THE COURT:  I understand.
17         MR. MURPHY:  That's really the necessity for
18 several of those pictures.  As the government says, we
19 intend to introduce an extremely limited subset of
20 autopsy and crime scene photos.  I believe we've
21 identified seven crime scene photos --
22         THE COURT:  All right.
23         MR. MURPHY:  -- that identify the victim.
24 Specifically, Marvin Rivera Guevara and where he is
25 recovered and an autopsy photo that identifies the body

1    bag with his name identifying him as the individual in

2    the autopsy.  Similarly, with respect to the autopsy in

3    Government's Exhibit 59 raised by counsel pertaining to

4    Christian Sosa Rivas.  The government intends to

5    introduce evidence that that is, in fact, Christian

6    Rivas' body in the body bag for which the autopsy was

7    recovered.  It doesn't intend to show in order to shock

8    the jury's conscience or anything of that matter.  The

9    actual autopsy photos.

10          As the government noted, not every exhibit on

11   this list is going to be entered at trial, as the Court

12   is well aware.  Some of those exhibits are necessary

13   for the individuals who are testifying to be able to

14   testify whether or not they are published to the jury

15   or admitted into evidence, Your Honor.

16          THE COURT:  These would be used in connection

17   with the coroner's testimony?

18          MR. MURPHY:  Correct, Your Honor.

19          THE COURT:  All right.

20          MR. MURPHY:  And the crime scene photos would

21   be specifically with respect to 1-1A to 1M and 1-2A to

22   1M would be used with respect to one of the cooperating

23   witnesses who was there on that crime scene and a

24   detective who was also there to investigate that crime

25   scene.  So those photos would not be coming in through

 1  the testimony of a medical examiner.

 2           THE COURT:  But you intend to offer into

 3  evidence 1-1A through 1M and 1-2A through 1M?

 4           MR. MURPHY:  Seven of those photos between --

 5           THE COURT:  All right.  What I'd like you to

 6  do is if you could actually identify specifically,

 7  before the witness testifies, the specific photos that

 8  you want to enter into evidence, and the Court will

 9  make a ruling on those.

10           MR. MURPHY:  Sure.

11           THE COURT:  All right.  If you would, notify

12  defense counsel in advance as well of which ones you

13  are going to offer.

14           MR. MURPHY:  If it's okay with the Court, we

15  will email the Court's clerk and CC counsel with the

16  photographs we intend to enter.

17           THE COURT:  That would be great.

18           All right.  Let me take up Torres' second

19  motion in limine to exclude evidence of prior bad acts

20  based upon the rank.

21           MR. OATES:  Good morning again, Your Honor.

22           This was our motion to exclude sort of

23  blanket statements by some witnesses as to what

24  somebody needs to do in order to achieve a certain

25  rank.  My understanding is that the government is going

1  to set forth and argue evidence that my client has

2  achieved the rank of *chequeo* within the gang.

3          Some of the witnesses that have identified

4  them state that -- or plan to testify that in order to

5  achieve that rank, in order to achieve the rank of

6  *chequeo*, that somebody had to have committed a murder

7  in the past.  There's no evidence that my client has

8  committed a murder, but once the jury hears that, they

9  are going to improperly assume that my client has

10 committed some sort of murder in the past.

11         It's a prior bad act and a taint that, I

12 think, is going to be difficult for him to overcome and

13 them having to prove the case beyond a reasonable doubt

14 if the jury assumes, you know, without any foundation,

15 without any evidence, just sort of a blanket statement

16 that in order for him to have that rank, he must have

17 committed a murder in the past.

18         I believe that there may be some evidence of

19 that from the government's expert witness, Sergeant

20 Saa.  More specifically, from a particular witness who

21 is going to testify about one of the old murders.  It

22 just is --

23         THE COURT:  What are you expecting that

24 witness to say relative to your client?

25         MR. OATES:  We're expecting that witness to

1   say that in order to attain the rank of *chequeo*, that

2   somebody has to have committed a murder.

3            THE COURT:  But not specifically as to

4   Mr. Torres?

5            MR. OATES:  Not specifically as to

6   Mr. Torres, but there's going to be evidence that

7   Mr. Torres is a *chequeo*.  Therefore, he has committed a

8   murder in the past.

9            THE COURT:  All right.

10           MR. OATES:  Thank you, Your Honor.

11           THE COURT:  All right.  Mr. Murphy.

12           MR. MURPHY:  This motion is somewhat unusual

13  insofar as counsel has identified a prior bad act --

14  that should have been identified as 404(b) -- without

15  specifying what exactly the prior bad act that his

16  counsel has -- there's going to be evidence that his

17  defendant, Mr. Torres, has committed.  As counsel just

18  said, there is no evidence that the government intends

19  to present that Mr. Torres committed a murder.

20           THE COURT:  Except by implication.

21           MR. MURPHY:  Right.  And so there is no

22  404(b) by implication, Your Honor.  As the government

23  has set forth repeatedly, frankly, in responses to

24  Mr. Torres, his client, Mr. Torres, has been charged

25  with engaging in racketeering activity with an

1   enterprise that engages in racketeering activity.

2   There will be evidence of the rank structure of that

3   enterprise because the law requires the government to

4   prove that an enterprise is an organization with

5   structure.

6            And for that reason, multiple government

7   witnesses will testify about the enterprise's

8   organization and structure, which includes the ranks of

9   the MS-13 gang and which includes, in addition to

10  having to prove the organization and structure, very

11  specifically VICAR requires that the government prove

12  that acts of violence are committed in order to

13  maintain or increase one's position in that

14  organization.

15           Therefore --

16           THE COURT:  That's what's required by way of

17  proof as to the conduct of a specific defendant,

18  correct?

19           MR. MURPHY:  Correct, Your Honor.

20           THE COURT:  Right.

21           MR. MURPHY:  And so the government will

22  establish through multiple witnesses that MS-13 gang

23  members commit violent crimes, to include murder, in

24  order to maintain or increase their positions in the

25  gang.

1          There is no way for the government to
2  establish that evidence without telling the jury what
3  the commission of violent crimes does with respect to
4  moving up or not within the organization of MS-13,
5  which VICAR very specifically requires that you have to
6  demonstrate violent acts are committed in order to
7  maintain or increase one's position in the gang.
8          But setting that aside, what counsel is
9  specifically seeming to refer to here is a *Giglio*
10 statement that the government provided as part of the
11 *Giglio* disclosure, again, which circles back to the
12 uncharged murders in El Salvador, that when he became a
13 *chequeo* in El Salvador, he became so by being involved
14 in a murder in El Salvador.
15         The government doesn't intend to -- had no
16 intention of -- because we had just submitted a motion
17 to exclude getting into murders in El Salvador, the
18 government had no intention of eliciting from that
19 individual whether or not he committed a murder in
20 El Salvador in order to become a *chequeo*.  The
21 government intends to elicit information that he was a
22 *chequeo* when he came to the United States.  That is
23 separate and apart from what we provided as *Giglio* to
24 defense counsel, and we also filed a motion to exclude
25 that *Giglio* very specifically, Your Honor.

1             THE COURT:  The Indictment does not allege

2    that Torres committed a murder or conspired to commit a

3    murder in order to achieve the rank of *chequeo*.  He was

4    already a *chequeo*.

5             MR. MURPHY:  The Indictment alleges that

6    Mr. Torres conspired to commit a murder and that the

7    reason that the violent crime was committed was in

8    order to increase or maintain one's rank within the

9    gang.

10            THE COURT:  Right.  The government alleges

11   that he already had that rank when he committed the

12   crimes alleged in Counts 1 and 4.

13            MR. MURPHY:  Correct, by his own statement.

14            The government alleges that in order to

15   maintain, which is one thing.  So to maintain the rank

16   of a *chequeo* or increase one's rank from *chequeo* to

17   homeboy, you have to commit violent acts, Your Honor.

18            THE COURT:  It seems to me that there is a

19   concern about blanket testimony that in order to

20   achieve the rank of *chequeo*, you need to have committed

21   a murder, which is not the predicate for either of

22   these two counts.  It seems to me that the witness

23   could certainly talk about the structure of MS-13 and

24   the different ranks and that people achieve those ranks

25   through committing various criminal activities without

1    specifically attributing to the *chequeo* rank the need

2    to commit a murder.

3              How would that materially limit you?

4              MR. MURPHY:  Well, for one, it's not various

5    activities by which they move up in rank.  The

6    witnesses will very clearly testify that it is a

7    specific activity.

8              THE COURT:  For that particular rank.

9              MR. MURPHY:  One specific activity that you

10   need to commit in order to move up in rank in MS-13,

11   and that is to commit murders.  We're not talking about

12   you can go deal drugs or you can extort some money and

13   move up in rank.  That is not how the rank structure or

14   maintaining or increasing position, which the

15   government has to prove at trial, occurs in MS-13.  So

16   that would significantly limit the evidence that the

17   government -- the ability for the government to prove

18   its elements when in order to move up in rank in MS-13,

19   you have to commit a specific violent activity.

20             THE COURT:  Right.  You can get all that in

21   without specifically attributing to the rank of *chequeo*

22   a murder.  You could say that in order to move up, as I

23   understand the testimony, the members are expected to

24   engage in certain conduct and to achieve higher ranks,

25   they have to engage in more serious crimes, including

1   murder.  It seems to me that lessens the implication
2   directly attributable to what would be viewed as
3   Mr. Torres' prior conduct.

4           It seems to me that you can ask the question
5   in a way that gets out all the information you want
6   which minimizes the prejudice that I appreciate exists.
7   It's simply saying, If you're a *chequeo*, you've had to
8   commit a murder.

9           MR. MURPHY:  Right.  So as the government
10  said, we don't intend to elicit that testimony from the
11  witness identified by Mr. Oates pertaining to
12  Mr. Torres.  What we intend to elicit is testimony from
13  a gang expert and those who are involved in MS-13 --

14          THE COURT:  No.  I understand.

15          MR. MURPHY:  -- that in order to move up in
16  rank in MS-13, you have to commit murders.  The
17  government --

18          THE COURT:  That's fine.  But I think if it
19  stops there, you minimize the implication that -- you
20  don't necessarily make a connection to a *chequeo*, which
21  I think is the concern.

22          MR. MURPHY:  Right.  As I said, the
23  government doesn't intend to elicit that information
24  from that witness.  What the testimony will be is that
25  in order to become a homeboy, who is an official member

1   in the gang, you have to commit a murder or murders

2   depending on your clique.  That will be the testimony.

3           THE COURT:  Are any of these defendants

4   alleged to be homeboys?

5           MR. MURPHY:  No.

6           THE COURT:  All right.  It seems to me we can

7   work through this in a way that minimizes the prejudice

8   while allowing the government to bring out what you

9   want.

10          MR. MURPHY:  As the government represents, we

11  don't intend to ask that witness whether or not he

12  committed a murder to become a *chequeo*.  Again, it was

13  an incident that occurred in El Salvador.  It's the

14  government's position that that's not relevant to the

15  issues before the Court, Your Honor.

16          THE COURT:  What I want to avoid is specific

17  testimony, specific blanket testimony that in order to

18  have achieved the *chequeo* rank, you have to have

19  committed a murder.

20          MR. MURPHY:  Understood.

21          THE COURT:  All right.  Mr. Oates, any more

22  on this?

23          MR. OATES:  I think that alleviates my

24  concern, Your Honor.

25          You know, in the *Giglio* materials, you know,

1  there is one witness who said that the prospective

2  member must commit a murder in order to achieve the

3  rank of *chequeo*.  Everybody else says that you must

4  commit a murder in order to achieve the rank of

5  homeboy.  If the government is not going to elicit any

6  evidence or testimony that in order to be a *chequeo*,

7  you have to commit a murder -- which it sounds like

8  they don't -- then I think that --

9          THE COURT:  All right.  I think we can get

10 through this.

11         MR. OATES:  Thank you, Your Honor.

12         THE COURT:  All right.  Let's take up

13 Defendant Juarez's motion to exclude government's

14 translation exhibits of wiretaps generally and

15 Government's Exhibit 18-25A specifically.

16         Mr. Murphy, have you reviewed whether you-all

17 can agree that someone is saying "*son*" instead of

18 "*sos*"?

19         MR. MURPHY:  Your Honor, to be very clear,

20 there is no basis to exclude that particular exhibit or

21 the entire swath of T-3 audios because he has an expert

22 who has translated a word differently from the

23 government's --

24         THE COURT:  Right.  I'm just talking about

25 that one specific.

```
 1              MR. MURPHY:  So with respect to that one
 2   specific --
 3              THE COURT:  Have you-all gone back and looked
 4   at it?
 5              MR. MURPHY:  So the translator has translated
 6   what he has translated.  He will testify to his
 7   translations, and he will certainly be testifying to,
 8   you know, during his direct that there are different
 9   interpretations for different words.  He's not an MS-13
10   gang member.  So he is doing these translations based
11   on the context as he reviews it.
12              There will be every opportunity for
13   Mr. Krischer to cross-examine that particular witness
14   as to whether or not this particular word in this
15   particular exhibit was translated correctly.  There
16   will be every opportunity for Mr. Krischer to present
17   his own expert.
18              THE COURT:  My only question was in light of
19   this motion, have you gone back to your translator and
20   asked them to just review that one word?
21              MR. MURPHY:  No, the government has not
22   because it's the government's position that he has
23   translated what he's translated and he will testify to
24   those translations.  And to the extent that there is,
25   you know, any issue, those can be -- any issue in any
```

1    of the translations that he's made in this case, those

2    will be addressed by counsel as they see fit during

3    cross-examination or via any other expert that they

4    would like to bring in concerning the translations in

5    this case.  The government is not now going to have a

6    translator change the translation because his expert

7    disagrees with what that word means, Your Honor.

8              THE COURT:  All right.  Mr. Krischer.

9              MR. KRISCHER:  Thank you, Judge.

10             And just to be clear -- because I think the

11   government misstated my motion -- I did not move to

12   exclude the T-3 evidence.  I moved to exclude the

13   demonstrative evidence, which specifically is going to

14   be the A -- so the series 18, 20 -- the 18 series and

15   the 19 series.  The A exhibits are the translations,

16   and the B exhibits are the actual audio.  Nowhere did I

17   file a motion arguing that the audio should not be

18   admitted.  In fact, this Court already ruled on that

19   with Defendant Tovar, that the T-3 audio is admissible.

20             Specific is whether or not this demonstrative

21   evidence comes --

22             THE COURT:  What's the demonstrative

23   evidence?

24             MR. KRISCHER:  It's going to be the actual

25   transcript of the audio.

1          THE COURT:  The transcript.  I see.

2          MR. KRISCHER:  The exhibit has two columns.

3  One is a transcription of the recording, and the other

4  is English translation.

5          Again, it's a misstatement to say that I

6  disagree with their expert.  If he believes that the

7  word was "*son*," then he properly translated as "they."

8  That's not the issue.

9          THE COURT:  Why is that material?

10          MR. KRISCHER:  Well, because very

11  specifically, the statement at issue is whether or not

12  one of the once-upon-a-time codefendants is saying

13  specifically with regard to Mr. Rosales Juarez whether

14  or not he is or is not in the gang.

15          So the way that it's translated is he didn't

16  explain.  So it's someone that suspects or thinks that

17  they are from Mara and they don't know they are not.

18          Objectively, that makes no sense, they don't

19  know they are not.  The proper -- not the proper

20  translation.  What the actual recording says is, So

21  someone thinks, suspects or thinks you are from Mara

22  and they don't know you are not.

23          And his participation and involvement in the

24  gang is directly at issue in the case.

25          THE COURT:  Right.

```
1              MR. KRISCHER:  So we're not asking the
2   government -- we're not saying "son" doesn't mean
3   "they."  What we're saying is that the demonstrative
4   evidence is incorrect.
5              THE COURT:  All right.
6              MR. KRISCHER:  And the demonstrative evidence
7   is not the evidence.  It's the audio recording.
8              THE COURT:  Other than this one word, what's
9   the other objection?
10             MR. MURPHY:  Well, I have only reviewed the
11  statements with regard to my client.  But this is
12  material.  And so the issue is going to be that when or
13  if the jury gets all of these transcriptions, then they
14  are not going to necessarily rely on their own memory
15  of what the recording said or what the court
16  interpreter translated as the testimony comes in but
17  instead replace that recollection, replace the
18  translator's interpretation with the government's own
19  recollection of what the recording says.
20             THE COURT:  All right.
21             MR. KRISCHER:  So there's really no value to
22  this other than to suggest to the jury this is what was
23  actually said.
24             THE COURT:  Right.  You have your own
25  translator that would be prepared to testify on this
```

1   issue?

2          MR. KRISCHER:  I certainly could.  Again, the

3   issue is not the translation.  The issue is what the

4   actual recording says.

5          THE COURT:  Hold on.  The interpreters need a

6   moment.

7          All right.

8          MR. KRISCHER:  So I just want to be very

9   clear, Judge, that that becomes the issue.

10          THE COURT:  It's a factual issue.

11          MR. KRISCHER:  It's a factual issue.

12   However, the government is going to introduce evidence

13   stating what the content of the recording, which is

14   separately going to be admitted, says.

15          THE COURT:  All right.  Mr. Murphy.

16          MR. MURPHY:  Just very briefly.  As defense

17   knows and as, I think, the Court is aware, the audios

18   are predominantly in Spanish.  When I say

19   predominantly, I mean 95 percent in Spanish.  The

20   government has no intention of playing Spanish audios

21   to the jury at trial.  The government doesn't believe

22   that everyone on the jury is going to speak Spanish.

23          So when he says he's not seeking to exclude

24   the T-3 audios because he's only seeking to exclude the

25   demonstratives, that's not correct.  He is seeking to

1   exclude the T-3 evidence because the T-3 evidence the

2   government will produce and enter at trial so the jury

3   can understand what the T-3 audios mean because they're

4   in Spanish are the transcripts themselves, Your Honor.

5           To be clear, he has been provided those

6   audios.  He has an expert who can review those audios.

7   If there's a factual discrepancy with respect to the

8   audios, he is more than welcome to have his expert

9   testify about the audios and what the proper

10  translation, as he sees it, is, Your Honor.

11          To be very clear, the demonstrative

12  transcripts are the T-3 evidence that will be entered

13  in this case because they are the English translations

14  of those materials, which is what the jury will

15  understand.

16          THE COURT:  All right.  You intend to present

17  your translator, correct, as a witness?

18          MR. MURPHY:  Correct, Your Honor.

19          THE COURT:  All right.  It seems to me what

20  we're dealing with is simply a factual issue as to

21  what's on the tape and what it means.  The evidence is

22  going to be from the translator based on what he heard

23  and how he interprets that.  You would have the

24  opportunity to put your translator on.

25          I am going to direct the government, though,

1  to ask the translator to just review that one word to

2  make sure he is confident in his testimony.  If he is

3  not, he can say that it may be something else.  In any

4  event, he should review that word before he testifies.

5          MR. MURPHY:  Understood.

6          And given the motion, Your Honor, it was the

7  government's full expectation to specifically ask the

8  translator about that particular exhibit and whether or

9  not there were any alternate translations of that

10 particular word in the exhibit.

11         THE COURT:  All right.

12         MR. KRISCHER:  I'm sorry, Judge.  And I don't

13 mean to belabor the point, Judge.  But what I

14 understood the Court to say is that the Court wants the

15 government to have their witness go back and review

16 that particular recording.  Not to say, well, yes, it's

17 possible that "*son*" --

18         THE COURT:  Right.  That's what they are

19 going to do.  You would have the opportunity to

20 cross-examine and put your own translator on and argue,

21 as you have, that their translation, if that in fact is

22 what the translator continues to say it means, doesn't

23 make any sense.  The jury, if they want, they can

24 listen themselves and see if it, according to their

25 ear, means "*sos*" or "*son*."

1          MR. KRISCHER:  Thank you, Judge.

2          THE COURT:  All right.  Let me take up

3    Defendant Torres' motion to withdraw his request to

4    exclude agent narratives during his interview.

5          Mr. Murphy, in light of this motion, you're

6    going to put on the whole interview, or do you want to

7    stick with what you've presented to the Court?

8          MR. MURPHY:  No, Your Honor.  I mean, the

9    government is going to put on its case as the

10   government sees fit.  We don't intend to put on the

11   entire interview.  To be frank, given his motion, the

12   Court ordered us not to put in the entire interview.

13   That's how we've now prepared our case to do, Your

14   Honor.

15         THE COURT:  All right.  Mr. Oates.

16         MR. OATES:  Your Honor, when I filed that

17   motion, I mean, I had been in the case for

18   approximately a couple of months.  I was looking at

19   this case and going through all the discovery and

20   looking at things through a very, very small peephole

21   as to what I thought the evidence would show.  There

22   was a statement.  I filed a motion on the statement

23   that I thought was proper.  The judge denied the

24   voluntariness but granted about the general narrative.

25         THE COURT:  Right.

1          MR. OATES:  As I see the case now and as I

2   now have a full view of what this case looks like, it

3   is important as to the strategic part but also what I

4   believe are inconsistencies on the parts of the agents

5   writing their reviews, writing their reports, and what

6   happened to the video, that the entirety of that

7   interview be played.

8          As I think the Court probably recalls,

9   there's a lot of information that's being given to

10  Mr. Torres.  He is sort of being taught that.  That's

11  information -- that's important to explain the totality

12  and the context of any statements that he does do.  But

13  it's also incredibly important to -- it's incredibly

14  important to show what this case is about and a large

15  part of what our theory of this case is about, Your

16  Honor.

17          I know that the Court made -- at the hearing

18  date, the government argued very stringently against

19  excluding it based on that second reason of sort of a

20  narrative.  We've received a ton of information within

21  the last few days, Your Honor.  We've gotten new stuff

22  now.  It is a strategic decision that I couldn't have

23  made before, only recently, to be able to change our

24  position as to that.

25          So I don't think the government is going to

1  be prejudiced in any way.  I know that they've prepared

2  the case.  But it's a small change to play the entirety

3  of the interview rather than just the portions.  So the

4  government isn't really prejudiced.  If anything, it's

5  for the reasons that I stated in my motion.  It is

6  Mr. Torres who is being prejudiced, and that was my

7  motion, to exclude those parts and those narrative

8  parts.

9          We are now asking the Court to withdraw our

10  objection to that.  It's important and necessary for

11  our defense to play the entirety of that interview.

12          Frankly, it's Mr. Torres' decision, and it's

13  Mr. Torres' -- it doesn't impede on the government.  It

14  impedes on Mr. Torres.  Mr. Torres is wishing to waive

15  that objection, Your Honor.

16          If the government chooses to use Mr. Torres'

17  statements, we would ask that the rule of completeness

18  show that they play all of these statements and the

19  statements made towards him that elicited those

20  comments, Your Honor.  I think that that's fair.

21          Thank you.

22          THE COURT:  All right.  Anything further on

23  this, Mr. Murphy?

24          MR. MURPHY:  The rule of completeness, Your

25  Honor, requires that the statements that are entered be

1  entered with enough context in order to understand the

2  statements.  That was what the Court's order directed.

3          At the time, the Court asked the government

4  to provide the statements in the context that were

5  necessary to add the -- so that the jury could

6  understand what those statements mean.  The government

7  did that on February 17, as directed by the Court.

8          Now, today, we are being told that the rule

9  of completeness now requires that the government change

10 its own strategy which, apparently, Defendant Torres

11 can impede on on his own whim at this point in time to

12 effectuate the rule of completeness, Your Honor.

13         The statements and contexts surrounding those

14 statements that the government has already provided

15 satisfy fully the rule of completeness with respect to

16 the statements that the government intends to enter.

17 The government has a prerogative to enter its evidence

18 in its case as it sees fit, and the defense has a

19 prerogative to enter its own case and its own theories

20 as it sees fit.

21         There is nothing -- he has the full

22 transcript.  He has the full audio.  There is nothing

23 stopping him from entering whatever he wants from that

24 statement in his own case.  There's no legal right he

25 has to impede on the government's ability to enter its

1  case as it sees fit consistent with the order of this

2  Court, Your Honor.

3          THE COURT:  All right.  Anything further on

4  this?

5          MR. OATES:  I mean, the government is arguing

6  that they have the right to pick and choose which parts

7  of the interview that they play.  The Court said

8  specifically in its ruling that -- and at the end, it

9  says, The Court will therefore exclude such statements

10 except for those necessary to understand the substance

11 of Torres' answers to specific questions.

12          So to understand the substance, the exact

13 response.  So that's, you know, a sentence or two

14 before that.  What we're asking and what is

15 significant, now that I understand the full amount of

16 information in this case, is that there's context that

17 is incredibly important and necessary in order to

18 understand Mr. Torres' statement.  So it's not just

19 necessary to understand the substance; there needs to

20 be the context.

21          You know, frankly, you know, the government

22 is not prejudiced.  I mean, the government is correct.

23 I have the transcripts.  I have the full video, and I

24 can certainly cross-examine them on that.  But it was

25 our request to limit that interview.  We're withdrawing

1  that request now for important strategic defense

2  reasons having seen everything, and there really is no

3  prejudice to the government.

4          Thank you, Your Honor.

5          THE COURT:  I understand the defendant's

6  position, and I also understand that the evaluation of

7  cases evolves over time.  Nevertheless the Court did

8  rule in response to defendant's motion.  The government

9  prepared and submitted an exhibit based on that.  The

10 defendant's motion to withdraw its objections on the

11 day of trial, I think, is late, frankly.  The

12 government would be prejudiced at this point.  I am

13 going to deny the motion.  The defendant can certainly

14 put in all or part of the remaining video during its

15 case.  You can certainly cross-examine the agent.

16         All right.  The motion is denied.

17         MR. OATES:  Thank you, Your Honor.

18         THE COURT:  I believe that's it.  Are there

19 any others that we haven't addressed?

20     (No response.)

21         MR. OATES:  I don't know if the Court wanted

22 to take up the issue of additional *voir dire*.

23         THE COURT:  I've looked at the supplemental

24 submissions.  Frankly, most of those have already been

25 covered in the questionnaires.  As I indicated to

1  counsel, the Court is going to conduct *voir dire*,

2  basically require counsel to make their strikes based

3  on the information that's in those questionnaires.  I

4  am going to ask a few additional questions.  If there's

5  anything in particular you would like me to consider

6  specifically, I'll hear you on it.

7            MR. OATES:  Understood.  Thank you, Your

8  Honor.

9            THE COURT:  All right.  Is there anything?

10  Any one or two questions that you feel strongly about

11  that haven't been asked?

12            I am going to inquire about whether any

13  members of the panel have been affected or experienced

14  anything they attribute to gang activity and that kind

15  of thing.  Other than that, I am going to require

16  counsel to rely on the answers that have already been

17  provided in these questionnaires.

18            MR. OATES:  Certainly.

19            The Court's very brief indulgence, Your

20  Honor.

21            Your Honor, Question No. 5 I would ask that

22  the Court give.  Question No. 5 is in this case, you

23  will hear allegations -- spelled here wrong -- you will

24  hear allegations that the defendants committed crimes

25  where they were members of MS-13.  Is there anyone that

1  feels that a defendant is more likely to have committed

2  those crimes because he associates with members of

3  MS-13?

4          I think one of the -- this gets at, you know,

5  an important part.  Obviously, there's Count No. 1,

6  which encompasses sort of everything, the entirety of

7  the racketeering charges, but then there are individual

8  counts.  My client and the other defendants are

9  presumed innocent of those charges as well.  The

10  government has to meet its burden beyond a reasonable

11  doubt, you know, for all of those charges as well.

12          The problem with the overall racketeering

13  charge and then the presumption of innocence on each of

14  the individual charges is that it sort of bleeds over

15  into, well, you know, he's involved in this

16  racketeering.  He associates with other MS-13 members.

17  He probably, you know, is guilty of what else they're

18  charging him with.  So, you know, this is a specific

19  question to come at that.

20          You know, there are some jurors who, frankly,

21  may say, look, if these guys are running around with

22  MS-13 and they're charged with being a part of MS-13,

23  then they're also probably guilty of -- or more likely

24  to be guilty of these other charges, and not apply the

25  presumption of innocence to each of the charges

1    individually, Your Honor.

2              THE COURT:  I understand the concern.  I hope

3    to address some of that in what I will ask the jury.

4              MR. OATES:  Okay.

5              THE COURT:  Why don't we hear what they have

6    to say.

7              MR. OATES:  I'm sorry.  I think Question

8    No. 8 also bleeds into that as well:  Is there any

9    member of the panel who believes that a person is more

10   likely guilty of charges simply because they are

11   associated with members of MS-13?

12             If I could trade No. 9 over No. 8 -- No. 9.,

13   Is there any member of the panel who believes that a

14   person is more likely guilty of charges against them

15   because that person is a member of MS-13?  I think that

16   also gets right to the heart of, you know, the

17   presumption of innocence, even for people alleged to be

18   members of MS-13.  It spans through all of the

19   different charges and different counts.

20             THE COURT:  All right.

21             MR. OATES:  I would also ask that the Court

22   ask No. 10 and No. 11.  No. 10, The defendants in this

23   matter are Hispanics.  Anything that would prevent them

24   from considering the evidence fairly and impartially.

25             THE COURT:  Both of those were specifically

1    asked on the questionnaires.

2             MR. OATES:  And then No. 11, Is there any

3    member of the jury panel that knows or is acquainted

4    with another juror?

5             THE COURT:  All right.  I'll ask that one.

6             MR. OATES:  Thank you, Your Honor.

7             THE COURT:  Mr. Murphy, how much time did you

8    want for opening statement?

9             Oh, Mr. Krischer, you have something.  I'm

10   sorry.

11            MR. KRISCHER:  With regard to the *voir*

12   *dire* -- I just wanted to clarify the Court's ruling

13   with regard to immigration information being presented

14   to the jury.  So there was a separate motion filed by

15   Mr. Rosales Juarez to exclude any reference.  I had

16   highlighted the specific Facebook message, which the

17   government kindly has redacted.

18            But to the extent that any of the other

19   witnesses may address those, we just wanted to make

20   sure that the government instructs their witnesses that

21   they are not to raise or discuss any -- well,

22   specifically, Mr. Rosales Juarez's immigration status,

23   whether or not he was deported even if that's

24   responsive to a question that is inartfully asked.

25            THE COURT:  I wouldn't expect to hear any

1  evidence about the immigration status of any of the

2  defendants.

3          Mr. Murphy, if for some reason you think you

4  are going to get into that, you need to raise it with

5  me beforehand.

6          MR. MURPHY:  We understand the Court's

7  ruling, Your Honor.

8          THE COURT:  All right.

9          MR. KRISCHER:  Just with regard to the *voir*

10 *dire* then, Judge, Your Honor said you were going to

11 address attitudes towards MS-13.  I think the last

12 three questions in my proposed *voir dire* very

13 specifically were asking questions about whether or not

14 any attitudes came specifically from publicity or the

15 community versus independent experience or personal

16 experience and then whether or not each of those two

17 sources of information would impact their ability.

18         So with regard -- I trust that the Court is

19 going to ask those questions.

20         THE COURT:  In a fashion.

21         MR. KRISCHER:  Very good.  Thank you, Judge.

22         THE COURT:  All right.  Mr. Murphy, I'm

23 sorry.  How much time for opening statement?

24         MR. MURPHY:  Forty minutes should be

25 sufficient, Your Honor.

1          THE COURT:  All right.  I'll give the

2   defendants an equal amount of time.  I suspect you

3   won't need that much.

4          Anything else before we bring the jury in?

5          We're going to bring around 70 juror members.

6   We're going to bring them all in at one time.  I first

7   thought we would do it in two separate groups.  I think

8   that's too needlessly complicated at this point.  I

9   think we can comfortably do it with everybody here at

10  one time.

11         As I indicated earlier, the government gets

12  ten strikes and each defendant gets four.

13         We're going to have three alternates.  I am

14  going to put in five.  We're going to pick 12, and then

15  we're going to select another 5.  The government will

16  get one strike.  The defendants are going to have to

17  get together and exercise one strike.  So we end up

18  with three alternates.

19         All right.  The Court will stand in recess as

20  we bring in the jury.

21     (A jury is duly impaneled and sworn.)

22         THE COURT:  Ladies and gentlemen, let me give

23  you some explanation of how we're going to proceed

24  here.  Then we're going to take our luncheon break a

25  little earlier than we normally do.

1            Let me tell you how we're going to conduct

2    the trial.  We're first going to begin each day at

3    9:30.  We'll adjourn typically between 5:30 and 6:00.

4    My hope is that we won't go past 6:00, and we'll just

5    have to see how the evidence comes in.  My intention is

6    to move this case along in as orderly and deliberately

7    as we can.

8            We'll take breaks in the morning at

9    approximately 11:00 and, as I said, a lunch break from

10   1:00 to 2:00 and a break in the afternoon around 3:30,

11   depending on how the evidence plays.

12           If any of you need a break at any other time,

13   just please raise your hand, and I'll accommodate you

14   as best as I can.

15           We're going to go ahead and recess for lunch

16   now.  We'll reconvene at 2:00, at which time I'll give

17   you some preliminary instructions, and then we'll

18   proceed with opening statements.

19           We will sit each day during the trial.  There

20   will be a couple of exceptions that I can tell you

21   about at this point.  We will not sit during the

22   afternoon of March 3 or on March 4, which is a Friday,

23   and we will not sit on March 18, which is a Friday.

24   There may be other times as well, but at least I can

25   tell you that now.

1          Before I excuse you, I'll tell you for the
2   first time what I will tell you every time before I
3   excuse you, and that is, do not talk about this case
4   among yourselves until all the evidence is in, you've
5   been given instructions, and you've been excused to
6   begin your deliberations.  As little as you know now,
7   don't speculate about what the trial is or what it may
8   be or what the evidence is or may be.
9          Also, it's important that you not, when
10  you're outside of the courtroom, do any research on
11  your own.  If you hear things in the courtroom that
12  piques your interest, don't undertake to look on the
13  Internet to find out what people might be talking
14  about.  Your obligation is to decide this case solely
15  on what you hear in the courtroom by way of evidence.
16         Also, don't communicate with your friends on
17  any social media about the case or your service as
18  jurors.  That's important.
19         So with that, I'll excuse you until 2:00, at
20  which time we'll begin the trial.
21         Mr. Burns will show you where you can
22  adjourn.
23         THE COURT SECURITY OFFICER:  I'll take care
24  of it, Your Honor.
25         THE COURT:  All right.  Thank you.

```
 1        (The jury exits at 12:45 p.m.)

 2             THE COURT:  All right.

 3             MR. WALSH:  Your Honor, there's one other

 4   thing I'd like to raise.  If the Court would, when we

 5   come back from lunch, tell the jurors that we can't

 6   communicate with them either and we're not being rude.

 7             THE COURT:  I'll cover that in my preliminary

 8   instructions.

 9             MR. WALSH:  Thank you.

10             THE COURT:  I'll tell them not to take it out

11   on you if they see you taking a mad dash away from

12   them.

13             All right.  Who is going to be your first

14   witness after opening, Mr. Murphy?

15             MR. MURPHY:  We anticipate that it will be

16   Edgar Blanco Torres, Your Honor.

17             THE COURT:  All right.  Also, I'm going to

18   ask you to let defense counsel know the evening before

19   the morning what the order of witnesses are you expect.

20             MR. MURPHY:  We'll certainly endeavor to do

21   so.  We're doing a bit of reshaping --

22             THE COURT:  I understand.

23             MR. MURPHY:  -- in light of a witness getting

24   COVID as of today.  We'll certainly endeavor to do so.

25             THE COURT:  All right.  Very good.
```

1             The Court will stand in recess until 2:00.

2        (Recess from 12:47 p.m. until 2:07 p.m.)

3       (The jury is not present.)

4             THE COURT:  Are we ready to proceed?

5             MR. PATTERSON:  Yes, Your Honor.

6             THE COURT:  All right.  Bring the jury out.

7       (The jury enters at 2:07 p.m.)

8             THE COURT:  All right.  Please be seated.

9             Ladies and gentlemen, now I'm going to give

10  you some preliminary instructions to guide you in your

11  participation in this trial.  What I say now is

12  intended to serve only as an introduction to the trial

13  in this case.  It's not a substitute for the detailed

14  instructions on the law, which I will give to you at

15  the close of the case and before you retire to

16  deliberate on your verdict.

17             It will be your duty to find from the

18  evidence what the facts are.  You and you alone are the

19  judges of the facts.  You are the judges of the facts.

20  You will then have to apply those facts to the law as

21  the Court will give it to you, and you must follow the

22  law whether you agree with it or not.

23             Nothing the Court may say or do during the

24  course of the trial is intended to indicate or should

25  be taken by you as indicating what your verdict should

1  be.

2       The evidence from which you will find facts

3  will consist of the testimony of witnesses, documents,

4  and other things received into the record as exhibits

5  and any facts that the lawyers agree to or stipulate to

6  or that the Court may instruct you to find.

7       Now, certain things are not evidence and may

8  not be considered by you, and I will list them for you

9  now:

10      First, the statements, the arguments, and the

11 questions by the lawyers are not evidence.

12      Secondly, the objections to questions are not

13 evidence.  Lawyers have an obligation to their clients

14 to make objections when they believe evidence being

15 offered is improper under the rules of evidence.  You

16 should not assume that the lawyer making the objection

17 is improperly trying to keep some pertinent information

18 from you, and you should not hold it against a lawyer

19 who makes that objection.

20      You also should not be influenced by the

21 objection or by the Court's ruling on it.  If an

22 objection is sustained, that is, if the Court agrees

23 with the objection, you must not consider that

24 question, any partial answer to the question, or the

25 exhibit which was objected to.

1          If it is overruled, that is, that the Court

2   does not agree with the objection, then you treat the

3   answer or exhibit like any other.

4          If you are instructed that some item of

5   evidence is received for a limited purpose only, then

6   you must follow that instruction as well.

7          Next, the testimony that the Court has

8   excluded or told you to disregard is not evidence and

9   must not be considered.

10          Also, anything you may have seen or heard

11   outside of the courtroom is not evidence.  It must be

12   disregarded.  You are to decide this case solely from

13   the evidence presented here in the courtroom.

14          And in that regard, there are two kinds of

15   evidence.  There's direct evidence and circumstantial

16   evidence.  Direct evidence is direct proof of a fact,

17   such as testimony of an eyewitness.  Circumstantial

18   evidence is proof of facts from which you may infer or

19   conclude that other facts exist.  I will give you

20   further instructions on these as well as other matters

21   at the end of the case, but keep in mind that you may

22   consider both kinds of evidence.

23          Also, in considering the case, you will have

24   to make judgments about the believability and

25   credibility of witnesses' testimony.  It will be up to

1  you to decide which witnesses to believe, which

2  witnesses not to believe, and how much of any witness'

3  testimony to accept or reject.  In considering the

4  weight and value of the testimony of any witness, you

5  may take into account the appearance, attitude, and

6  behavior of that witness; the interest that that

7  witness may have in the outcome of the case; the

8  relationship that witness may have to any party in the

9  case; the inclination of the witness to speak

10  truthfully or not as you judge that to be; the

11  probability or improbability of the witness' statement;

12  and all other facts and circumstances in evidence.

13  Thus, you may give the testimony of any witness such

14  weight or value as you may determine the testimony of

15  such witness is entitled to receive.

16          Please pay careful attention to the testimony

17  of witnesses because, contrary to what you may have

18  seen on television, it is not possible to recall

19  witnesses after you begin your deliberations.

20          As you know, this is a criminal case, and

21  there are three basic rules about a criminal case that

22  you must keep in mind:

23          The first, as I've indicated previously, is

24  that each defendant is presumed innocent until proven

25  guilty.  The Indictment brought by the government

1  against these defendants is only an accusation.  It's

2  nothing more.  It is not proof of guilt or anything

3  else.  The defendants, therefore, start out with a

4  completely clean slate.

5          Secondly, the burden of proof is on the

6  government until the very end of the case.  The

7  defendant has no burden to prove his innocence or to

8  present any evidence or to testify.  Since the

9  defendants have the right to remain silent, the law

10  prohibits you from arriving at your verdict by

11  considering whether or not the defendants may have

12  testified.

13          Third, the government must prove each

14  defendant's guilt beyond a reasonable doubt.  I will

15  give you further instructions on this point, but bear

16  in mind that in this respect, a criminal case is

17  different from a civil case.

18          There are 14 different crimes that are

19  alleged against these defendants, some collectively,

20  some individually, or in combination with some of the

21  others.  I'm sure the government will outline what

22  those are, and I'm not going to do that in any detail

23  now.

24          Let me by brief summary tell you that two

25  crimes are charged against all of the defendants:

1            One is a conspiracy to participate in a

2   racketeering enterprise, in violation of what we call

3   the Racketeer Influenced and Corrupt Organizations Act

4   or RICO statute, charged in Count 1 of the Indictment.

5            The second charge against all of these

6   defendants is a conspiracy to distribute cocaine and

7   marijuana charged in Count 5 of the Indictment.

8            The defendants are also charged separately in

9   various combinations with other crimes related to those

10   two conspiracies, which, again, I believe the

11   government will outline for you in opening statement.

12   I'm not going to instruct you now in detail on what the

13   elements of each of those are or what the government

14   must prove beyond a reasonable doubt.  I will do that

15   after you hear all the evidence.

16            But I do want to give you a very brief

17   explanation on some of the terms that you will hear a

18   lot about since you might better follow the evidence as

19   it's presented.

20            The first is the term "conspiracy."  A

21   conspiracy is simply an agreement between two or more

22   people to do something unlawful or to do something

23   lawful by unlawful means.

24            Here, as I mentioned, all the defendants are

25   charged with two conspiracies:  Conspiracy to violate

1   the RICO statute by participating in what we call a

2   RICO enterprise and also a conspiracy to distribute

3   cocaine and marijuana.  As I indicated, some defendants

4   are also charged separately with other conspiracies in

5   violation other aspects of the RICO statute.

6           Because that RICO statute figures so

7   centrally in this case, I also want to define for you a

8   couple of terms you will hear a lot about and which you

9   will no doubt perhaps find familiar to you.

10          The first is, as I've mentioned before, the

11  term "RICO enterprise."  Briefly summarized -- and you

12  will get more detailed instructions on this at the

13  closing -- a RICO enterprise is any group of

14  individuals associated in fact who join together for

15  the purpose of engaging in a common course of conduct

16  even though their association is not recognized as a

17  legal entity.

18          "Racketeering activity" is defined as, among

19  other things, murder, kidnapping, attempted murder, or

20  conspiracy to commit murder, in violation of the laws

21  of Virginia and drug trafficking in violation of

22  federal law.

23          This last term I'm going to mention is

24  "pattern of racketeering activity," which is defined as

25  at least two acts of racketeering committed within ten

1  years of each other.

2          Let me now say a few words about your conduct

3  as jurors:

4          First, I instruct you that during the trial,

5  you are not to discuss the case with anyone or permit

6  anyone to discuss it with you.  Until you retire to the

7  jury room at the end of the case to deliberate on your

8  verdict, you simply are not to talk about the merits of

9  this case.

10          Second, do not read or listen to anything

11  touching upon this case in any way.  If anyone tries to

12  talk to you about it, bring that to the Court's

13  attention immediately.

14          Third, I know many you use cell phones and

15  the Internet and other tools of technology.  You must

16  not use those tools to communicate electronically with

17  anyone about the case.  This includes your family and

18  friends.  You may not communicate with anyone about the

19  case on your cell phone, through email, BlackBerry,

20  iPhone, text messaging, Twitter, through any blog or

21  website, through any chat rooms, and by way of any

22  other social networking websites, including Facebook,

23  MySpace, LinkedIn, Instagram, or YouTube.

24          Finally, it's very important that you not

25  form any opinion in this case until all the evidence is

1  in.  You need to keep an open mind until you start your

2  deliberations at the end of the case.

3          If you want to take notes during the course

4  of the trial, you may do so.  You should have now or

5  will be provided notebooks, but remember that sometimes

6  it's difficult to take detailed notes and still pay

7  attention to what the witnesses are saying at the same

8  time.  So if you do take notes, please be sure that

9  your note-taking does not interfere with your listening

10  to and considering all the evidence.

11          Also, if you take notes, do not discuss your

12  notes with anyone before you begin your deliberations,

13  and do not take your notes with you at the end of the

14  day.  Be sure to leave those in the jury room.

15          Also, if you do take notes, please understand

16  that your notes are not evidence and should not take

17  precedence over your own independent recollections of

18  the evidence.  Remember that it's your own individual

19  responsibility to listen carefully to all the evidence.

20  For that reason, if you do not take notes, you cannot

21  rely on anybody else's note-taking, and you cannot give

22  any responsibility to someone who is taking notes to

23  remember the evidence.  That's an obligation that each

24  of you have separately from anyone else.

25          Let me now explain to you how the trial will

1  proceed.  After I'm finished with these preliminary

2  instructions, the government will make an opening

3  statement, which is simply an outline to help you

4  understand the evidence as it comes in.  After the

5  government makes its opening statement, the defendants

6  may but do not have to make an opening statement.

7  Opening statements are neither evidence nor argument.

8         After opening statements, the government will

9  then present its witnesses, and counsel for the

10 defendants may cross-examine them.  Following the

11 government's case, the defendant may, if he wishes,

12 present witnesses, whom the government may

13 cross-examine.  After all the evidence is in, the Court

14 will instruct you on the law.

15        Finally, the lawyers will present their

16 closing arguments to you in which they'll summarize and

17 interpret the evidence for you.  After that, you will

18 begin your deliberations on your verdict.

19        I want to emphasize that no statement,

20 ruling, remark, or comment which I may make during the

21 course of this trial is to indicate in any way my

22 opinion as to how you should decide the case.  It

23 wasn't intended to influence you in any way in your

24 determination of the facts.

25        At times during the trial, I may confer

1    privately with the lawyers and others about various
2    evidentiary procedural issues.  During these
3    conferences both here at the bench and otherwise, it's
4    not our intention to hide anything from you but simply
5    to determine how certain issues will be handled and how
6    best to proceed.  Please be patient as we do that.
7    We're only taking care to ensure that the trial is
8    being conducted fairly.
9           In that regard, it is important to me that
10   your time is used efficiently and that you not spend
11   significant amounts of time outside of the courtroom
12   during the trial.  But there may be developments that
13   require matters to be heard outside of your presence.
14   I will do everything I can to keep this case moving
15   along to minimize the time that you spend outside of
16   the courtroom and to allow your time to be used
17   efficiently.
18          I've instructed the attorneys and the parties
19   that they are not to speak with you because it simply
20   does not look appropriate for one side or the other to
21   be speaking with any of you no matter how innocent or
22   trivial those conversations might be.  So that if you
23   happen to be outside of the courtroom and you see one
24   of the lawyers -- once they have sight of you --
25   abruptly turn and walk away, don't hold that against

1  them.  Don't think they are being discourteous.  They

2  are simply following my instructions.

3         Until this case is submitted to you to begin

4  your deliberations, as I indicated earlier, you must

5  not discuss it with anyone at all, not even among

6  yourselves.  After it is submitted, you must discuss

7  the case only in the jury room with all your fellow

8  jurors present.

9         Again, it's important that you keep an open

10 mind and not discuss any issue in the case until the

11 entire case has been submitted to you and you have

12 received the final instructions of the Court regarding

13 the law in which you must apply it to the evidence.

14        Again, your job is to decide all the factual

15 information in the case, such as who is to be believed,

16 who should not be believed.  The Court will decide all

17 the legal questions in the case, such as what testimony

18 or exhibits are to be received in evidence and which

19 are not received.  Please do not concern yourselves

20 with any of the legal questions that the Court may take

21 up.

22        Again, at the close of the evidence, I will

23 be able to give you your final and complete

24 instructions, which will be much more detailed than

25 these preliminary instructions, and which you must use

1  to guide you in reaching your decisions.

2          We will now proceed with the opening

3  statement from the government.

4                    OPENING STATEMENT

5          MR. PATTERSON:  Good afternoon, ladies and

6  gentlemen.

7          At the heart of this case is a murder and two

8  attempted murders.  On July 3, 2017, Marvin Rivera

9  Guevara left the pizzeria where he worked in

10  Charlottesville, Virginia.  He left with a man he

11  thought was a friend.  He thought that he was going to

12  go with this friend to smoke marijuana and meet some

13  women.  He did not know that this was going to be the

14  last night of his life.

15          This is Marvin.

16          Marvin did not know that he was being led

17  into a trap that would lead to his death at the hands

18  of members and associates of the Guanacos Lil Cycos

19  Salvatrucha clique of MS-13.  This clique is also known

20  by its initials of GLCS.  Marvin did not know about

21  GLCS's plan for him and that four members and

22  associates of GLCS were lying in wait for Marvin in a

23  car in a parking lot near the pizzeria.

24          You see, ladies and gentlemen, GLCS wrongly

25  believed that Marvin was a rival gang member.  You'll

1   hear evidence that one of the most important rules of
2   MS-13, a rule that is strictly adhered to, is to attack
3   and kill rival gang members.  You'll learn that this is
4   how individual gang members rise in rank or maintain
5   their rank and accrue power and respect in the gang.
6          During this trial, you'll hear from one of
7   these men who lied in wait to kill Marvin, Walter
8   Amaya.  He is a cooperating witness with the
9   government.  You'll learn that he and his fellow GLCS
10  members and associates were known by gang nicknames.
11  He'll tell you that his gang nickname was Pensamientos.
12  Pensamientos will tell you about GLCS's plot to lure,
13  ambush, and kill Marvin and how he participated in this
14  plot.
15         Mr. Amaya will tell you how he and three
16  other members and associates of GLCS followed Marvin in
17  Mr. Amaya's car as Marvin's coworker, also an associate
18  of MS-13, led Marvin to a remote area near Moore's
19  Creek.  Mr. Amaya will tell you that after Marvin
20  arrived, he was led out of his car at gunpoint to a
21  location next to Moore's Creek where Marvin was
22  surrounded and ambushed by a pack of five MS-13 members
23  and associates.
24         Mr. Amaya will tell you how he and the other
25  four MS-13 members and associates hacked Marvin to

1  death with a machete and knives and laid him low.  The

2  evidence will show that Marvin's attackers mercilessly

3  and repeatedly struck him over 140 times.  They struck

4  him so hard that the machete they were using, its

5  handle broke.

6          Mr. Amaya will tell you that after they

7  murdered Marvin, they took a photograph of his dead

8  body and sent it to gang leadership to prove that they

9  had accomplished the ultimate act, that they had killed

10  a man.  In other words, they took a trophy photograph

11  the way some hunters take photographs of animals that

12  they've killed.

13          Then they threw Marvin's body over the edge

14  of a high embankment and into the shallow creek bed

15  below.

16          You'll hear more about GLCS's plans to

17  brutally eliminate gang rivals and those they perceive

18  to have disrespected the gang.  This time you'll hear

19  from a man who barely survived such an attack in

20  Northern Virginia after spending approximately a month

21  in the hospital recovering from gunshot and stab

22  wounds.

23          This is Elvin Pena Aguilera.  He will tell

24  you what GLCS did to him on March 8, 2019.  Elvin will

25  tell you that he was invited over to the home of a man

1   he considered to be like his little brother, David

2   Escobar.  You'll learn that David Escobar is a *chequeo*

3   of the GLCS clique.  Elvin will tell you that while

4   after he got to Escobar's house, three of David's

5   friends showed up in a car.  Elvin was told that they

6   are going to smoke marijuana and get some food.

7            You'll learn that, once again, GLCS had a

8   plan to take a man's life and that all three of the men

9   who showed up at David Rivera's house planned to kill

10  Elvin and were members and associates of the GLCS

11  clique.  You'll also learn that GLCS needed a way to

12  get Elvin from David Escobar's house to the scene of

13  the shooting, a remote location.

14           You'll learn that the man chosen to execute

15  GLCS's plan to kill Elvin was Defendant Roberto Cruz

16  Moreno, who knew that he was driving Elvin to his

17  intended brutal demise when he picked Elvin up from

18  David Escobar's house that night.

19           Elvin will tell you that he got into the car

20  with David Escobar and the three other men and was

21  listening to music on his headphones.  Elvin will also

22  tell you that when he looked up, they were in a wooded

23  area with the house far away from them.  Everyone

24  except the driver got out, and Elvin was told they were

25  going to smoke weed in the woods before getting food.

1          You'll learn that the four men walked into
2   the woods that night, but only the three GLCS members
3   and associates got back into Defendant Cruz Moreno's
4   car.  Elvin will tell you that as they walked into the
5   woods, the man he thought was his brother and friend
6   suddenly pulled a gun on him and shot him four times,
7   including in his abdomen.  Elvin will tell you that
8   after he was shot, one of the other men stabbed him
9   multiple times and tried to slit his throat.
10          The GLCS pack then left Elvin to die alone in
11   the cold, snowy woods as Defendant Cruz Moreno drove
12   his fellow GLCS members and associates to his home in
13   his warm car.
14          You'll learn that despite this brutal attack,
15   Elvin refused to die.  He wouldn't submit to GLCS's
16   plan to kill him.  When he was sure his attackers had
17   left, Elvin made his way towards the nearest house, and
18   when his wounds would not let him continue, he called
19   out for help.  His call was answered by a neighborhood
20   man who had heard the gunshots and who helped him.
21          Elvin will tell you that as a result of this
22   attack, some of his fingers don't move.  Because his
23   throat was cut, he has trouble speaking loudly.  Elvin
24   will also tell you about the mental scars that are
25   still with him today.  He has PTSD and had a

1    schizophrenic break.

2         You'll hear more about the violence

3    perpetrated by GLCS here in Northern Virginia from

4    another man who nearly lost his life following a

5    violent and brazen daylight attack by GLCS.  This is

6    Norman Medina Sanchez.  You'll hear evidence about what

7    it means for MS-13 to patrol and scout and how the 18th

8    Street gang tattoos that adorn Norman's body were chum

9    in the water for GLCS.

10        You'll learn that Defendant Marvin Torres

11   first scouted out and identified Norman as a gang rival

12   to his fellow GLCS members and associates.  Torres took

13   and sent this picture to the gang in a Telegram group

14   chat.  You'll learn that Defendant Torres took this

15   picture of Norman in the parking lot of the very same

16   laundromat where Norman was ultimately shot.  You'll

17   hear evidence that Defendant Torres sent this picture

18   of Norman to the gang so that his fellow gang members

19   and associates could identify and kill Norman.  Ladies

20   and gentlemen, that is exactly what GLCS tried to do.

21        You'll learn that on August 3 and 4, 2019,

22   Defendant Jose Rosales Juarez scouted out Norman at a

23   restaurant and bar in Manassas.  You'll see evidence of

24   conversations between Rosales Juarez and GLCS's leader,

25   Andy Tovar, about killing Norman.

1              This is Andy Tovar, ladies and gentlemen.

2              You'll learn that Andy Tovar and Defendant

3    Rosales Juarez determined they would wait for a better

4    opportunity to attack and kill Norman, including when

5    they had a better escape plan and after they purchased

6    a firearm.

7              You'll hear from Norman that GLCS's next

8    opportunity came on August 12, 2019, while Norman was

9    doing his laundry in Manassas, Virginia, with a friend.

10   Norman will tell you how he noticed a black car and men

11   standing near it in the parking lot of the laundromat.

12   To Norman, these men seemed to be staring at him.

13   You'll learn that Defendant Kevin Perez Sandoval drove

14   a black car and was one of the three GLCS members or

15   associates who spotted Norman at the laundromat the day

16   he was shot.

17             During this trial, you'll also here from

18   Javier Bonilla Arevalo, who is also a cooperating

19   witness with the government.  You'll learn that his

20   gang nickname was Mental.  And because he participated

21   in GLCS's attacks to kill both Elvin and Norman, he

22   will tell you about GLCS's plans for both and how he

23   participated.

24             With respect to Norman, Bonilla will tell you

25   that both he and Defendant Kevin Perez Sandoval and

1  Kevin Castro saw Norman in the parking lot at the

2  shopping plaza.  They recognized him from the tattoos

3  in the picture Defendant Torres sent the gang weeks

4  before.  Upon recognizing Norman, he'll tell you how

5  he, Defendant Perez Sandoval, and Kevin Castro all

6  immediately sprung into action to kill Norman.

7          He will tell you that after Kevin Castro

8  called Andy Tovar to get authorization to kill Norman

9  at the laundromat -- and this is while Defendant Perez

10  Sandoval was driving them -- Perez Sandoval then drove

11  him to get the gun from Kevin Castro's house.  He will

12  tell you that after Kevin Castro returned to the car

13  with a bag containing the gun, a mask, and a change of

14  clothes, Defendant Perez Sandoval then drove him back

15  to the laundromat so that Kevin Castro could shoot

16  Norman.

17          Norman will tell you that he and his friend

18  were drinking beers in a parking lot area near the

19  laundromat when he suddenly saw a figure approaching

20  him through a hole in the fence.  Norman sensed he was

21  in danger, and he took off running.  But it was too

22  late.  Shots rang out, and Norman will tell you that he

23  felt a sharp pain in his torso.  Breathing heavily from

24  one of the gunshots, Norman flagged down a passing

25  police cruiser, and then an ambulance rushed him to a

1    hospital where surgery saved his life.  Norman will

2    tell you about the lingering effects he has from being

3    shot, including continuing pain in his stomach.

4            You'll hear from Bonilla how Defendant Perez

5    Sandoval hurried the shooter, Kevin Castro, and Bonilla

6    from the scene of the crime in Defendant Perez

7    Sandoval's car to Defendant Jose Juarez's house.  You

8    will hear that Defendant Rosales Juarez knew Kevin

9    Castro had just shot a gang rival and provided

10   Defendant Perez Sandoval with one of his cars in which

11   to leave.  He let them exchange his hot car that the

12   police were looking for for another car.  Defendant

13   Rosales Juarez was doing yet another favor for the

14   gang, this time ensuring that Defendant Perez Sandoval

15   wouldn't be driving around in the identifiable black

16   car so soon after the shooting.

17           Defendant Rosales Juarez's next favor for the

18   gang that night was renting a hotel room under his own

19   name for Kevin Castro and Bonilla so they could hide

20   out in the hotel room anonymously.

21           Ladies and gentlemen, this is GLCS.  You'll

22   hear from Bonilla Arevalo that this particular photo of

23   GLCS includes him, Defendants Cruz Moreno and Perez

24   Sandoval and Kevin Castro.

25           During this trial, you'll learn a lot about

1 GLCS and each one of the defendants in this case.  The

2 government will prove that each of the defendants was

3 involved in violent racketeering and drug distribution

4 on behalf of GLCS and will leave no reasonable doubt

5 that the defendants are guilty of the crimes charged in

6 this case.

7          One of the men who participated in Elvin's

8 attempted murder, the man who drove everyone to and

9 from the scene of the crime knowing that GLCS intended

10 to kill Elvin, is in the courtroom today.  He is

11 Defendant Cruz Moreno.  You'll learn that not only was

12 Defendant Cruz Moreno involved in violent racketeering

13 activity on behalf of GLCS but that he was also heavily

14 involved in drug distribution for the clique.

15          He also possessed a firearm.  This firearm

16 allowed him to protect GLCS's drugs while he and other

17 members and associates of GLCS sold drugs.  The

18 evidence will show that the same firearm Defendant Cruz

19 Moreno possessed in his vehicle with cocaine had

20 earlier been used during GLCS's attempt to kill Elvin.

21          You'll learn that the distribution of cocaine

22 and marijuana was a significant way that GLCS was able

23 to buy the weapons used in the charged crimes and

24 otherwise financially support the criminal activities

25 of MS-13.

1          One of the men who participated in Norman's
2     attempted murder, the man who drove everyone to and
3     from the scene of the crime knowing GLCS intended to
4     kill Norman, is in the courtroom today.  He is
5     Defendant Perez Sandoval.  You'll learn that not only
6     was Defendant Perez Sandoval involved in violent
7     racketeering activity on behalf of GLCS, but he was
8     also heavily involved in drug distribution for the
9     clique.
10         Another of the men who was involved in the
11    conspiracy to murder Norman, the man who first
12    identified Norman as a rival gang member to GLCS, is in
13    this courtroom today.  He is Defendant Torres.  You'll
14    learn that not only was Defendant Torres involved in
15    violent racketeering activity on behalf of GLCS, but he
16    was also heavily involved in the drug distribution for
17    the clique.
18         Finally, another of the men who was involved
19    in the conspiracy to murder Norman, the man who scouted
20    Norman for Andy Tovar a few days before Norman was
21    ultimately shot and later gave Perez Sandoval a
22    different car and rented a hotel room for the shooter
23    after Norman was shot, is in this courtroom today.  He
24    is Defendant Rosales Juarez.
25         You'll learn that not only was Defendant

1  Rosales Juarez involved in violent racketeering

2  activity on behalf of GLCS, but he, too, was heavily

3  involved in drug distribution for the clique.

4          During the course of this trial, you'll come

5  to learn a lot about the gang enterprise in which each

6  of the defendants and their coconspirators are

7  associates.

8          MS-13 stands for La Mara Salvatrucha Trece.

9  You'll learn from a gang expert and some of the

10 government's cooperating witnesses that MS-13 is a

11 large international street gang whose members are

12 primarily from El Salvador.  You'll learn that the gang

13 has a significant presence in the United States,

14 including Northern Virginia.  You'll learn that the

15 gang is organized into smaller groups, like GLCS,

16 called cliques, which are led by an individual who is

17 called *la primera palabra*, or the first word.

18          The cliques make money through illegal means,

19 and they send part of the profits to senior leadership

20 in El Salvador.

21          You'll also hear evidence that MS-13 has a

22 rank structure.  The lowest rank is *paro*, then

23 *observacion*, and then *chequeo*.  The highest rank is

24 homeboy.  You'll learn that homeboys are full-blown

25 members of the gang, and the *paros*, *observaciones*, and

1    *chequeos* conduct the day-to-day business of the gang at

2    the direction of the homeboys.

3              You'll learn that to move up in the rank or

4    rank-up, an MS-13 gang member needs to commit acts of

5    violence.  You'll hear that in order to become a

6    homeboy in GLCS, an individual has to commit a murder.

7              As you've already heard, MS-13 is extremely

8    violent.  You'll learn that MS-13's principal objective

9    is to instill fear and be the largest gang in the

10   world.  The way MS-13 does this is through extreme

11   violence.

12             The evidence in the case will show that each

13   of the violent crimes you just heard about were

14   instances of GLCS implementing MS-13's primary

15   objective, controlling territory and accumulating power

16   through brutal violence, specifically attacking and

17   killing gang rivals or perceived rivals.

18             In each of these attacks, the defendants and

19   GLCS were ruthlessly following the gang's rules.  In

20   each of these attacks, the individuals involved were

21   trying to either increase their rank or maintain their

22   rank in MS-13.

23             Finally, you'll hear that MS-13 often uses

24   the following three methods of operation to hunt down

25   and kill their rivals:  First, they identify their

1   target and share his identity as a gang rival among the

2   clique.   Second, MS-13 members and associates use

3   deceit or stealth to isolate their prey.   Third, after

4   they have formulated their plan of attack, they

5   overwhelm their isolated and outnumbered prey by

6   attacking in a pack.

7           You will hear and see evidence that the

8   defendants did not commit these acts alone.   Indeed,

9   the defendants hunted in packs and laid low rivals

10  together with other members and associates of GLCS

11  under the ruthless leadership of Andy Tovar.   You'll

12  learn that Andy Tovar surrounded himself with a

13  ruthless band of men in GLCS, men who were willing to

14  commit all manner of violence and do anything necessary

15  to gain territory and power for GLCS and -- this is

16  important -- elevate or maintain their own positions

17  within GLCS.

18          When law enforcement arrested members and

19  associates of GLCS, Tovar rebuilt the clique by

20  promoting members and associates and recruiting more

21  ruthless men.   During this trial, you'll learn about

22  some of Andy Tovar's chosen men, including each of the

23  defendants.

24          I'm going to go over the key players.   The

25  evidence will show that seven men were involved in

1  Marvin's murder:  Andy Tovar, the leader or first word

2  of the GLCS clique; Omar Antonio Villalta, a homeboy in

3  GLCS; Christian Martinez Sanchez, a homeboy and the

4  second word of GLCS and a cooperating witness, who will

5  tell you about his role in the plot to murder Marvin;

6  Walter Amaya, a homeboy in GLCS; Eduardo Zelaya, a

7  homeboy in GLCS; Jose Ruiz Escobar Umana, a *chequeo* in

8  GLCS; and Juan Carlos Charlie Argueta, an associate of

9  the Normandy clique of MS-13.

10         The evidence will show that five men were

11  involved in Elvin's attempted murder:  Andy Tovar;

12  Defendant Roberto Cruz Moreno, a *chequeo* or *pasa de*

13  homeboy in GLCS; David Escobar, a *chequeo* in GLCS;

14  Kevin Castro Alvarez, a homeboy in GLCS; and Javier

15  Bonilla Arevalo, a *chequeo* in GLCS.

16         The evidence will show that six men were

17  involved in Norman's attempted murder:  Andy Tovar;

18  Defendant Jose Rosales Juarez, a *paro* in GLCS;

19  Defendant Kevin Perez Sandoval, an *observacion* in GLCS;

20  Defendant Marvin Torres, a *chequeo* in GLCS; Kevin

21  Castro Alvarez; and Javier Bonilla Arevalo.

22         Several people who participated in Marvin's

23  murder, Elvin's attempted murder, and Norman's

24  attempted murder have already pled guilty and are

25  cooperating with the government's investigation.  As

1  you heard, some of them will testify during the trial

2  as government witnesses.

3         The evidence will show commonalities between

4  the approach that GLCS took in Marvin's murder and

5  Elvin and Norman's attempted murders.  As discussed,

6  these commonalities are hallmarks of MS-13's *modus*

7  *operandi*.  In each case, GLCS hunted as a pack.  They

8  scouted their prey.  Then they either lured their prey

9  to an isolated place by claiming friendship, as they

10  did with Marvin and Elvin, or waited until their prey

11  was in an isolated place and then used stealth to catch

12  him unawares, as they did with Norman.  Then they

13  struck.  They attacked their isolated and outnumbered

14  victim with overwhelming force.  Finally, GLCS

15  coordinated their getaways to elude law enforcement and

16  cover their tracks.  In these packs, each person played

17  a role.

18         During the course of this trial, you are

19  going to hear over 30 witnesses, and you are going to

20  see over 700 exhibits.  The government's evidence will

21  prove beyond a reasonable doubt that the defendants

22  were involved in violent racketeering activities, drug

23  distribution, and firearm offenses charged in this

24  case.

25         I don't have time to discuss every witness

1   and every piece of evidence that you will see during

2   the course of this trial, but I want to highlight some

3   of the most significant categories of evidence that you

4   will see and hear.

5           As I mentioned, during this trial, you are

6   going to hear from a gang expert.  The gang expert is

7   going to testify to MS-13's history, structure,

8   organizational purpose, illegal activities, gang rules,

9   colors, and hand signs.  The gang expert will testify

10  that MS-13 gang members know exactly what MS-13 does to

11  gang rivals.

12          As I said earlier, you're also going to hear

13  from cooperating witnesses:  Pensamientos; Mental; and

14  Christian Martinez Sanchez, whose gang nickname is

15  Fire.  Collectively, they will testify the defendants

16  are associates or members of the GLCS clique of MS-13

17  and about each of the defendants' involvement in the

18  charged crimes.

19          During the trial, you will hear that the

20  cooperating witnesses were all involved in the charged

21  violent crimes and drug distribution on behalf of GLCS

22  and they are testifying because they hope to receive a

23  reduction in their sentences.  You will hear that they

24  haven't been promised anything for their cooperation.

25  And if they testify falsely, they won't receive any

1    reduction to their sentence, and they will be

2    prosecuted for perjury.

3              You're also going to hear from the surviving

4    victims in this case, Elvin and Norman.  Elvin and

5    Norman are not perfect human beings.  They will tell

6    you as much.  They've each committed crimes, and they

7    were each affiliated with gangs.  But despite almost

8    losing their lives to MS-13's brutal violence, they

9    will confront GLCS again in this courtroom and testify

10   to you about what happened to them.

11             During this trial, you will also see

12   transcripts of Title 3 wiretaps of Andy Tovar's phone

13   during the spring and summer of 2019.  These calls were

14   predominantly in Spanish, which is why you will see

15   transcripts rather than hearing the calls themselves.

16   You'll note how extensively Andy Tovar communicated

17   with the defendants and other coconspirators in GLCS to

18   coordinate the crimes charged in this case and to help

19   each other avoid law enforcement detection after they

20   had committed the crimes.  These calls will also

21   demonstrate without a doubt that each of the defendants

22   was heavily involved in the MS-13 enterprise and in the

23   gang's criminal activities.

24             Similarly, during trial you'll see numerous

25   messages translated from Spanish to English, sent

1   between the defendants and other GLCS coconspirators

2   concerning the crimes charged in this case and the

3   business of the gang.  These messages will further

4   demonstrate that each of the defendants was heavily

5   involved in the MS-13 enterprise and the gang's

6   criminal activities.

7           Finally, you will hear and see evidence of

8   the defendants' own words telling you about their

9   involvement in GLCS and the crimes charged in this case

10  by the statements they each made to law enforcement.

11          You'll learn that Defendant Cruz Moreno told

12  law enforcement about driving his coconspirators to the

13  woods with Elvin, knowing that GLCS intended to murder

14  Elvin.

15          You'll learn that Defendant Cruz Moreno

16  identified the gun he possessed in this case as the

17  very same gun used by David Escobar to attempt to

18  murder Elvin.

19          You'll learn that Defendant Perez Sandoval

20  admitted to driving Kevin Castro and Javier Bonilla

21  both before and after the attempted murder of Norman

22  and to doing other favors for GLCS.

23          Additionally, you'll learn that Defendant

24  Torres told law enforcement he had been a *chequeo* in

25  GLCS for approximately two years and that he used to

1  collect dues payments from other GLCS members and

2  associates.

3        Finally, you'll learn that Defendant Rosales

4  Juarez admitted to law enforcement that he booked a

5  hotel room for Javier Bonilla and Kevin Castro, the man

6  who shot Norman, the evening Norman was shot because he

7  was doing a favor for Andy Tovar.

8        Before I finish, I want to briefly discuss

9  the charges in this case with you.  The first crime

10 each of the defendants has been charged with is a

11 conspiracy to participate in a racketeering enterprise.

12 Conspiracy is simply an agreement between two or more

13 people to alert the others to break the law.  To prove

14 a conspiracy to participate in a racketeering

15 enterprise, the government has to prove that MS-13 is a

16 criminal enterprise that engages in racketeering

17 activity.  The government also has to prove that the

18 defendants knowingly agreed to be associated with the

19 enterprise and to personally participate in the affairs

20 of the enterprise.

21        Finally, the defendants had to agree that a

22 coconspirator, not necessarily the defendants, would

23 commit at least two acts of racketeering activity.

24 Racketeering activity includes crimes like murder, drug

25 distribution, and extortion.  Here the evidence will

1   show that the defendants knowingly agreed to and did

2   participate in at least two of MS-13's racketeering

3   activities by, among other things, participating in

4   conspiracies to murder Elvin and Norman and

5   distributing cocaine and marijuana on behalf of GLCS.

6           Additionally, the evidence will show that

7   other members and associates of GLCS, who are part of

8   the same charged conspiracy, murdered Marvin as a part

9   of the racketeering activity.

10          To be clear, the government is not alleging

11  that these four defendants participated in the murder

12  of Marvin.  However, that crime was committed by other

13  GLCS members as an act of racketeering activity that

14  was part of this conspiracy.

15          The government will prove during this trial

16  that MS-13 is a criminal enterprise that engages in

17  racketeering activity by putting on evidence that MS-13

18  gang members murdered Julio Urrutia and MS-13 gang

19  members murdered Christian Sosa Rivas.  Again, to be

20  clear, the government is not alleging that these four

21  defendants had anything to do with the murders of

22  Urrutia or Sosa Rivas.  Those were committed by other

23  MS-13 members and are being offered to demonstrate that

24  MS-13 is a criminal enterprise that engages in

25  racketeering activity.

1          The second crime which the defendants have
2     been charged with is conspiracy to commit murder in aid
3     of racketeering.  To prove conspiracy to commit murder
4     in aid of racketeering, the government has to prove
5     that MS-13 was an enterprise engaged in the
6     racketeering activity I just discussed, that Defendants
7     Cruz Moreno, Perez Sandoval, Torres, and Rosales Juarez
8     had positions in that enterprise, and that they
9     knowingly conspired with others to murder Elvin in the
10    case of Cruz Moreno and Norman in the case of the other
11    three.
12         The government also has to show that each
13    defendant did so in order to increase or at least
14    maintain their positions in MS-13 or the position of
15    another in MS-13.  For example, to help a fellow gang
16    member raise in rank.
17         Defendants Cruz Moreno and Perez Sandoval are
18    also charged with attempted murder and assault with a
19    dangerous weapon in aid of racketeering, which is still
20    the same proof requirements as those I've just
21    discussed with you but also requires proof of a
22    dangerous weapon to commit a violent act.
23         Defendant Cruz Moreno and Perez Sandoval are
24    also charged with aiding and abetting and the using and
25    discharging of firearms during crimes of violence

1  related to GLCS's attempts to murder Elvin and Norman

2  with pistols because, among other things, they drove

3  the shooters to the sites of the attempted murders and

4  drove them away after the shootings occurred.

5          The third crime each of the defendants has

6  been charged with is a conspiracy to distribute cocaine

7  and marijuana.  The evidence will show that in 2019,

8  each of the defendants worked together with other

9  members and associates of GLCS to distribute cocaine

10 and marijuana.

11         Defendant Cruz Moreno is also charged with

12 the distribution of cocaine and possession of a firearm

13 in furtherance of a drug trafficking crime as a result

14 of his possession of a firearm to protect GLCS's

15 narcotics during the course of distributing cocaine on

16 behalf of GLCS.

17         Finally, Defendant Rosales Juarez is also

18 charged with accessory after the fact because of the

19 assistance he provided those involved in Norman's

20 shooting to evade law enforcement detection knowing

21 that Kevin Castro had just shot a rival.

22         As I said at the outset, this is GLCS.

23         Their hallmark is violence.  Getting promoted

24 in the gang involves violence.  Maintaining a position

25 in the gang involves violence.  Protecting the gang's

1  territories from rivals involves violence.  Making

2  money to send to El Salvador involves violence.

3          On the night of July 3, 2017, that violence

4  was on full display in a remote area of

5  Charlottesville, Virginia, where members of GLCS

6  brutally murdered Marvin Rivera Guevera with a machete

7  and knives because they wrongly believed he was a rival

8  gang member.

9          That violence was, again, on full display on

10  the night of March 8, 2019, in Bristow, Virginia, when

11  Defendant Cruz Moreno and his GLCS coconspirators

12  repeatedly shot, stabbed, and tried to slit the throat

13  of Elvin Pena Aguilera because they thought he had

14  become a rival gang member and he disrespected MS-13.

15          Finally, GLCS's violence was on full display

16  in broad daylight on August 12, 2019, when Defendant

17  Perez Sandoval and his GLCS coconspirators shot Norman

18  while he was waiting for his laundry in suburban

19  Manassas, Virginia.

20          None of these brutal attacks were impulsive,

21  reactive, or carried out in the heat of passion.

22  Rather, they were deliberate, planned, and ruthlessly

23  executed to promote MS-13's infusion of violence and

24  allow the individuals involved to rank-up or maintain

25  their ranks in MS-13.

1          The victims were all men who the GLCS

2  identified as rivals.  They tricked or scouted these

3  men for the perfect times and locations to gang up and

4  butcher or shoot them via coordinated ambushes.

5          The evidence will also show that defendants'

6  violent acts were fueled by the money they made

7  distributing drugs in the Eastern District of Virginia.

8          At the end of this trial, we will have

9  another opportunity to speak with you.  You will hear

10  from my colleagues.  By that time, you will have heard

11  from our witnesses and seen our exhibits.  Each piece

12  of evidence is a piece of a puzzle.  As you hear from

13  the witnesses and see the exhibits, the pieces of the

14  puzzle will form a picture, a picture of how the MS-13

15  racketeering enterprise operated and, within that

16  picture, how the defendants served this enterprise

17  through their criminal actions.

18          Based on that evidence, my colleagues will

19  ask you to look at each of the defendants and tell them

20  that the Eastern District of Virginia is not MS-13

21  territory and that they cannot kill and do as they

22  please here, that the MS-13 gang will not be allowed to

23  control, and that there are consequences for MS-13

24  committing acts of violence and distributing drugs that

25  wreak havoc on our community.

1            We'll ask you to send a message by rendering

2    the only verdict consistent with the evidence you'll

3    hear during this trial, that each defendant is guilty

4    of each and every count with which they have been

5    charged.

6            Thank you for your service, your time, and

7    your attention during this trial.

8            THE COURT:  Mr. Walsh.

9        (Mr. Walsh's opening statement is under a separate

10       cover.)

11           THE COURT:  Mr. Conte.

12                    OPENING STATEMENT

13           MR. CONTE:  Thank you, Your Honor.

14           May it please the Court, counsel for the

15   government, cocounsel, ladies and gentlemen of the

16   jury.  Good afternoon.  My name is Joseph Conte.  I

17   represent Mr. Kevin Perez Sandoval.

18           As a threshold, I want you to remember that

19   you have to only listen to the evidence.  You weigh it

20   against that standard called beyond a reasonable doubt.

21   Now, that's the standard that you must weigh all the

22   evidence against.  Keep that in mind.  That's No. 1.

23           The second most important thing is that you

24   can't -- as the judge has already told you -- come to

25   any conclusions or decisions until you've heard all of

1   the evidence, all of the evidence.  Because you're

2   going to hear a lot of evidence.  A lot of that

3   evidence is not going to involve Kevin Perez Sandoval.

4   So listen to the evidence and keep a tally of what you

5   hear about Kevin Perez Sandoval because you're not

6   going to hear much.

7          So listen to the evidence.  Don't come to any

8   conclusions.  It would be a disservice to your duty as

9   jurors to reach conclusions, to make any kind of

10  decisions until you've heard all the evidence in the

11  case.

12         Again, we don't have to present evidence.  I

13  don't want to parrot Mr. Walsh because -- but we stand

14  similarly situated.  We don't have to present evidence.

15  We're going to fight the same witnesses.  There's going

16  to be evidence maybe against his client, maybe against

17  mine.  The wealth of the evidence is going to be -- not

18  involve our clients.  So pay attention to the evidence

19  and listen to what all of these witnesses have to say

20  and whether they involve Kevin Perez Sandoval at all.

21         Kevin Perez Sandoval, he's sitting here.  You

22  see him.  He's grown.  Unfortunately, he is probably

23  immature for his age.  He had friends, friends who

24  turned out to be MS-13 members.  That's how he met

25  these people.

1            Unfortunately, he did use marijuana and he

2   occasionally used cocaine.  That's how he became

3   associated with some of these people who dealt with

4   marijuana and cocaine.  That's his association with

5   MS-13.  He is not a member of MS-13.  He doesn't

6   believe -- have the beliefs of the MS-13 members.  He

7   is just a person that was there for the drugs and --

8   for the drugs and --

9            So listen to the evidence.  Pay attention to

10  the evidence.  This is what you're going to find out

11  about Kevin Perez Sandoval.

12           Again, I'm not going to parrot Mr. Walsh, but

13  the witnesses in this case have something to gain by

14  not being truthful with you.  They've either cut a deal

15  with the government in the hopes of a reduced sentence

16  or been granted immunity to testify.  They'll walk.

17  They will just turn their back and walk out the door

18  just like that, like any free person, after committing

19  heinous acts.  You have to take that into

20  consideration.

21           So finally, I repeat:  Listen to all the

22  evidence, weigh it in the balance against that standard

23  of beyond a reasonable doubt.

24           I'll be able to address you at the end of

25  this trial, but heed my words and listen to the

1    evidence.  Don't come to any conclusions until you've

2    heard all the evidence.

3              Thank you.

4              THE COURT:  All right.  Thank you.

5              Mr. Oates.

6                        OPENING STATEMENT

7              MR. OATES:  May it please the Court and

8    counsel for the government, defense counsel.

9              Good afternoon, ladies and gentlemen.  My

10   name is Jonathan Oates.  I'm an attorney representing

11   Marvin Torres.

12             Marvin, can you please stand for a moment.

13             Marvin Torres is the individual in the purple

14   shirt.

15             Thank you.

16             This case is not about MS-13.  As much as the

17   government wants to make this case about MS-13 and

18   telling you, "Send a message that this isn't MS-13

19   territory," this isn't about MS-13.  MS-13 is not on

20   trial here today.  If they were -- if it was, it would

21   lose every single time.  MS-13 is not a good

22   organization.  It's a violent one.  It's a gang.  It's

23   a violent one.  You're going to hear evidence and

24   testimony about how violent it is.

25             That's not what we're here about today.  Andy

1  Tovar with his MS-13 tattoos on his head organizing all

2  of this or people in El Salvador calling the shots or

3  anybody else isn't here on trial today.  Not a single

4  one of us is going to tell you that MS-13 is somehow

5  some sort of a good thing.

6          This case is about people.  There are people

7  here, Mr. Torres, who is charged with crimes, who is

8  alleged to have committed crimes.  These are people.

9  These are individuals.

10          At the beginning of this, these were kids.

11 The government alleges that Mr. Torres was somehow

12 involved in racketeering when he was 16 years old.  You

13 heard about the attempted murder that happened in

14 August 2019 that Mr. Torres was somehow involved in.

15 At the time, he was 18 years old.

16          This talk about hunting in packs and all of

17 the other things that the government has argued today,

18 none of that involves Mr. Torres, Marvin Torres.  The

19 only person here who is not alleged to have been at a

20 murder scene or to have driven somebody to or from a

21 murder scene is Marvin Torres.

22          The only reason Marvin Torres is here is

23 because of a group chat photo that he sent.  You're

24 going to hear evidence that on July 12 -- no --

25 July 14, 2019, Marvin Torres was at a laundromat that's

1  around the corner from his house.  It's a place that he

2  goes all the time.  It's a place -- you'll hear that

3  it's a place that other people go all the time.

4         Mr. Torres saw a guy, Norman Medina Sanchez,

5  who had 18th Street tattoos on his legs.  He took a

6  picture of it, and he sent that to the group chat.  His

7  exact words were, "Look at this guy with shit on his

8  legs," and then there's some, frankly, not very nice

9  language saying, "Look at this fag washing."

10         "Look at this guy with shit on his legs."

11         That's it.  That's Mr. Torres' involvement.

12  There wasn't any -- you're not going to hear any text

13  messages from Mr. Torres saying, "Hey, let's go kill

14  this guy," or "This guy is in our territory.  Let's

15  kill him.  Let's attack him."

16         "Hey, who has got the gun?  Here's where this

17  guy is."

18         From July 14 to the date of the attempted

19  murder on August 12, Marvin Torres' involvement with

20  regards to this attempted murder is zero, nothing.

21         Judge Trenga instructed you that you're going

22  to hear a lot about conspiracy, and Mr. Torres,

23  obviously, isn't charged with attempting to murder him,

24  as the government concedes.  He's charged with

25  conspiracy.

1            Judge Trenga stated that when you hear
2     conspiracy, think about an agreement, right?
3     Conspiracy basically is a legal term for an illegal
4     agreement.  It's a deal.  Let's work together on
5     something.  Let's do this.
6            It comes -- and you show that by seeing
7     what's inside somebody's mind, right?  There's no
8     contract.  So did Marvin Torres do anything -- this is
9     what you'll have to decide:  Did Marvin Torres do
10    anything to show that he agreed that these other people
11    should kill Norman Medina Sanchez?
12           Well, what do we look at?  We can't step
13    inside Mr. Torres' brain.  We don't know exactly what's
14    going on.  What do we look at?  Well, one of the things
15    we look at is we look at his actions.  When Javier
16    Bonilla and Kevin Castro and Kevin Perez Sandoval saw
17    Norman Medina Sanchez at the laundromat that day, did
18    they call Marvin?  Did Marvin say, "Yeah, that's the
19    guy that I saw"?  Did Marvin say, "Hey, why don't you
20    go get that gun?"  Did Marvin say, "Hey, be careful not
21    to get caught?"
22           Did Marvin say, "Hey, before you go and try
23    to kill this guy, why don't you run it up the ladder?
24    Why don't you ask for Andy Tovar?"
25           Did Marvin say anything?  Did they ask

1  Marvin?  Did they communicate at all with Marvin Torres

2  about that?  No, zero.

3            What evidence is there of an agreement of

4  what the government has to prove inside Marvin Torres'

5  brain that he conspired to kill Norman Medina Sanchez

6  on that day?  There's nothing.  You're not going to see

7  a single text message, hear a single phone call, hear

8  that Marvin Torres was anywhere near there at all.

9  Marvin Torres is absolutely innocent of that charge.

10  He is absolutely innocent of that charge.  He is

11  absolutely innocent of that charge.  He didn't conspire

12  to kill anybody.

13            Following that attempted murder in August, in

14  the government's investigation, they went and they

15  talked to -- obviously, there were crime scene police

16  officers, people who investigated the scene.  They made

17  an arrest of Andy Tovar.  They got his phones.  You're

18  going to hear that the text messages that had the photo

19  that they sent, that they claim says that he somehow

20  conspired, the text message that he sent a month

21  earlier, that says he somehow conspired to kill Norman

22  Medina Sanchez.  The police and law enforcement have

23  that, and they received it.  That's the information you

24  are going to have.  They had wiretaps.  They had phone

25  calls.  Everything that you're going to hear about

1  today in this case with respect to Norman Medina

2  Sanchez, every piece of physical evidence they've had

3  for years.

4          Other people were charged in between then.

5  You're going to hear that Marvin Torres wasn't charged

6  until two years later despite having all of this.

7  Despite having everything that you can see, Marvin

8  Torres was not charged for two years.  As you're

9  listening to the evidence, ask yourselves why.

10          You're going to hear evidence that MS-13 and

11  the GLCS clique was ruled by Andy Tovar.  He had these

12  little millions of children running around and doing

13  not good things for him but that Andy Tovar was

14  dominant and that people lived in terror of what he

15  would do.  You're going to hear text messaging phone

16  calls of people saying -- well, to Marvin Torres

17  saying, "Marvin, if you don't do this and if you don't

18  do that, I'm going to stomp you with my 300-pound

19  boots.  I'm going to beat you with a bat again.  "And

20  this is for a 17- or 18-year-old kid.  You're going to

21  hear that this isn't what he wanted to get into.  Once

22  you're in it, you're stuck, and you can't get out.

23          You're going to hear about how special agents

24  with Homeland Security in the gang task force went and

25  they visited Marvin.  They wanted to talk with him

1   because they knew that Marvin didn't want to be in the

2   gang anymore and he wasn't doing what he was supposed

3   to do.  You're going to hear that they knew that there

4   were plans to kill Marvin.

5         You're going to hear that Marvin was trying

6   to get away.  This conversation -- this interview

7   happened March 9, 2021.  They contacted Marvin.  They

8   said, "Hey, come in.  There's some stuff of interest.

9   We want to talk with you."  And they brought him in,

10   and they laid out all of these things about how he was

11   going to get killed.

12         It's not a very smart decision.  Marvin said,

13   "Okay.  I know, but I'm going to handle it on my own."

14         They offered him help.  Marvin didn't make a

15   good decision that day, probably on March 9, 2021.  He

16   said, "You know what?  I'm going to do it on my own."

17   Had he made a different decision, he certainly wouldn't

18   be here.

19         But without any new evidence, without

20   anything new, within two weeks of that meeting, the

21   special agents went down and they talked to the

22   cooperating witness.  They talked to Javier Bonilla,

23   the guy you're going to talk to -- I'm sorry -- you're

24   going to hear from, the guy who in early March

25   explained that, "Yeah, I stabbed him in the neck twice,

1   but I didn't really want to.  I didn't want to hurt

2   him."  This guy was with Kevin Perez Sandoval and Kevin

3   Castro as they pulled a gun on Norman Medina Sanchez on

4   August 12, 2019, the guy who is not going to be

5   prosecuted for anything.

6           They went down and they talked to him.  After

7   he told the agents thanks, but no thanks, they went

8   down and talked to him.  They said, "Trance" -- that's

9   his nickname, his MS-13 GLCS gang nickname.  Marvin is

10  Trance.  They said, "Tell us what you know about

11  Trance.  Tell us what you know about his involvement in

12  the attempted murder of Norman Medina Sanchez."

13          Frankly, Javier Bonilla, much to his credit,

14  didn't tell them anything new because Marvin Torres had

15  zero involvement in that attempted murder, none.  There

16  was no agreement.  There was no actions.  He had zero

17  involvement.  He's innocent of that.  And the

18  government learned no new evidence about Marvin Torres.

19          I take that back.  The government did learn

20  from Javier Bonilla about Marvin Torres.  They asked

21  him, "Was Marvin Torres distributing drugs for the

22  clique?"

23          And he said, "No."

24          Marvin Torres is charged with distributing

25  cocaine and marijuana from January 2019 through August

1  2019.  When they went down and talked to Javier

2  Bonilla -- who the government is going to say trust

3  this guy -- they asked him, "Was Marvin selling drugs

4  during this time?"

5           And he said, "No."

6           He said that Marvin basically was -- you

7  know, he was paying rent or an amount of money to not

8  have to distribute drugs for the gang.  And he was

9  doing it on his own, frankly, not as a part of the

10 gang, not as a part of the clique.  So Marvin Torres is

11 innocent of that charge as well.

12          I don't think there's going to be a lot of

13 dispute as to these facts.  But it's pretty clear that

14 the facts are absolutely not going to show that Marvin

15 Torres had some sort of agreement to murder Norman

16 Medina Sanchez by taking a picture.  That's just

17 ludicrous.

18          You know, Mr. Walsh and Mr. Conte talked a

19 little bit about the standard of proof that the

20 government bears in this case.  And as a defense

21 attorney, I have to bring that back up again because

22 it's so critically important.  Keep this in mind as

23 you're listening to the evidence in this case:  The

24 government has to prove Marvin Torres -- has to prove

25 this agreement beyond a reasonable doubt.

1            Beyond a reasonable doubt is the highest

2   standard that we have in the law.  There is no higher

3   standard, and it's something that's critical in our

4   criminal justice system.  It's so high for criminal

5   cases, much higher than civil cases, much higher than,

6   you know, people using parenting rights.  In a family

7   case, you can lose your parenting rights, your rights

8   as a parent for clear and convincing evidence.  That's

9   the last thing beyond a reasonable doubt.  You can

10  bankrupt a multibillion-dollar company in a lawsuit for

11  a preponderance of the evidence.  Bankrupted company,

12  losing parental rights, guilty of a criminal

13  conviction.

14            It's that high, and it's that high because

15  it's meant to prevent wrongful convictions.  It's meant

16  to prevent people that are innocent of crimes from

17  being convicted.  Marvin Torres is innocent in this

18  case.  Marvin Torres is absolutely innocent of these

19  charges.

20            Let me back up.  I got ahead of myself just a

21  moment.

22            So after the special agents -- after Marvin

23  on March 9, 2021, said, "Thank you, but no thank you;

24  you know, I know that these people want to kill me; and

25  I know that they're trying to kill me, but I'm going to

1   handle it on my own," special agents went down, they

2   found Javier Bonilla.  They said, "Let's talk about

3   Trance.  We want to talk about Marvin.  Tell us what he

4   knows."

5            They don't learn anything else.  And despite

6   that, despite that all the evidence you're going to see

7   against Marvin Torres after talking to Javier Bonilla,

8   nothing has changed.  They still brought charges.  They

9   still did.  I don't know if it was out of -- I think it

10  has to do with this, what I started with.  They lost

11  sight that this case isn't about MS-13, that the people

12  that they've charged and the facts as they alleged are

13  innocent people.

14           You know, show them that this isn't MS-13

15  territory with the torches and the pitchforks.  Get

16  every single one of them regardless of what we know,

17  regardless of what they've known for years.  They

18  didn't charge him not because they have a goodness in

19  their heart.  They didn't charge him because they knew

20  there wasn't any evidence.  Nothing has changed.

21           Please look critically at this case.  Please

22  look carefully at this case.  I know that this isn't

23  the first place that you want to be, but this is

24  perhaps the most important juncture and moment in

25  Marvin Torres' life.  His freedom is hanging in the

1  balance for charges that he did not commit.

2          At the end of the government's evidence, I'm

3  going to ask you to find a verdict of not guilty for

4  the drug distribution and the conspiracy to murder

5  Norman Medina Sanchez.

6          Thank you.

7          THE COURT:  Mr. Krischer.

8                    OPENING STATEMENT

9          MR. KRISCHER:  May it please the Court,

10 counsel for the government, defense counsel.

11         Ladies and gentlemen of the jury, I have an

12 unenviable place of being last, and I appreciate your

13 attention to all of our arguments and the relatively

14 brief statement that I'll make today at this, the

15 beginning of the case.

16         Mr. Rosales Juarez is charged with a RICO

17 conspiracy, a conspiracy to commit murder, of which

18 there are several.  Very specifically, Mr. Rosales

19 Juarez is only charged with a conspiracy to commit

20 murder that occurred in August 2019.  He is charged

21 with conspiracy to distribute cocaine and marijuana and

22 accessory after the fact, that he took some action

23 after the attempted murder in August 2019, and that

24 makes him culpable of a separate crime.

25         You have heard from the government as they

1  have laid out their case, and you've heard from the
2  other defense counsel about their thoughts on that
3  evidence.  It's important to know that even though we
4  are all defense counsel, we are not a team.  We are not
5  jointly defending each other's clients.  Each one of us
6  has one client, and that's the only person that we are
7  representing.
8          So there may be times when you see us working
9  together or conversing together because, as you've
10 heard, a lot of the evidence is going to be the same.
11 A lot of the evidence is going to be about the
12 credibility of the government's witnesses, the
13 criminals that they have elected to come and have
14 testify to you and tell you that our clients are
15 guilty.
16         I want you to pay attention as this case
17 progresses, and we'll be here for some time.  I want
18 you to pay attention to the evidence.  Pay attention to
19 what the government told you they were going to prove,
20 the evidence that they will show you, and hold them to
21 that.  Hold them to that burden.
22         Their statement today is not evidence.  They
23 still have to show it to you, and some of that evidence
24 is going to involve expert testimony.  You heard the
25 government talk about there's going to be a gang

1   expert.  This gang expert is going to talk about

2   structure and rank and rules and all of these things.

3           That expert is also going to tell you that

4   MS-13 gang members are liars.  They make things up.

5   They engage in bluster, that their status in the gang

6   is related to crimes that they have committed.  So, of

7   course, they're all going to talk about things that

8   they did, just the statements about what they did, but

9   they're liars.

10          You're also going to hear from the expert

11  that the first word is the last word.  The first word

12  is the one who lays down the law.  If you break his

13  law, then you get the bat or you get his boot or you

14  get greenlit, which you will learn means you are

15  authorized to be killed.

16          You are going to hear that it's in

17  everybody's interest -- gang member, gang associate,

18  member of the public who is aware that these people are

19  gang members -- it's in everyone's interest to play

20  along and to agree and to say okay and yes.

21          You're going to hear a lot of evidence about

22  lots of terrible crimes.  Many of the images that you

23  will see as this trial progresses will never leave you.

24  They will haunt you.  They will haunt all of the

25  attorneys and the people here in the courtroom.

1          What's important to remember -- and Mr. Walsh

2    pointed this out -- is most of the horrific pictures

3    that you will see have nothing to do with anybody

4    sitting here.  They involve murders that occurred in

5    2017, 2016, and 2014.  And as Mr. Walsh told you, that

6    is going to be designed to shock and awe you.  Because

7    when you see that, your reaction is going to be, We

8    can't let this happen.  We're going the show MS-13.

9    But that's not the evidence against our clients.

10          You're going to hear evidence that

11   Mr. Rosales Juarez was a part of the lowest rank in the

12   gang.  You're also going to hear evidence from the same

13   witness who says he was a part of the gang.  He also

14   told the government he's not in the gang.  The fact is

15   no one really knows if he's in the gang.  In fact, one

16   of the agents says, "We've never actually been able to

17   tie him to the gang at all."

18          So you're going to hear lots of evidence

19   about crimes that have nothing to do with my client.

20   You are going to hear contradictory evidence about

21   whether or not he's a member of a gang at all.  You're

22   going to hear lots of evidence about crimes that my

23   client has nothing to do with.

24          The other thing that I want you to pay

25   attention as we go through this trial is I want you to

1   pay attention to the evidence that you don't hear.  The

2   government alluded to a conversation between

3   Mr. Rosales Juarez, my client, and Andy Tovar about

4   buying a gun.  You are not going to hear evidence that

5   any gun was purchased, that anything was actually done

6   in relation to that conversation.

7         You're not going to see evidence that

8   Mr. Rosales Juarez was involved or participated in

9   events relating to the gang at all before 2019.

10         And at the end of the day, all of these gaps

11   and all of these contradictions are going to simply be

12   insufficient to meet the government's burden.  It will

13   be insufficient to prove beyond a reasonable doubt that

14   Mr. Rosales Juarez was a member or associated with a

15   gang, that he engaged in activities or made an

16   agreement to support the gang's activities, and

17   certainly not that he engaged in an agreement in order

18   to go and kill Mr. Medina Sanchez on August 12, 2019.

19         You will hear that he admitted to officers,

20   "Yes, I took them to that hotel."

21         The only evidence you're going to hear that

22   he knew about what happened beforehand comes from a

23   name you've heard many times already this afternoon,

24   Javier Bonilla.  Javier Bonilla, who has initially said

25   my client wasn't part of a gang -- that's what he first

1  said -- and then as he wanted more, as he was promised

2  more or received more from the government, his story

3  changed:  Oh, no.  He is part of the gang.

4            And he also says, Well, I think that someone

5  told Mr. Rosales Juarez that the shooting had occurred.

6            That's going to be the evidence that you

7  hear.  That certainly is insufficient to prove beyond a

8  reasonable doubt that Mr. Rosales Juarez made an

9  agreement or even knew at the time that he drove the

10 other individuals to the hotel that an attempted murder

11 had occurred.

12            We'll be able to come back and speak to you

13 directly one more time during this trial.  And at that

14 time, we'll actually be able to address every piece of

15 evidence that was and wasn't introduced.  At this

16 point, I'm just asking you to pay attention to these

17 things as the trial progresses.  But at the end of the

18 trial, I'll be able to go through each and every piece

19 of evidence and why none of that evidence is going to

20 be sufficient to prove beyond a reasonable doubt that

21 Mr. Rosales Juarez is guilty of any of the crimes the

22 government has charged him with.

23            Thank you very much, and have a good

24 afternoon.

25            THE COURT:  Thank you.

120

1              Ladies and gentlemen, before we continue, we

2    will go ahead and take our afternoon recess at this

3    time.

4              You're excused to the jury room.  We'll

5    reconvene at 4:00.  Again, please do not discuss this

6    case among yourselves during the recess.

7              You're excused to the jury room.

8         (The jury exits at 3:42 p.m.)

9              THE COURT:  All right.  Anything we need to

10   take up before the first witness?

11             MR. MURPHY:  Not from the government, Your

12   Honor.

13             THE COURT:  All right.

14             MR. WALSH:  No, Your Honor.

15             THE COURT:  All right.  The Court will stand

16   in recess.

17        (Recess from 3:42 p.m. until 4:08 p.m.)

18        (The jury is not present.)

19             THE COURT:  All right.  Please be seated.

20             Anything before we bring the jury out?

21             MR. MURPHY:  No, Your Honor.

22             THE COURT:  All right.  A couple of issues.

23   A few of the jurors have indicated they're having

24   difficulty from where they're seated viewing the

25   witness box and some of the other ongoings in the

 1  courtroom.  They've conferred among themselves, and

 2  they've asked if it was possible if they all could sit

 3  in the jury box together.  So I'm going to let them do

 4  that.

 5            Also, one of the jurors has indicated that

 6  the juror in front of this person is too tall to be

 7  seen over.  So they're going to switch places.

 8            Do we know which ones those are?

 9            THE COURT SECURITY OFFICER:  Not yet, sir.

10  I'll find out when they come out.

11            THE COURT:  All right.  Let's bring the jury

12  out.

13       (The jury enters at 4:09 p.m.)

14            THE COURT:  All right.  What's your number,

15  sir?

16            JUROR:  No. 48.

17            THE COURT:  No. 48.  You're switching places

18  with?

19            JUROR:  No. 8.

20            THE COURT:  Eight.  All right.  Very good.

21  Thank you.

22            All right.  Please be seated.

23            The government will call its first witness.

24            MR. PATTERSON:  The government calls Edgar

25  Blanco Torres.

1           THE COURT:  All right.  Mr. Torres will come

2    forward, please.

3           Would you identify yourself for the record

4    and be sworn, please.

5           INTERPRETER HORVATH:  Yes.  Maria Horvath,

6    federally certified court interpreter.

7           INTERPRETER PRADO:  Manuel Prado, federally

8    certified court interpreter.

9           Good afternoon, Judge Trenga.

10       (The interpreters affirm.)

11          THE COURT:  All right.  Thank you.

12          All right.  Is the witness sworn?

13          THE CLERK:  I'm going to do that now, Judge.

14     EDGAR OSWALDO BLANCO TORRES, GOVERNMENT'S WITNESS,

15                         AFFIRMED

16                    DIRECT EXAMINATION

17   BY MR. PATTERSON:

18   Q    Could you please introduce yourself to the Court

19   and spell your name for the court reporter.

20   A    Edgar Oswaldo Blanco Torres.

21          THE COURT:  Mr. Torres, would you keep your

22   voice up, please, if you would.

23   BY MR. PATTERSON:

24   Q    Could you spell your name, please.

25   A    First name is E-D-G-A-R.  Second name is

Blanco Torres - Direct

1   O-S-W-A-L-D-O, B-L-A-N-C-O, T-O-R-R-E-S.

2   Q     And how old are you?

3   A     Twenty-nine.

4   Q     Where were you born?

5   A     El Salvador.

6   Q     What year did you come to the United States?

7   A     2016.

8   Q     And how old were you when you came to the United

9   States?

10  A     Twenty-three.

11  Q     How did you get to the United States?

12  A     As an immigrant.

13  Q     Were you a legal immigrant?

14  A     No.

15  Q     When you first came to the United States, which

16  state did you go to?

17  A     Maryland.

18  Q     Why did you go to Maryland?

19  A     My family was waiting for me there.

20  Q     Did you stay with your family in Maryland?

21  A     Yes.  For a while, yes.

22  Q     How long did you stay with your family in

23  Maryland?

24  A     Six months.

25  Q     Where have you moved after being with your family?

Blanco Torres - Direct

1          MR. CONTE:  I object to the relevance of

2    this, Your Honor.

3          THE COURT:  May I see counsel at the bench,

4    please.

5       (Conference at the bench, as follows:)

6          THE COURT:  What's everyone's view of

7    witnesses testifying with their mask on?

8          MR. MURPHY:  I would defer to the preference

9    of the witness.

10         MR. WALSH:  I would too.

11         MR. KRISCHER:  Yeah.

12         MR. OATES:  I mean, I would like the witness

13   to take their mask off, especially for some witnesses,

14   if the jury is going to be judging their credibility.

15   I think being able to see their full face is important.

16         MR. PATTERSON:  If they're vaccinated.

17         MR. MURPHY:  Some witnesses may be more

18   confident with doing that than others.  I can tell you

19   there's at least one government witness who would not

20   be comfortable doing that for medical reasons.

21         THE COURT:  Do we know if this person is

22   vaccinated?

23         MR. PATTERSON:  I don't know the answer to

24   that.

25         MR. MURPHY:  We can inquire of his

Blanco Torres - Direct

1  vaccination status.  I don't know currently.

2            THE COURT:  I agree with you.  I think it's

3  much easier for the jury to make judgments about

4  credibility without the mask.

5            MR. MURPHY:  Do you want to inquire with each

6  witness when they come up as to whether or not they

7  would be comfortable testifying without a mask?

8            THE COURT:  Well, if they are vaccinated, I'm

9  going to ask that they testify without a mask.  Why

10 don't we inquire of the witness whether he's

11 vaccinated.

12           MR. PATTERSON:  May I do that right now?

13           THE COURT:  Yes, why don't you do that with

14 the interpreter.

15     (Mr. Patterson leaves the bench and returns.)

16           MR. PATTERSON:  He is vaccinated.

17           THE COURT:  All right.  We're going to ask

18 him to testify without a mask.  All right.

19           MR. PATTERSON:  Thank you, Your Honor.

20           THE COURT:  Very good.

21           I'm sorry.  What was the objection?

22           MR. CONTE:  Just relevance, Your Honor.

23           THE COURT:  What was the question?

24           MR. CONTE:  How long he lived in Maryland

25 with his parents.  I don't think that's relevant.

Blanco Torres - Direct

1          THE COURT:   Let him answer, and we'll move

2    on.

3          MR. PATTERSON:   Thank you, Your Honor.

4        (Proceedings continued in open court, as follows:)

5          THE COURT:   Mr. Torres, I understand that

6    you're vaccinated.   So I'm going to ask that you

7    testify without your mask on.

8    BY MR. PATTERSON:

9    Q    Where did you move after being with your family?

10   A    It's close to Maryland, but I keep forgetting the

11   name of the county.

12   Q    Who did you live with?

13   A    With some friends from the MS-13 gang.

14   Q    How far did you go in school before you came to

15   the United States?

16   A    Fifth grade.

17   Q    When you came to the United States, did you

18   continue to go to school here?

19   A    No.

20   Q    Have you ever been in a gang?

21   A    Yes.

22   Q    Which gang?

23   A    MS-13.

24   Q    What's the full name of MS-13?

25   A    La Mara Salvatrucha.

Blanco Torres - Direct

```
 1  Q    How old were you when you joined MS-13?

 2  A    Fourteen years old.

 3  Q    Where did you live when you joined MS-13?

 4  A    In El Salvador.  That was in San Miguel.

 5  Q    Within MS-13, was there a particular clique that

 6  you first joined?

 7  A    Yes.

 8  Q    Which one?

 9  A    Guanacos Lil Cycos.

10  Q    And do you know how they got the name Guanacos?

11  A    Because we are El Salvadorians, so we are

12  Guanacos.

13  Q    And approximately how long were you with the

14  Guanacos Lil Cycos clique?

15  A    Four years.

16  Q    Did you go to rehab?

17          THE INTERPRETER:  Excuse me?

18  Q    Did you go to a rehabilitation facility?

19  A    Yes.

20  Q    Why did you go?

21  A    Well, to rehab, to get help from the gangs and

22  from drugs.

23  Q    Why did you want to get help from the gang?

24  A    To be a good person in society and to get away

25  from gangs.
```

1  Q    How long were you in a rehabilitation program?

2  A    Ten months.

3  Q    When you left the program, did you return to

4  MS-13?

5  A    Yes.

6  Q    Which clique did you join when you went back to

7  MS-13?

8  A    Coronados Lil Cycos.

9  Q    Why didn't you go back to the Guanacos Lil Cycos

10 clique?

11 A    I didn't trust them to go back with them.

12 Q    What did you think might happen to you if you went

13 back to them?

14 A    They wanted to kill me.

15 Q    In what country were you when you joined the

16 Coronados clique?

17 A    El Salvador.

18 Q    Was the Coronados clique present in Maryland or

19 Virginia when you came to the United States?

20 A    Yes.

21 Q    Did you stay in Coronados or join another clique

22 when you came to the United States?

23 A    I went back to Coronados.

24 Q    Generally, when a person joins the MS-13 gang, are

25 they given a nickname?

                         Blanco Torres - Direct

1    A    Yes.

2    Q    Were you given a nickname?

3    A    Yes.

4    Q    What was your nickname?

5    A    Wizard.

6    Q    Why do MS-13 gang members use nicknames?

7    A    So that nobody could identify us through our true

8    name, nobody in the gang and nobody by the police.

9    Q    Are you currently in prison?

10   A    Yes.

11   Q    Are you in prison for pleading guilty to murder in

12   aid of racketeering?

13   A    Yes.

14   Q    What year did you plead guilty to this charge?

15   A    2018.

16   Q    Where did you plead guilty to this crime?

17   A    In Alexandria.

18   Q    In this court?

19   A    Yes.

20   Q    Was that for a murder you committed with other

21   MS-13 gang members?

22   A    Yes.

23   Q    What were the names of the other MS gang members

24   who were involved in that murder?

25   A    Rasta with the Coronados, Slaker from the

Blanco Torres - Direct

1   Coronados, Cannabis or Baby Face, Archangel from

2   Coronados, and then Katie Portillo, and Angelica

3   Blanco.

4   Q     And when you mentioned the people's names, are you

5   giving us nicknames here?

6   A     The nicknames.

7   Q     And when you're giving us -- when you say after

8   that another name, what is that that you're describing?

9   A     The name of the two girls.

10  Q     And were they members of MS-13?

11  A     No.

12  Q     But were they involved in the murder?

13  A     Yes.

14  Q     Were you housemates with any of these individuals?

15  A     Yes.

16  Q     Which ones?

17  A     With Cannabis, Slaker, Katie Portillo, and

18  Angelica Blanco.

19  Q     I'm going to now show you what has been marked for

20  identification as Government's Exhibits 59-6 -- it will

21  be 59-6, 59-7 -- it should be marked as 59-6, and then

22  59-7 should be the next one.

23            THE COURT:  You're asking him to look at 59-6

24  and 59-7?

25            MR. PATTERSON:  Yes, and then also 59-8,

Blanco Torres - Direct

1    59-9, 59-10, 59-11, and 59-12.  It should be seven

2    exhibits.

3            THE COURT:  Counsel, I don't have a 59-12.

4            You can continue.

5            Oh, I'm sorry.  I do have it.

6            MR. PATTERSON:  You do?

7            THE COURT:  I do, yes.

8    BY MR. PATTERSON:

9    Q    Do you recognize these photographs?

10   A    Yes.

11   Q    Who appears in these photographs?

12   A    Angelica Blanco, Katie Portillo.  That's me.

13   That's Rasta, R-A-S-T-A, Cannabis, Slaker, Jericho.

14   Q    And are you familiar with what each of the

15   individuals in these photographs looks like?

16   A    Yes.

17   Q    How are you familiar with what they look like?

18   A    Well, I lived together with them, and with

19   Cannabis and Rasta, we worked together.  And Slaker

20   too.

21   Q    Do the photographs in Government's Exhibits 59-6

22   through 59-12 fairly and accurately depict the

23   individuals you just mentioned?

24   A    Yes.

25            MR. PATTERSON:  Your Honor, at this time I

Blanco Torres - Direct

1    would ask to admit these exhibits into evidence and

2    publish them.

3              THE COURT:  All right.  Any objection?

4              MR. KRISCHER:  No, Your Honor, no objection.

5              THE COURT:  Without objection, Exhibits 59-6

6    through 12 are admitted.

7              MR. PATTERSON:  I'd like to put up 59-6 now,

8    please.

9    BY MR. PATTERSON:

10   Q    Who is depicted in this photo?

11   A    Heather Blanco.

12   Q    And looking at Government's Exhibit 59-7, who is

13   in this photo?

14   A    Katie Portillo.

15   Q    And looking at Government's Exhibits 59-8 and

16   59-9, who is that?

17   A    It's Rasta.

18   Q    And 59-10?

19   A    Cannabis.

20   Q    And 59-11?

21   A    Slaker.

22   Q    And 59-12?

23   A    Jericho.

24   Q    With respect to the racketeering crime you pled

25   guilty to here in the Eastern District of Virginia,

Blanco Torres - Direct

1    have you been sentenced for that crime?

2    A    Yes.

3    Q    And what sentence did you receive?

4    A    A life sentence.

5    Q    As a result of your guilty plea, did you enter

6    into a Plea Agreement with the government?

7    A    Yes.

8    Q    As a result of your cooperation, have you been

9    placed in protective custody within the Bureau of

10   Prisons?

11   A    Yes.

12   Q    Inside of the exhibit binder, I'd like for you to

13   look at what's been marked as Government's

14   Exhibit 58-2.

15            THE INTERPRETER:  I was asking where it was

16   in the folder.  I'm sorry.

17            MR. PATTERSON:  It should be before -- it

18   should be 58-2.  It could be in a separate folder,

19   58-2.

20            THE COURT SECURITY OFFICER:  Exhibit 58

21   should be in that book.

22   BY MR. PATTERSON:

23   Q    Do you recognize Exhibit 58-2?

24   A    Yes.

25   Q    What is it?

Blanco Torres - Direct

1  A     I forgot the name of it.

2  Q     Is it a Plea Agreement?

3  A     Yes, it's the Plea Agreement.

4  Q     Does your signature appear on the last page of the

5  Plea Agreement?

6  A     Yes.

7           MR. PATTERSON:  Your Honor, I would ask that

8  Government's Exhibit 58-2 be admitted.

9           THE COURT:  Any objection?

10          MR. CONTE:  Yes, Your Honor.

11          THE COURT:  I'm sorry?

12          MR. CONTE:  I have an objection, Judge.  May

13  we approach?

14          Can I confer with cocounsel?

15          THE COURT:  Yes.

16          MR. PATTERSON:  May I finish with my -- what

17  I was saying?

18          THE COURT:  I thought you moved in the

19  exhibit.

20          MR. PATTERSON:  I was moving it in, but I'd

21  ask not to publish it, Your Honor.

22          THE COURT:  All right.  Is there still an

23  objection?

24          MR. CONTE:  May I consult?

25          THE COURT:  Yes.

1        (Counsel confer.)

2            THE COURT:  All right.  Let me see counsel at

3   the bench.

4        (Conference at the bench, as follows:)

5            THE COURT:  What's the objection?

6            MR. CONTE:  Part of it is the document is

7   unredacted.

8            MR. MURPHY:  With respect to the standard

9   Plea Agreement that we always use, including a

10  paragraph which refers to polygraphs as a request of

11  the government, that paragraph has been redacted from

12  all the federal Plea Agreements in this matter.  It's

13  proprietary with respect to the government's agreement

14  with the defendants and also confidential with respect

15  to the defendants.  The government would note that we

16  are not publishing the Plea Agreement.

17           THE COURT:  I've seen a lot of Plea

18  Agreements that aren't under seal with that paragraph

19  in it.  I'm not sure what's proprietary about it.

20           MR. MURPHY:  Well, that's what's redacted.

21           THE COURT:  Any other objection?

22           I'm not sure why you need these.  He's pled

23  guilty to the cooperation agreement that --

24           MR. MURPHY:  Well, we are going to discuss

25  terms and terms of that Plea Agreement, none of

                    Blanco Torres - Direct

1   which -- questions about the terms of that Plea

2   Agreement, none of which include the redacted portion,

3   Your Honor.

4           THE COURT:  All right.

5           MR. CONTE:  That's good cross-examination,

6   somebody agrees to a polygraph.

7           THE COURT:  Well, I'm going to let the

8   exhibit in.  I'm going to let them cross-examine about

9   what's in the redaction just so the jury isn't

10  speculating about it.

11          MR. KRISCHER:  I'm sorry.  I don't believe --

12  well, my concern is that he won't remember and whether

13  or not the government has an unredacted copy that can

14  be used.

15          THE COURT:  Do you have one?

16          MR. MURPHY:  Frankly, you can ask him if he's

17  been polygraphed, and he will tell you that he hasn't.

18          MR. CONTE:  We can't ask him whether that was

19  part of his Plea Agreement because it's redacted.

20          THE COURT:  I think you can make a

21  presentation of what's redacted.

22          Let me ask:  What's the relevance of this

23  witness?

24          MR. MURPHY:  This is racketeering.  It's

25  relevant to the activity that the gang is involved in.

Blanco Torres - Direct

1          THE COURT:  What murder is he going to talk
2    about?

3          MR. MURPHY:  He is going to talk about
4    Christian's murder, Your Honor.

5          THE COURT:  All right.

6          MR. KRISCHER:  I will say, Judge, this was
7    the basis of why the original motions with regard to,
8    you know, a murder that's not involving this clique or
9    any of these codefendants -- at the time, the
10   foundation needs to be laid with regard to the
11   racketeering count.  To the extent that they are going
12   to start talking about this, I don't believe -- they're
13   getting there but --

14         MR. MURPHY:  We wanted to finish asking the
15   witness questions.

16         MR. KRISCHER:  That's what I'm saying.  With
17   regard to whether or not there's going to be an
18   objection, I certainly want to bring to the Court's
19   attention that this is one of the --

20         THE COURT:  No.  I understand.

21         It does seem to me, frankly, on what I've
22   heard so far, a little cumulative and sort of out of
23   the scope.  I'm going to let you get into it, but I
24   want you to move through it quickly.

25         MR. MURPHY:  Sure.

Blanco Torres - Direct

1          THE COURT:  I'm not sure I'm going to allow
2    any of the photos in as to either of these two given
3    the photos you want to introduce as to the others.  But
4    I think we can get through both of these two murders
5    pretty quickly if that's what these are for.
6          All right.
7       (Proceedings continued in open court, as follows:)
8          THE COURT:  Counsel.
9          MR. PATTERSON:  Your Honor, the government
10   would ask for this to be admitted into evidence but not
11   published.
12         THE COURT:  Well, do you want it to go back
13   to the jury room as an exhibit?
14         MR. PATTERSON:  Yes, Your Honor.
15         THE COURT:  All right.  Over objection, the
16   Court is going to admit Exhibit 58-2 with counsel's
17   representation as to what's on the redaction on page 6.
18   BY MR. PATTERSON:
19   Q    When you pled guilty, did you agree to cooperate
20   with the government?
21   A    Yes.
22   Q    What does the government expect you to do with
23   respect to your cooperation under the agreement?
24   A    To say the truth.
25   Q    How many times have you testified at trial?

Blanco Torres - Direct

1   A     This is the first.

2   Q     Do you hope to get your sentence reduced from

3   life?

4   A     Yes.

5   Q     Has anyone made you any promises other than what's

6   set forth in your Plea Agreement?

7   A     No.

8   Q     If you cooperate with the United States and

9   testify truthfully, what do you hope will happen?

10  A     Something better than the sentence that I have.

11  Q     And who will actually determine your sentence?

12  A     Judge.

13  Q     Do you understand the judge will determine whether

14  any reduction in your sentence is appropriate?

15          THE INTERPRETER:  Any objection what?

16  Q     Do you understand that the judge will determine

17  whether any reduction in your sentence is appropriate?

18  A     Yes.

19  Q     Why did you join MS-13?

20  A     As a reprisal for the burial of my father.

21  Q     Before joining MS-13, what did you know about the

22  gang's involvement in criminal activity?

23  A     Nothing.

24  Q     What did you know about members of MS-13

25  committing acts of violence against other people?

                          Blanco Torres - Direct

1  A     What's that?

2  Q     Did you know about MS-13 committing acts of

3  violence against other people?

4  A     Yes.

5  Q     When you moved to Maryland, did you meet any other

6  members of MS-13?

7  A     Yes.

8  Q     Who did you meet?

9  A     Are you talking about the names of other cliques,

10 or are you talking about the names of other people?

11 Q     Who did you meet from Coronados in Maryland?

12 A     Yaiko, Archangel, Cannabis, and Rasta.

13 Q     In the two weeks before the murder to which you

14 pled guilty, how frequently did you hang out with

15 members of the Coronados clique?

16 A     All the time every day.

17 Q     Are you familiar with the term *paro*?

18 A     Yes.

19 Q     What is a *paro*?

20 A     The people that carry out the favors for the

21 homies.

22 Q     What kind of favors do *paros* do?

23 A     Distribute marijuana in retail amounts.

24 Q     And do they also sell cocaine?

25           MR. CONTE:  Objection, leading.

Blanco Torres - Direct

1          THE COURT:  I'll let him answer.

2   A    Yes.

3   Q    Where do *paros* get the money to buy the drugs?

4          MR. KRISCHER:  Objection, Judge, with regard

5   to whether or not this is a Coronados clique, or is he

6   talking generally.

7          THE COURT:  He's talking about the Coronados

8   clique, which is his experience.

9          Right?

10          MR. PATTERSON:  That is correct.

11  BY MR. PATTERSON:

12  Q    Where do *paros* get the money to buy the drugs?

13  A    They don't get the money and stuff like that.  The

14  homies, we hand them the drugs and everything.

15  Q    And are you familiar with the term *chequeo*?

16  A    Yes.

17  Q    What is a *chequeo*?

18  A    A trusted person by the homies and by the clique.

19  Q    And what are the things that *chequeos* do?

20  A    Control the area.

21  Q    And were you a *chequeo*?

22          MR. WALSH:  Judge, I object.  He didn't get a

23  chance to answer.

24          THE COURT:  Hold on.  Do you want to answer?

25          MR. PATTERSON:  I don't think you want the

Blanco Torres - Direct

1    answer.

2              THE COURT:  All right.  Go ahead.

3              Just listen to the next question.

4              Go ahead.

5    BY MR. PATTERSON:

6    Q    Were you a *chequeo* in MS-13?

7    A    Yes.

8    Q    Are you familiar with the term "homeboy"?

9    A    Yes.

10   Q    What is a homeboy?

11   A    A homeboy, he's an active member of the MS-13.

12   Q    What does someone have to do to earn sufficient

13   status to become a homeboy?

14   A    Kill, commit crimes.

15   Q    And are you familiar with the term "first word"?

16   A    Yes.

17   Q    What is a first word?

18   A    He is the leader of the clique in general.

19   Q    Was there a first word in your clique, the

20   Coronados clique?

21   A    Yes.

22   Q    What was the name of this first word?

23   A    Infierno.

24   Q    Where was Infierno based?  Where did he live?

25   A    New York.

Blanco Torres - Direct

1  Q    Are you familiar with the term "second word"?

2  A    Yes.

3  Q    What is a second word?

4  A    They're the same.  They do it together.

5  Q    Do the first word and the second word work

6  together?

7  A    Yes.

8  Q    Was there a second word in your clique, in the

9  Coronados clique?

10  A    Yes.

11  Q    What was his name?

12  A    El Cantinflas, and he is in jail in Mexico.

13  Q    Are you familiar with the term "*corredor*"?

14  A    Yes.

15  Q    What does the *corredor* do?

16  A    He coordinates all the events that are going to be

17  handed out.

18  Q    Where does the *corredor* live?  In what country

19  does the *corredor* live?

20  A    In Maryland, there are a lot of *corredors*.

21  Q    Are there *corredors* that live outside of the

22  United States?

23  A    Yes.

24  Q    After you joined MS-13, did you ever attend any

25  clique meetings?

Blanco Torres - Direct

1   A      Yes.

2   Q      How frequently did the clique meet in the United

3   States?

4   A      Only once.

5   Q      And how long were you here before you were

6   arrested?

7   A      Ten months.

8   Q      And generally, who attends clique meetings?

9   A      Depends on the topics that need to be discussed.

10  In some meetings, there are just the homeboy, some with

11  just the *corredors*.

12  Q      And what happened at the meetings?

13  A      It's discussed everything they've been talking

14  about and talking about things that are going to be

15  done and eventually carried out in the future.  And

16  also, to decide discipline, people that are not doing

17  it right.

18  Q      And was money collected at these meetings?

19  A      Sometimes yes; sometimes no.

20  Q      Who was money collected from?

21  A      Money comes from the homeboys for activities.

22  Q      Was everyone in the gang required to pay this

23  money?

24  A      What?

25  Q      Was everyone in the gang required to pay this

Blanco Torres - Direct

1   money?

2   A     No.

3   Q     How much do gang members pay?

4   A     We all put down $50 if it was something that we

5   needed.

6   Q     Who was the money sent to?

7   A     To El Salvador.

8   Q     And what else was the money used for?

9   A     It was the cost of gas, more drugs, munitions.

10  Q     On that last word, when you say munitions, what do

11  you mean?

12  A     Bullets.

13        MR. CONTE:  Can we get the foundation for

14  some of this?

15        THE COURT:  Go ahead.  Ask the next question.

16  BY MR. PATTERSON:

17  Q     Did your clique have any guns?

18  A     Yes.

19  Q     Who do the guns belong to?

20  A     In general, to the whole clique.

21  Q     Could members of the clique use the guns?

22  A     Yes.

23  Q     When you were in MS-13 in the United States, did

24  your clique ever contact MS-13 members in El Salvador?

25        MR. CONTE:  Objection, Your Honor.

Blanco Torres - Direct

```
 1              MR. OATES:  Objection.
 2              THE COURT:  I'm sorry.  What was the
 3   question?
 4              MR. PATTERSON:  The question was when you
 5   were in MS-13 --
 6              THE COURT:  You need to lay a foundation.
 7              MR. OATES:  Thank you.
 8   BY MR. PATTERSON:
 9   Q    You mentioned that money from the clique was sent
10   to El Salvador.
11   A    Yes.
12   Q    How did the clique communicate with MS-13 members
13   in El Salvador?
14              MR. OATES:  Objection to the foundation
15   again, Your Honor.
16              THE COURT:  Why don't you ask him how he
17   knows things before you ask him what it is.
18   BY MR. PATTERSON:
19   Q    How do you know that the money was sent to
20   El Salvador?
21   A    Well, we would send it to Western Union to people.
22   Q    And did you directly contact people, MS-13
23   members, in El Salvador?
24   A    Yes.
25   Q    How would you do that?
```

Blanco Torres - Direct

1  A     Through WhatsApp.

2  Q     And did you have to get permission from

3  El Salvador to kill people in the United States?

4              MR. CONTE:  Objection, leading.

5              THE COURT:  I'll let him answer.

6              Go ahead.

7  A     Yes.

8  Q     Does MS-13 have rules?

9  A     Yes.

10 Q     What does it mean within MS-13 for someone to be

11 walking with an MS-13 gang member?

12 A     When somebody withdraws and would like to recruit

13 him for the gang.

14 Q     And how were you taught MS-13's rules?

15 A     Excuse me?

16 Q     How did you learn MS-13's rules?

17 A     Because I lived together with the homies, and I

18 learned with them the different rules.

19 Q     Does MS-13 have rules about cooperating with law

20 enforcement?

21 A     Yes.

22 Q     What happens to an MS-13 gang member who

23 cooperates with law enforcement?

24 A     As soon as he's identified, he will be murdered.

25 Q     And who identifies the individual?

1  A    Anybody, a *paro*, a *chequeo*, a homeboy.

2  Q    And have you been marked for death?

3  A    Yes.

4  Q    Why?

5  A    Because I lost contact with them, and then they

6  thought I was cooperating with the agents.

7  Q    And are MS-13 members expected to carry out

8  killings of people who are cooperating with law

9  enforcement?

10 A    Yes.

11 Q    What happens to an MS-13 gang member's reputation

12 if he kills someone who is perceived as being against

13 the gang?

14 A    Well, he obtains more benefits, and he gains power

15 within the gang.

16 Q    Is power an important thing in MS-13?

17 A    Yes.

18 Q    Are you familiar with the term "*calenton*"?

19 A    Yes.

20 Q    What is a *calenton*?

21 A    Well, it's a beating for several seconds.

22 Q    What's the purpose of a *calenton*?

23 A    Well, to teach the person to behave, so he won't

24 do any mistakes.

25 Q    Are you familiar with the term "*chavala*"?

Blanco Torres - Direct

1    A    Yes.

2    Q    What is a *chavala*?

3    A    He is a member of another gang, the 18th Street

4    gang.

5    Q    Is there a gang that MS-13 considers to be its

6    main rival?

7    A    Yes.

8    Q    What gang is that?

9    A    The 18th Street and the Nortenos or Northerners.

10   Q    What rules does MS-13 have about what a gang

11   member is supposed to do if they see a *chavala*?

12   A    If he is in a place where he can get killed, then

13   they should kill him.

14   Q    What happens to an MS-13 gang member's reputation

15   if he attacks a *chavala*?

16   A    His reputation grows.

17   Q    What happens to an MS-13 member if they see a

18   *chavala* and do not beat up or kill them?

19   A    Well, there are two options.  He didn't kill him

20   because he was in a crowded place where there were

21   children, or he didn't kill him because he did not want

22   to kill him, in which case he would be killed.

23   Q    What rules does MS-13 have about people who

24   falsely represent that they are in MS-13?

25   A    Well, sometimes they give him a *calenton* or a

Blanco Torres - Direct

1    beating.   Some other times we kill him.

2    Q    And is there a term for when someone pretends to

3    be MS when they're not?

4    A    Yes.

5    Q    What's that term?

6    A    *Alucinado*.

7    Q    Could you translate that into English?

8    A    *Alucinado*.

9    Q    And what rules does MS-13 have about an individual

10   disrespecting the gang?

11   A    I did not understand.   Could you rephrase the

12   question?

13   Q    What happens if someone disrespects MS-13?

14   A    They give him a *calenton*.

15   Q    I'd like to direct your attention to the murder

16   you pled guilty to.   What was the name of the person

17   who you helped murder?

18   A    Christian Sosa Rivas.

19   Q    Did you know anything about Christian before

20   participating in his murder?

21   A    He was hallucinating.   He was saying he was a

22   member of MS-13, but he wasn't.

23   Q    And did you have any contact with Christian before

24   the murder?

25   A    Yes.

1  Q    What kind of contact did you have with him?

2  A    Just to get to know him, to know who he was.

3  Q    Why did you have contact with him initially?

4  A    Because Katie Portillo was leaving with me, and he

5  was threatening Katie.

6  Q    Why was he threatening her?

7          MR. KRISCHER:  Objection, foundation.

8          THE COURT:  Go ahead.

9  BY MR. PATTERSON:

10  Q    Do you know why he was threatening her?

11  A    Because before, they were friends.  He would give

12  pounds of marijuana to Katie for her to sell, and she

13  lost.

14  Q    Did you have any discussions with any other gang

15  members about Christian before the murder?

16  A    Yes.

17  Q    Who did you talk with?

18  A    With members of the clique here and in

19  El Salvador.

20  Q    And what did you ask the people that you were

21  talking to?

22  A    Well, first, I asked whether he was a homie from

23  the gang, whether they knew him.

24  Q    Were you investigating him?

25  A    Yes.

1 Q    Did you talk with any other cliques in the United

2 States about Christian?

3 A    Yes.

4 Q    Which ones?

5 A    With Guanacos and the Virginians.

6 Q    Who from Guanacos did you talk with?

7 A    Fire was on the line.

8 Q    And did you talk to anyone else from Guanacos?

9 A    Well, did -- Jacob had other people on the line.

10 So they were there on the line.

11 Q    And what did you discuss with the Guanacos?

12 A    Well, to find out whether they knew him, and they

13 said no, that he was hallucinating.

14          MR. OATES:  Objection, hearsay.

15          THE COURT:  Hold on.

16          I'm going to allow it.  Overruled.

17 A    And he had a green light already through the

18 program called East Coast.

19 Q    When you say he, who do you mean?

20 A    Christian.

21 Q    Did you do any other investigation besides what

22 you've mentioned of Christian?

23 A    Yes.

24 Q    What other investigation did you do?

25 A    We talked about another person nicknamed Killer.

1  He was the runner for Christian supposedly.

2  Q     And where was Killer based?

3  A     In El Salvador.

4  Q     And what did you find out from Killer?

5  A     No.  We realized he was also making himself.

6  Q     What did you decide after you had done this

7  investigation of Christian?

8  A     Well, I spoke with my homeboys to what we are

9  going to do about it.

10 Q     What did you decide to do?

11 A     We decided to kill him on December 31.

12 Q     And did you talk with anyone who knew Christian

13 when you were planning how to kill him?

14 A     Yes, Rasta, Archangel, Cannabis.

15 Q     Did you talk to anyone who is not in MS-13?

16 A     Yes.

17 Q     Who did you talk to?

18 A     Katie Portillo and Angelica Blanco.

19 Q     Why did you talk with Angelica Blanco?

20 A     Because Christian was text messaging Angelica, and

21 Angelica said --

22           MR. KRISCHER:  Objection.

23           THE COURT:  I'm going to allow it.

24           I think we need to get through this and get

25 to the facts that you want to bring out.

Blanco Torres - Direct

1  BY MR. PATTERSON:

2  Q     Did Angelica help you?

3  A     Yes.

4  Q     Do you know why?  Did she tell you why she wanted

5  to help you?

6                MR. KRISCHER:  Objection, Judge.

7                THE COURT:  Sustained.

8                Hold on.

9                Go ahead.  Next question.

10 BY MR. PATTERSON:

11 Q     I would like to go to the day of the murder.  What

12 time of day did the murder take place?

13 A     At 9:30 or 10:00 p.m.

14 Q     I would like to start earlier in the day.  Where

15 were you earlier that day?

16 A     I was in Woodbridge in the house of our homies.

17 They called me Joker.

18 Q     Who was there with you?

19 A     All of those who are involved in my case.

20 Q     Did you discuss what you intended to do to

21 Christian that night?

22 A     Yes.

23 Q     Where did you go in the afternoon?

24                THE INTERPRETER:  Excuse me?

25                MR. PATTERSON:  Where did he go in the

Blanco Torres - Direct

1   afternoon?

2   A    I went to the place where the murder was going to

3   take place.

4   Q    And why did you go there?

5   A    To see whether it was a safe place where nobody

6   could see us.

7   Q    And what did you decide?

8   A    That it was the place where it was going to take

9   place.

10  Q    Did you call anyone that afternoon?

11  A    Yes.

12  Q    Who did you call?

13  A    I called several people, but I'd been talking also

14  with the homeboys over in El Salvador.

15  Q    What were their names?

16  A    Whisper, Sniper, Tiger, City Gangster.

17  Q    Did you say Whisper?

18  A    Yes.

19  Q    And what were their ranks in MS-13?

20  A    Sniper was the first word of the clique.

21  Q    And what rank was Whisper?

22  A    He was a regular homeboy.

23  Q    Did you tell Whisper anything?

24  A    Yes.

25  Q    What did you tell him?

1  A     That I was going to deliver Christian that night

2  to them.

3  Q     And did Whisper tell you anything?

4  A     Yes.

5  Q     What did he tell you?

6  A     That we should kill him.

7  Q     Where did you go next?

8  A     We went to the place where we met to vent and get

9  Christian.

10 Q     How did you get to the -- I think you mentioned a

11 second ago that this was a park.  Is that right?

12 A     Yes, it's like a park.

13 Q     What state was it in?

14 A     In Virginia.

15 Q     How did you get to the park?

16 A     Well, they just sent me the address, and I went

17 out there.

18 Q     How did you get there?  Did you walk?

19 A     In a car together with Katie, myself, Slaker, and

20 Cannabis.

21 Q     When you got there, was anyone else there?

22 A     Yes.

23 Q     Who else was there already?

24 A     Katie Blanco and Christian, and in another car,

25 Rasta and Archangel.

Blanco Torres - Direct

1 Q    Who was riding in your car?

2 A    Slaker.

3 Q    Did you give Slaker any instructions?

4 A    Yes.

5 Q    What did you say?

6 A    We were going to go there, but he already knew

7 what we were going to do.

8 Q    And when you got there, did you tell him anything?

9 A    Yes.

10 Q    What happened once he got there?

11 A    The group I was in, we went to another area.  It

12 was darker.  It was like a beach, like a lake.

13 Q    Did you bring anything with you?

14 A    Well, in my hands, I didn't have anything, but my

15 group, yes, they had.

16 Q    What did they have?

17 A    Cannabis had a machete, also a knife.  Slaker and

18 I, we had also knives --

19         THE INTERPRETER:  And something else.  I

20 can't understand him.

21 BY MR. PATTERSON:

22 Q    Can you say it again, what you had?

23 A    Oh, and something to clean your fingerprints.

24 Q    And you said that you and your group were a little

25 way away from Angelica and Christian, correct?

Blanco Torres - Direct

1    A    Yes.

2    Q    Why did you go there?

3    A    So that Christian would trust me, be more

4    trustful, and walk down towards the lake.

5    Q    And what happened next?

6    A    So when Christian was down by the lake, I went

7    near him together with Slaker.  So just to trust -- you

8    know, to make him trust us, I asked him whether he had

9    some marijuana to sell me.

10   Q    And what happened next?

11   A    Well, he said he had a little bit that we could

12   smoke together.

13   Q    And what happened next?

14   A    We went towards the rest of us, and we smoked.

15   Q    Where was Katie?

16   A    She was a little behind the group.

17   Q    And why was Katie a little behind the group?

18   A    We didn't want Christian to see her.  Because if

19   Christian saw her, he would get scared, and he would

20   leave.

21   Q    Why did you think he would get scared if he saw

22   Katie?

23              MR. KRISCHER:  Objection.

24              THE COURT:  I'll let him answer.

25              Go ahead.

1  A    Because he knew that Katie lived with gang members

2  of MS-13.

3           MR. KRISCHER:  Objection, again, Judge.  I

4  apologize.

5           THE COURT:  No.  I understand.

6           Overruled.  Go ahead.

7           Let's get through this, please.

8  BY MR. PATTERSON:

9  Q    What happened next?

10 A    Well, Christian was about to leave.  Slaker then

11 caught him, and we start killing him.

12 Q    And did anyone else join the attack?

13 A    Well, it's only the guys that I already told you

14 about, and Katie and Angelica had left when it all

15 started.

16 Q    And what did you do?

17 A    So I punched him on the head so that he would

18 fall, and then we started to kill him.

19 Q    What did you do when you thought Christian was

20 dead?

21           THE INTERPRETER:  Your Honor, it seems the

22 battery is low on this thing.

23           THE COURT:  I'm sorry?

24           THE INTERPRETER:  It seems like the battery

25 is low on this thing.  The red light is on.

Blanco Torres - Direct

1          THE COURT SECURITY OFFICER:  Let me see it.

2          It needs to be changed tomorrow, sir.  We can

3   get through this today.

4          THE COURT:  All right.

5   BY MR. PATTERSON:

6   Q    What did you do to Christian after you thought he

7   was dead?

8   A    I grabbed him by the feet, and I dragged him to

9   the water.  Then I lowered some rocks on top of his

10  body so he wouldn't float.

11  Q    After the murder, did you call anyone that night?

12  A    Yes.

13  Q    Who did you call first?

14  A    The homeboy Infierno, who was in New York.

15  Q    And were you able to reach him?

16  A    No.

17  Q    Why did you call him?

18  A    To let him know what the clique had accomplished

19  that day.

20  Q    Did you call anyone else?

21  A    The homeboys in El Salvador.

22  Q    What was his name?

23  A    Whisper.

24  Q    Why did you call Whisper?

25  A    To tell him Christian was dead.

Blanco Torres - Direct

1  Q    And what did you tell him -- why did you call him

2  to tell him that?

3  A    He was going to give out alerting to the homeboys

4  of the hood, the neighborhood, telling them that we

5  already killed the guy.

6  Q    Did you tell the leaders of your gang how the

7  murder actually took place?

8  A    Yes.

9  Q    And what did Whisper tell you?

10  A    He was very happy.  It was good.

11  Q    And after the murder, what did you do with your

12  phone?

13  A    I broke it apart, and I threw it away.

14  Q    Why?

15  A    So that it couldn't be found.

16  Q    And did you remain in Virginia after that night?

17  A    No.

18  Q    Where did you go?

19  A    Landover, Maryland, where I was living.

20  Q    Why did you go there?

21  A    Well, that's where I lived was right there.

22  Q    And how did you get to Maryland?

23  A    In Slaker's car.

24  Q    And how did you get into police custody?

25              THE INTERPRETER:  Pardon me?  How did he get

162

Blanco Torres - Cross

1  in police custody?

2          MR. PATTERSON:  Yes.

3  A    I was working at a construction site in

4  Pennsylvania, and they arrested me there.

5  Q    How long were you in Maryland before you were

6  arrested?

7  A    Two months.

8          MR. PATTERSON:  Thank you.  I have no further

9  questions.

10          THE COURT:  All right.  Which counsel will

11  begin?

12                  CROSS-EXAMINATION

13  BY MR. WALSH:

14  Q    Mr. Torres, I'm going to go back a little bit and

15  ask you some questions.  Okay.

16      So I understand you joined the gang when you were

17  14; is that correct?

18  A    Yes.

19  Q    And that was in El Salvador, correct?

20  A    Yes.

21  Q    Okay.  And was that the Coronados gang?

22  A    It was Guanacos Lil Cycos.

23  Q    Okay.  And then it's your testimony you came to

24  the United States in 2016, correct?

25  A    Yeah.

Blanco Torres - Cross

1  Q    And when you came to the United States, you went
2  to Maryland, correct?
3  A    Yes.
4  Q    And were you still with the gang at that time?
5  A    Yes.
6  Q    And that's when you told this jury you began to
7  live with gang members, correct?
8  A    Right.
9  Q    But you testified to the jury that you went to
10 rehab for drugs, correct?
11 A    Yes.
12 Q    Can you tell me when that was?
13 A    2011-2012, towards the end of 2012.
14 Q    So you went to rehab for drugs while you were in
15 El Salvador?
16 A    Yes.
17 Q    All right.  But then you returned back to the same
18 gang, correct?
19 A    Yes.
20 Q    Let me ask you a question.  You told this jury you
21 have pled guilty, and you have a life sentence,
22 correct?
23 A    Yes.
24 Q    Is it two life sentences?
25 A    One.

1  Q    Okay.  And the crime you admitted to was a

2  mandatory life sentence, correct?

3  A    Yes.

4  Q    So when you tell the jury that the judge sentenced

5  you, really, it was the prosecution that charged you

6  with a mandatory life sentence, correct?

7  A    Yes.

8  Q    Right.  Because you pled guilty, you had to get a

9  mandatory life, correct?

10 A    Yes.

11 Q    And that's what they charged you with, correct?

12 A    Yes.

13 Q    Now, let me ask you a question.  When you are a

14 member of MS-13, you get tattoos, correct?

15 A    Yes.

16 Q    Do you ask permission to get the MS-13 tattoos?

17 A    Yes.

18 Q    And you have MS-13 tattoos, correct?

19 A    I do have tattoos, but they're not MS-13 tattoos.

20 Q    You don't have any MS-13 tattoos on your body?

21 A    No.

22 Q    Or anything that symbolizes the gang?

23 A    No.

24 Q    We talked about *paros*.  *Paros* are not in the gang;

25 are they?

                    Blanco Torres - Cross

1    A    No.

2    Q    But *paros* sell drugs for the gang, correct?

3    A    Yes.

4    Q    And when I say drugs, I mean cocaine and

5    marijuana.

6    A    Yes.

7    Q    But they are not gang members?

8    A    No.

9    Q    But if you're considered a *paro*, you have to

10   follow what the gang asks you or requires you to do,

11   correct?

12   A    Yes.

13   Q    Do you -- as a gang member, do you identify who

14   you are going to make a *paro* of?

15   A    Yes.

16   Q    Yes.  Okay.  So if a *paro* who is not a gang member

17   decides not to do something, he's going to get a

18   beatdown, is that right, or she?

19   A    Yes.

20   Q    And a beatdown, that could be like a 13-second

21   beatdown?

22   A    No.

23   Q    Okay.  It's a discipline, though, correct?

24   A    Yes.

25   Q    And it could be anything from a beating to

Blanco Torres - Cross

1  something else; is that correct?

2  A    It could be 16 strikes with a bat, 7 strikes with

3  a bat, 14 strikes with a bat.  It depends on what the

4  seriousness of the offense was.

5  Q    I was going light then.  I was just thinking it

6  was 13 punches, but you could be hit with a bat 14, 16

7  times?

8  A    You can use a bat and a fist.

9  Q    And it's safe to say, generally, the *paros* are the

10  ones that are selling the drugs for the gang, the lower

11  ones, correct?

12  A    Yes.

13  Q    And the reason why is the ones who are ranked up

14  high, they don't want to be involved with getting

15  caught selling drugs, correct?

16  A    Exactly.

17  Q    *Paros* don't only sell drugs.  They also are used

18  to drive people around, gang members around, correct?

19  A    Yes.

20  Q    It's safe to say that if a *paro* doesn't drive a

21  gang member that the gang member tells him to do, then

22  there's discipline?

23  A    Sure.

24  Q    I didn't hear.

25  A    Yes.

1    Q    Okay.  When you joined the gang in El Salvador,

2    you didn't know the rules before you joined; did you?

3    A    Yes.

4    Q    How many rules are there?

5    A    There's an awful lot of rules.

6    Q    And those rules differ from one clique to another

7    clique, correct?

8    A    Some of them.

9    Q    Okay.  Some of them.  So --

10   A    Yes.

11   Q    So different cliques can have different rules,

12   correct?

13   A    Yes.

14   Q    And it's safe to say some cliques might not have

15   any rules, correct?

16   A    No, not a single clique has no rules.  All have

17   some rules.

18   Q    It's safe to say you don't know what each clique's

19   rules are, though, correct?

20   A    No.

21   Q    So when you talk about the rules of a *chavala* and

22   things like that, you are referring to your clique,

23   correct?

24   A    That's a general rule for the entire MS gang.

25   Q    That's your understanding, but you are not in all

Blanco Torres - Cross

1  of those other cliques to know that, correct?

2  A    The difference in the rules between cliques are

3  not that great.

4  Q    The difference in the rules between cliques are

5  not that great; is that what you said?

6  A    No.  It's almost the same.

7  Q    But like I said, you have never been in all of

8  those other cliques?

9  A    Right.

10  Q    Okay.  Your testimony for the government said that

11  you were calling to El Salvador.  Is that right?

12  A    Yes.

13  Q    Well, isn't it someone who is ranked up high that

14  has the privilege to call El Salvador?

15  A    Yes.

16  Q    Okay.  So a *paro* or someone lower would not be

17  allowed to call El Salvador, correct?

18  A    Yes, he could.

19  Q    Does he have to get permission from the first

20  word?

21  A    They all have a -- if there's only one *paro* in the

22  clique or something, he can call his homeboy in

23  El Salvador.

24  Q    You testified walk with MS-13 gang member.  That

25  is someone that MS is trying to recruit?

Blanco Torres - Cross

1   A     Yes.

2   Q     How long would you generally walk with a person?

3   What duration?

4   A     Performing it could be three years, five years.

5   Q     So you could walk with someone for three to five

6   years before they even become part of the gang?

7   A     Yes.

8   Q     And during that time, do you -- well, let me

9   strike that.

10        You walk with them to investigate them; is that

11  correct?

12  A     Yes.

13  Q     To see if they are trusted, right?

14  A     Yes.

15  Q     If someone was walking with you for a year and

16  they decide they didn't want to walk anymore, they

17  could get a beating, correct?

18  A     If he knows too much or if he knows about the

19  plans that the homeboys have carried out, the homeboys

20  will kill him.

21  Q     But as someone that's walking with the gang, the

22  gang is not going to -- strike that.

23        Let me ask you.  Let me take you to December 31,

24  2016.

25  A     Okay.

Blanco Torres - Cross

1  Q    You had been in the United States for ten months;
2  is that your testimony?
3  A    Yes.
4  Q    And so you only had one meeting during that time,
5  correct?
6  A    Yes.
7  Q    But you had joined the same gang that you were in
8  in El Salvador -- excuse me, the same clique you were
9  in in El Salvador?
10 A    Yes.
11 Q    If you decided not to go with that clique when you
12 came to the United States, would your family be in
13 danger?
14 A    Yes.
15 Q    And you had testified for the government those
16 people that were involved in the murder on December 31,
17 2016, correct, the names of those people?
18 A    Yes.
19 Q    Roberto Cruz Moreno was not one of them, correct?
20 A    I don't recognize the name, no.
21 Q    So you can say you've never had any dealings with
22 Roberto Cruz Moreno, correct?
23 A    I don't know the name.  I don't know.
24 Q    Okay.  In the clique or in MS-13, it's not
25 uncommon for members to have the same name, correct,

Blanco Torres - Cross

1  like Scooby or Killer?

2  A    Not in the same clique.  It could be little

3  something or a big something.

4  Q    But in separate cliques, members in separate

5  cliques, members could have the same name, like Killer

6  or, you know, Snappy or Grumpy or --

7  A    Yes.  Yes.

8  Q    You testified that you have a green light,

9  correct?

10  A    Yes.

11  Q    How do you know that?

12  A    I'm being held, and I hear what the other gang

13  members told me about at the detention center.

14  Q    Aren't you in protective custody?

15  A    Yes.

16  Q    So while you were in protective custody, the

17  people you are with are talking about the green light?

18  A    Yes.  Yeah, you can hear them.  They are all

19  jumbled up.

20  Q    Can you tell me who's talking about you?

21  A    The whole clique.

22  Q    Your clique, right?

23  A    Yeah, the homies from other cliques that I've met.

24  Q    The government asked you questions about you

25  wanting to have your sentence reduced from a life

Blanco Torres - Cross

1   sentence, a mandatory life sentence, correct?

2   A     They asked me what?

3   Q     So the government -- you testified that you were

4   hoping to have your sentence from a mandatory life

5   sentence reduced; is that correct?

6   A     Yes.

7   Q     And you're hoping to stay in the United States,

8   correct?

9   A     Yes.

10  Q     And because of that, you've been working with the

11  government, correct?

12  A     Basically, a meeting to be honest.  I'm trying to

13  come clean.  I realize I made a mistake.  I'm trying to

14  clean the mistake up or correct it.  But yes, what you

15  are saying is also in the back of my mind.

16  Q     Let's talk about that.  You prepared your

17  testimony with the government, correct?

18  A     Yes.

19  Q     And you worked on that answer; didn't you?

20  A     No.

21  Q     That just came from you?

22  A     Yes.

23  Q     You understand to get your sentence of mandatory

24  life reduced, the government has to file a motion

25  asking for it, correct?

                    Blanco Torres - Cross

1  A    Yes.

2  Q    So you have to please them before they file a

3  motion to let the Court reduce your sentence, correct?

4            MR. PATTERSON:  Objection.

5            THE COURT:  Overruled.

6  A    I don't know what you're getting at.

7  Q    I'm going to ask the question again.  Maybe I'll

8  change it.  You have to satisfy the government before

9  they file a motion to reduce your sentence, correct?

10  A    I am sorry that -- my testimony -- and I feel I

11  think something is going to happen.

12  Q    And that something that's going to happen is that

13  they're going to try to reduce your sentence, correct?

14  A    Yes.

15            MR. WALSH:  Judge, that's all the questions I

16  have for him, I think.

17            THE COURT:  All right.  Mr. Conte.

18            MR. CONTE:  Just a couple of questions.

19                    CROSS-EXAMINATION

20  BY MR. CONTE:

21  Q    Good afternoon, sir.  You signed a cooperation

22  agreement with the United States, correct?

23  A    Yes.

24  Q    How many times have you met with them?

25  A    Not too many times.

Blanco Torres - Cross

1  Q    Well, more than five?  Less than five?

2  A    No.  Not more than five, no.

3  Q    And you went over your testimony, correct?

4  A    What we were talking about?

5  Q    How many times did you go through your testimony?

6  A    Once before today.

7  Q    All right.  And you testified -- when

8  Mr. Patterson asked you what is expected of you, you

9  testified to tell the truth, correct?

10 A    Right.

11 Q    That's what you were told to say; isn't this

12 correct?

13 A    Yes.

14         MR. CONTE:  Thank you.

15         Nothing further, Your Honor.

16         THE COURT:  All right.  Mr. Oates.

17         MR. OATES:  Your Honor, may we approach

18 briefly?

19         THE COURT:  Yes.

20     (Conference at the bench, as follows:)

21         THE COURT:  All right.  What's the issue?

22         MR. OATES:  Your Honor, I think that my cross

23 is probably going to be about 10 or 15 minutes.  I

24 think Mr. Krischer is probably going to be the same.

25 We would ask -- I think it may be better to start fresh

1  tomorrow morning.

2          THE COURT:  All right.  Well, I didn't want

3  to keep the jury past 6:00 on the first day anyway.

4  We'll take it up in the morning.

5          MR. OATES:  I do have -- before we leave, I

6  do have a couple of brief questions based on something

7  that just happened.

8          MR. WALSH:  We'll talk about it.

9          MR. OATES:  All right.

10          THE COURT:  We'll go ahead and do it in the

11  morning.

12          MR. OATES:  Thank you.

13      (Proceedings continued in open court, as follows:)

14          THE COURT:  Ladies and gentlemen, it's been a

15  long day for you on the first day.  We're going to

16  recess now until tomorrow morning.  Please make

17  whatever travel arrangements you need to make.  Try to

18  get to the courthouse around 9:20 or so, so we can

19  start at 9:30 absent anything that we might have to

20  deal with before then.

21          Again, I ask you not to discuss this case not

22  only among yourselves but with anyone outside of the

23  courtroom.  I'm sure your family and friends will be

24  curious, to say the least, about how you spent your

25  day.  If they ask questions about the case, then tell

1   them the judge has instructed you not to talk about it.

2          So with those instructions, you are excused

3   until tomorrow morning.

4          THE COURT SECURITY OFFICER:  Sir, what time

5   do they need to be here tomorrow?

6          THE COURT:  At 9:00 for the lawyers and 9:30

7   for the jury.

8      (The jury exits at 5:58 p.m.)

9          THE COURT:  Mr. Torres, you're excused until

10  tomorrow morning.  Do not discuss your testimony during

11  the recess.

12         All right.  Let me just make an observation.

13  We've heard a lot already about the MS-13 structure and

14  organization, and the Court is not going to want a lot

15  of duplicative or cumulative evidence on that.  So I'd

16  appreciate your bearing that in mind as you prepare the

17  rest of your witnesses.

18         MR. MURPHY:  The government would ask, Your

19  Honor -- many of the arguments that the Court heard

20  during opening were with respect to the government's

21  witnesses lying, Your Honor.  To the extent the

22  government would like to corroborate what its witnesses

23  were saying, we would ask some leeway to be able to --

24         THE COURT:  I understand.  There will be some

25  leeway, but I don't want multiple witnesses simply

 1    saying the same thing we've already heard.  Some

 2    things, I suspect, are not going to be challenged as

 3    much as others.

 4              MR. MURPHY:  Understood.

 5              THE COURT:  All right.  We'll stand in recess

 6    until 9:00.  We'll meet at 9:00 to take up any issues.

 7              The Court will stand in recess.

 8         ------------------------------------
                    Time:  6:00 p.m.
 9

10

11

12

13

14

15

16

17

18

19

20

21
          I certify that the foregoing is a true and
22
       accurate transcription of my stenographic notes.
23

24
                              _____
                                       /s/
25                            Rhonda F. Montgomery, CCR, RPR


       Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599