1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION

3    UNITED STATES OF AMERICA,   )   Case 1:20-cr-18
                                 )
4               Plaintiff,       )
                                 )
5         v.                     )   Alexandria, Virginia
                                 )   February 23, 2022
6    ROBERTO CARLOS CRUZ MORENO, )   9:14 a.m.
     et al.,                     )
7                                )
                Defendants.      )   Volume 2
8    _____)   Pages 178 - 348

9
                      TRANSCRIPT OF TRIAL
10
           BEFORE THE HONORABLE ANTHONY J. TRENGA
11
              UNITED STATES DISTRICT COURT JUDGE
12
                        AND A JURY
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:

16        NICHOLAS U. MURPHY, II, ESQUIRE
          NICHOLAS J. PATTERSON, ESQUIRE
17        AMANDA LOWE, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
18        2100 Jamieson Avenue
          Alexandria, Virginia  22314
19        (703) 299-3700

20   FOR DEFENDANT ROBERTO CARLOS CRUZ MORENO:

21        THOMAS B. WALSH, ESQUIRE
          PETROVICH & WALSH, PLC
22        10605 Judicial Drive, Suite A-5
          Fairfax, Virginia  22030
23        (703) 934-9191

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES CONTINUED:

2    FOR DEFENDANT KEVIN PEREZ SANDOVAL:

3         JOSEPH R. CONTE, ESQUIRE
          LAW OFFICE OF J.R. CONTE PLLC
4         400 7th Street, N.W., Suite 206
          Washington, D.C.  20004
5         (202) 638-4100

6    FOR DEFENDANT MARVIN TORRES:

7         JONATHAN R. OATES, ESQUIRE
          KRUM, GERGELY & OATES, LLC
8         4103 Chain Bridge Road, Suite 401
          Fairfax, Virginia  22030
9         (703) 988-3711

10   FOR DEFENDANT JOSE ROSALES JUAREZ:

11        ADAM M. KRISCHER, ESQUIRE
          DENNIS, STEWART & KRISCHER, PLLC
12        2007 15th Street N, Suite 201
          Arlington, Virginia  22201
13        (703) 248-0626

14   DEFENDANTS ROBERTO CARLOS CRUZ MORENO, KEVIN PEREZ
     SANDOVAL, MARVIN TORRES, AND JOSE ROSALES JUAREZ IN
15   PERSON

16   TERESA ROMAN, MIRIAM DEUTSCH, AND MARIA HORVATH,
     SPANISH INTERPRETERS
17

18

19

20

21

22

23

24

25

1                              I N D E X

2
    WITNESS                   EXAMINATION                    PAGE
3
    Edgar Blanco Torres   Cross by Mr. Krischer              194
4                         Cross by Mr. Oates                205
                          Redirect by Mr. Patterson         210
5
    Michael Furr          Direct by Ms. Lowe                212
6
    Jocelyn Posthumus     Direct by Mr. Murphy              217
7                         Cross by Mr. Walsh                230

8   Claudio Saa           Under separate cover              233

9   Johnnie Benningfield  Direct by Mr. Murphy              234
                          Voir Dire by Mr. Krischer         240
10                        Further Direct by Mr. Murphy      247
                          Cross by Mr. Walsh                282
11                        Cross by Mr. Krischer             290
                          Cross by Mr. Oates                299
12                        Redirect by Mr. Murphy            309

13  Walter A. Amaya       Direct by Mr. Murphy              321

14

15

16

17

18

19

20

21

22

23

24

25

181

1        (The jury is not present.)

2            THE CLERK:  Criminal Case 1:20-cr-18, *United*

3   *States v. Roberto Carlos Cruz Moreno, Kevin Perez*

4   *Sandoval, Marvin Torres, and Jose Rosales Juarez.*

5            Counsel, will you please note your

6   appearances for the record.

7            MR. MURPHY:  Good morning, Your Honor.

8   Nicholas Murphy, Nicholas Patterson, and Amanda Lowe on

9   behalf of the United States.

10           THE COURT:  Good morning.

11           MR. WALSH:  Good morning, Your Honor.  Thomas

12  Walsh on behalf of Roberto Cruz Moreno, who is present.

13           THE COURT:  All right.  Any issues?

14           Yes, Mr. Conte.  I'm sorry.

15           MR. CONTE:  May it please the Court.  Joseph

16  Conte for Kevin Perez Sandoval.  Good morning, Your

17  Honor.

18           THE COURT:  Good morning.

19           MR. KRISCHER:  Good morning, Judge.  Adam

20  Krischer on behalf of Jose Rosales Juarez, who is

21  present.

22           THE COURT:  All right.

23           MR. OATES:  And good morning, Your Honor.

24  Jon Oates on behalf of Marvin Torres, who is present.

25           THE COURT:  All right.  Any issues that we

1   need to take up?

2          MR. MURPHY:  The government has a few things

3   it would like to address, Your Honor, before we get

4   started.

5          THE COURT:  All right.

6          MR. MURPHY:  The first is that Special Agent

7   Justin Schmitt, who is the lead case agent in the case,

8   will not be present in court on Friday due to a

9   personal family matter.  So I wanted to make the Court

10  and counsel aware that he would not be here on Friday.

11         THE COURT:  All right.  That's fine.

12         MR. MURPHY:  The second is with respect to at

13  least one of the opening statements yesterday, as the

14  Court is aware, the Court precluded the government

15  specifically from entering evidence pertaining to the

16  immigration status of anyone, including Defendant

17  Roberto Cruz Moreno.

18         During the opening statement by Mr. Walsh, he

19  specifically argued to the jury that Defendant Roberto

20  Cruz Moreno was not even present in the United States

21  during 2017, thereby opening the door -- I mean, the

22  government assumes he's talked with his client about

23  when he came to the United States and where he lived,

24  and the government assumes that he has reviewed

25  discovery and the trial exhibits, which very

1  specifically demonstrate that Roberto Cruz Moreno was

2  present in the United States starting in November of

3  2015.

4           Specifically, Government's Exhibits 34-4O,

5  34-4P, 34-4Q, and 34-4R are documents seized from

6  Roberto Cruz Moreno's car during the traffic stop on

7  April 20, 2019, are immigration documents which

8  documented the date that he entered the United States

9  via Texas, November 27, 2015, and a notice to appear

10  because he had appeared into the United States

11  illegally at that time, Your Honor.

12           THE COURT:  All right.

13           MR. MURPHY:  Moreover, Documents 34-4S and

14  34-4T explicitly identify that Roberto Cruz Moreno had

15  enrolled in the Central Islip Union School District for

16  the school year 2016-2017.  Thus, there is no basis for

17  any argument that Roberto Cruz Moreno was not present

18  in the United States in 2017.

19           And from the government's perspective, there

20  are two ways to address that erroneous argument by

21  counsel.  Either the government can be permitted to

22  introduce evidence demonstrating to the jury that

23  Roberto Cruz Moreno was, in fact, present in the United

24  States as of November 2015 or the Court can simply

25  provide judicial notice to the jury that Roberto Cruz

1  Moreno has been present in the United States since

2  November 2015.

3          THE COURT:  All right.

4          MR. MURPHY:  So that's the first matter the

5  government wanted to address.

6          Secondly, again, out of respect for allowing

7  counsel to make their arguments without the government

8  interjecting to disrupt those arguments, I think all

9  counsel for the defendants argued that the government's

10  cooperating witnesses had received immunity in their

11  cases such that if they testified, they would walk out

12  the door.

13          Your Honor, as the Court is probably aware,

14  first of all, all of those cooperating witnesses have

15  been charged criminally either in the Eastern District

16  of Virginia or in a commonwealth state court for the

17  crimes with which they are testifying about in this

18  case.  That's the first matter.

19          Second of all, as counsel was made aware via

20  *Giglio* disclosures to counsel, I believe all of those

21  individuals provided information after they were

22  charged, either federally or in the state, to the

23  government under a proffer use immunity letter with the

24  government.

25          There is no blanket immunity from prosecution

1  that any cooperating witness has been provided in this

2  case.  And to the extent that counsel has now argued

3  and intends to ask questions or further continue to

4  make arguments suggesting that any witness has received

5  blanket immunity from prosecution from the government,

6  the government would request that they be precluded

7  from doing so because that's not in line with the facts

8  or evidence in this case, which demonstrates that they

9  have received limited use immunity, which means the

10  government cannot use statements they provide during a

11  proffer to the government to prosecute them.  That does

12  not mean that the government cannot otherwise prosecute

13  them based on any other evidence the government has,

14  Your Honor.

15          THE COURT:  Right.

16          MR. MURPHY:  So the government wants to be

17  very clear about that issue, and, frankly, given the

18  nature of that issue, the government doesn't believe

19  there's any basis to be discussing immunity with these

20  witnesses because they have no such immunity.  What

21  they have is immunity from having their own statements

22  turned against them, by the government, that they

23  provided during a proffer, Your Honor.

24          THE COURT:  All right.

25          MR. MURPHY:  The third issue I want to

1  address is with respect to the redacted plea we had the

2  sidebar about.  I just want to correct the record.  As

3  the Court may be aware or is likely aware, polygraphs

4  are not admissible evidence at trial.  For that reason,

5  the Eastern District of Virginia always redacts the

6  polygraph paragraph in a Plea Agreement before entering

7  it into evidence at trial because it's not admissible

8  evidence at a trial as established by the Supreme

9  Court.

10         So for that reason, the polygraph paragraph

11  has been redacted by the government.  And because it's

12  not admissible evidence at trial, the government cannot

13  ask its witnesses, "Did you take a polygraph?" and "Did

14  you pass that polygraph?" and, therefore, bolster their

15  testimony.  There should be no reason why defense

16  counsel would be permitted to ask them questions about

17  the redacted polygraph paragraph, Your Honor.

18         THE COURT:  All right.  Mr. Conte, come

19  forward.

20         Let me just make a couple of comments based

21  on what you've said, Mr. Murphy.

22         MR. MURPHY:  Sure.

23         THE COURT:  With respect to Mr. Moreno's

24  presence or nonpresence in the United States, counsel

25  made statements in opening statement that he may not be

1  able to follow through on and would be haunted in

2  closing.  He'll be limited by the evidence.

3           I think you perfectly are free to put on

4  evidence establishing his presence in the United

5  States.  That doesn't necessarily require you to get

6  into his immigration status.

7           MR. MURPHY:  Certainly.  But the evidence

8  that the government has related to when he entered the

9  United States directly relates to the immigration

10 documents, Your Honor.  So, certainly, the government

11 can redact those documents.

12          THE COURT:  Right.  It seems to me you can

13 get into the fact without getting into whether he was

14 here legally or illegally.

15          MR. MURPHY:  I would agree.  I also am not

16 sure that we won't draw an objection for foundation.

17          THE COURT:  Well, I would suggest you talk

18 with Mr. Walsh and see if you can't agree on either a

19 stipulation or something that would avoid the need to

20 get into this evidence further.

21          Anyway, that's just a matter of proof at

22 trial, and counsel is going to be restricted in their

23 closing arguments by what the evidence is.

24          And with respect to -- I'm sorry.  The second

25 issue was?

188

1              MR. MURPHY:  The second issue, Your Honor,

2    was with respect to the immunity or the references

3    to --

4              THE COURT:  Again, that's a matter of --

5    they've made opening statement.  They're going to be

6    limited and restricted by the proof during their

7    closing.  I think that's just a matter of what comes

8    out during cross.  They certainly can ask if they have

9    a good faith basis.  If they don't have a good faith

10   basis to think that someone has gotten immunity, I'm

11   sure they're not going to ask it.  If there is an

12   immunity, they can bring it out.  You can bring out

13   contrary evidence if that's not the case.  I just think

14   it's a matter of proof at trial that's going to

15   establish the limits and contours of closing.

16             MR. MURPHY:  Understood.

17             THE COURT:  All right.

18             MR. MURPHY:  And with respect to the redacted

19   Plea Agreements?

20             THE COURT:  Yes.  The fact that someone

21   agrees to a polygraph -- I mean, I understand the

22   substance of the polygraph is not admissible, and I

23   wouldn't expect counsel to ask whether they have taken

24   a polygraph exam.  But it just seems to me it raises

25   more questions with the jury, what's in the redaction,

1    than not.  I don't know that it's a big issue whether
2    the jury knows that or not.  I just --
3               MR. MURPHY:  To the extent that it's raised,
4    the government would just simply request that the
5    government is not permitted to put on evidence as to
6    the substance of that polygraph.
7               THE COURT:  I think that's true.  We're not
8    going to have results of polygraph exams.
9               MR. MURPHY:  To the extent they have a
10   question about, oh, well, you can get polygraphed, did
11   you get polygraphed, I think there will need to be an
12   explicit instruction that --
13              THE COURT:  Is there evidence of the
14   polygraph?
15              MR. MURPHY:  There is not, Your Honor.  That
16   does not preclude defense counsel --
17              THE COURT:  I understand.  So we don't have
18   any transcripts of what they said during a polygraph
19   exam?
20              MR. MURPHY:  No, Your Honor.
21              THE COURT:  All right.  Does any defense
22   counsel want to respond to any of that?
23              MR. OATES:  Your Honor, speaking on the
24   polygraph issue, I mean, I think the government has
25   said that he hasn't taken any polygraph tests yet.

1              Is that correct?

2              The government represented that he hasn't

3    taken any polygraph tests.  I think that asking him

4    whether or not he has taken any polygraph tests since

5    that's a part of his Plea Agreement, I think, is

6    something for the jury to consider.  I think that's

7    material.

8              THE COURT:  Why would that be relevant?

9    What's that probative of?  It's certainly not probative

10   of his credibility.

11             MR. OATES:  Well, it's probative of the fact

12   that he hasn't taken any polygraph tests yet, and those

13   are still pending.

14             THE COURT:  All right.  I'm not going to let

15   you get into whether he has taken polygraphs or not.

16             MR. OATES:  Okay.

17             THE COURT:  All right.  Mr. Conte.

18             MR. CONTE:  Number one, Your Honor, I think

19   we can -- the government puts it in there, that they

20   can ask him to take a polygraph, and they haven't done

21   so just to verify his veracity.  Whether there was a

22   polygraph or not, I think it's fair game.  We could ask

23   them if there was one, whether or not they tried to

24   verify the witness' veracity.

25             As to the immunity issue, Javier Bonilla was

1  given a letter of immunity, and in that letter, it

2  specifically cites 18, United States Code,

3  Section 6002, which grants use immunity for any

4  statements he made and any derivative evidence that

5  comes from it.

6          THE COURT:  You certainly can bring that out.

7  My only comment was that to the extent there was no

8  immunity agreement and counsel knows there was no

9  immunity, they can't imply that there was and that he's

10 operating under immunity.

11         MR. CONTE:  Well, I'm sure myself and my

12 cocounsel have no intention of --

13         THE COURT:  I understand.  I think that was

14 Mr. Murphy's concern.

15         MR. CONTE:  Very well.

16         THE COURT:  All right.  Yes, Mr. Krischer.

17         MR. KRISCHER:  Good morning, Judge.

18         Just one additional issue.  Yesterday the

19 Court instructed the government to take the specific

20 exhibit, which I had raised in my motion, back to the

21 interpreter.  The interpreter is listed as a witness

22 today.  They may have sent something to me, but since

23 I've been in the courthouse, I don't have access to

24 email.  So I'm just wondering if that's been done.

25         THE COURT:  All right.  Have you gotten any

1   confirmation?

2           MR. MURPHY:  Yes.  Your Honor, I actually

3   spoke with him yesterday morning and again this

4   morning.  He has now twice -- I think maybe three

5   times -- rereviewed that.  He indicated to me that

6   based on the context, he believes that that term means

7   they.  He is prepared to testify as to why he believes

8   that term means they, Your Honor.

9           THE COURT:  And he's listened to the tape

10  again?

11          MR. MURPHY:  Yes.

12          THE COURT:  All right.

13          MR. KRISCHER:  Thank, Judge.

14          THE COURT:  Let me tell you about one

15  development.  One of our jurors has reported sick,

16  Juror No. 8.  She reported that she late last night

17  felt ill.  So she's not here today.  I'm excusing her.

18  We'll replace her with Alternate Juror No. 70.  She's

19  been asked to take a rapid COVID test followed up with

20  a PCR test.  Once we get those results, we'll decide

21  what, if anything else, we need to do.  I'm going to

22  tell the jury that.  We'll just proceed in that

23  fashion.

24          All right.  Anything else we can take up?

25          MR. MURPHY:  Not from the government, Your

1  Honor.

2          THE COURT:  All right.  We still have

3  Mr. Torres.

4          How long do you anticipate your cross,

5  Mr. Oates?

6          MR. OATES:  So 10 minutes, 10 or 15 minutes,

7  Your Honor.

8          THE COURT:  The same for you, Mr. Krischer?

9          MR. KRISCHER:  That's correct, Judge.  I

10  anticipate 10 or 15 minutes top.  Since Mr. Oates

11  didn't begin yesterday, with the Court's permission,

12  I'll start, and Mr. Oates will follow.

13          THE COURT:  That's fine.

14          All right.  The Court will stand in recess,

15  until the jury is ready.

16      (Recess from 9:29 a.m. until 9:36 a.m.)

17      (The jury is not present.)

18          THE COURT:  All right.  Bring the jury in.

19      (The jury enters at 9:37 a.m.)

20          THE COURT:  Please be seated.

21          Good morning.

22          I'm sorry to report that one of your jurors

23  reported late last night she became ill.  Out of an

24  abundance of caution, she has not reported today, and

25  she's been excused.  This is Juror No. 8, and she will

1   be replaced by Juror No. 70.  I have asked her to take

2   a rapid COVID test followed up by a PCR test and will

3   advise you of any developments regarding that.

4              All right.  Let's proceed.

5              Mr. Torres, you remain under oath.

6              THE WITNESS:  Okay.

7              THE COURT:  You may remove your mask to

8   testify.

9              Mr. Krischer.

10             MR. KRISCHER:  Thank you, Judge.

11                    CROSS-EXAMINATION

12  BY MR. KRISCHER:

13  Q    Good morning, Mr. Torres.

14  A    Good morning.

15  Q    I want to talk about some of the things that you

16  discussed yesterday evening.  You told us yesterday

17  that you joined MS-13 when you were 14 years old.

18  A    Yes, 13, 14.

19  Q    Was that a choice that you made on your own, or

20  were you forced?

21  A    It's a decision I took.

22  Q    Because you wanted to be a part of this gang?

23  A    Yes, to get ready and to avenge the death of my

24  father.

25  Q    Your father was killed in gang violence?

Blanco Torres - Cross

1   A     No.

2   Q     So what was there to avenge?

3   A     Because the person who killed my father, he was at

4   the same place I was.

5   Q     In El Salvador?

6   A     Yes.

7   Q     And you joined the Guanacos clique in El Salvador?

8   A     Yes.

9   Q     Was that also because that was the clique in your

10  area?

11  A     Yes.

12  Q     And then at some point, you went to drug

13  rehabilitation?

14  A     Yes.

15  Q     I'm sorry.  About four years after you joined the

16  clique?

17  A     Yes.

18  Q     And at that time, you did it because you wanted to

19  get away from the gang?

20  A     Yes.

21  Q     And be a better person?

22  A     Yes.

23  Q     The rehab, was that residential?  Did you live

24  there?

25  A     Yes.

                        Blanco Torres - Cross

1   Q     And that was also in El Salvador?

2   A     Yes.

3   Q     And you lived in the rehab for a year and ten

4   months?

5   A     Yes.  Well, at times at the center and the rehab

6   and some other times at the church.

7   Q     That was connected or related to the rehab?

8   A     Yes.

9   Q     And during that time, you had no interaction with

10  gang members?

11  A     No.

12  Q     And that's why they wanted to kill you?

13  A     Yes.

14  Q     And so then you left El Salvador and came to the

15  United States?

16  A     Well, when I left the rehab, I went back with the

17  gang, but by then the name was Coronados Lil Cycos.

18  Q     So they're the same clique, Coronados and GLCS?

19  A     No.

20  Q     So when you came out of rehab, you stayed in

21  El Salvador and rejoined the gang?

22  A     Yes.  I was looking for work, and then I went back

23  to the gang.

24  Q     Specifically to the Coronados clique?

25  A     Yes.

Blanco Torres - Cross

1   Q    You joined the Coronados clique because Guanacos

2   wanted to kill you?

3   A    Yes.

4   Q    And the Coronados did not kill you?

5   A    No, because I started working with Coronados, and

6   then they would, you know, back me up when Guanacos

7   would try to kill me.

8   Q    So they would back you up against Guanacos?

9   A    Yes.

10  Q    Now, you also talked about some of the people that

11  were involved in the murder that you committed, and I

12  wanted to go over again what their clique was, what

13  their relation to the gang was.

14       Erica Blanco is not in the gang?

15  A    Angie Blanco?

16  Q    Oh, I'm sorry.  Yes, Angie Blanco.  Thank you very

17  much.  She was not in the gang?

18  A    No.

19  Q    Katie Portillo, she was not in the gang?

20  A    She was not in the gang.

21  Q    And you were in Coronados?

22  A    Yes.

23  Q    And what about Rasta?

24  A    Coronados.

25  Q    Cannabis?

Blanco Torres - Cross

1    A    Via Satellite.

2    Q    Slater or Slaker?

3    A    Slaker.

4    Q    What gang?

5    A    Coronados.

6    Q    And Jacob?

7    A    Yes.

8    Q    Coronados?

9    A    Yes.

10   Q    What was your rank in the GLCS in El Salvador?

11   A    First, I was a *paro*.

12   Q    And what was the highest rank you received in GLCS

13   in El Salvador?

14   A    A *chequeo* and then homeboy.

15   Q    And what rank --

16        MR. PATTERSON:  Clarification?

17        MR. KRISCHER:  Judge, may we approach?

18        THE COURT:  Yes.

19   (Conference at the bench, as follows:)

20        MR. MURPHY:  So I believe the response to the

21   question was *pasa de* homeboy, not homeboy.  *Pasa de*

22   homeboy is a rank intermediate between *paro* and

23   homeboy, committed the crime to be a homeboy but have

24   not yet been formally jumped into the clique as a

25   homeboy.  I just wanted to make sure we are correct on

Blanco Torres - Cross

1 the record that what he is saying is *pasa de* homeboy,

2 not that's a homeboy in GLCS.

3          THE INTERPRETER:  I need to check with him.

4          MR. PATTERSON:  He said *pasa de* homeboy,

5 which means he is in line to be a homeboy.  It is a

6 term of art in MS-13.

7          THE INTERPRETER:  Okay.  Let me check.

8          THE COURT:  All right.  Good.

9          Let me just put on the record that all the

10 interpreters remain under oath.

11          THE INTERPRETER:  Yes.

12      (Proceedings continued in open court, as follows:)

13          THE COURT:  All right.  We're going to have a

14 clarification.

15 BY MR. KRISCHER:

16 Q    Just for the record, my question was what was the

17 highest rank that you achieved in GLCS in El Salvador?

18 A    Which clique?

19 Q    I'm sorry.  We were at this point -- let's just

20 back up to the beginning so there's no confusion.

21      The highest rank you received in GLCS in

22 El Salvador?

23 A    I was homeboy.

24 Q    And then the highest rank that you achieved in

25 Coronados in El Salvador?

1  A    Well, here in the United States, they were going

2  to jump me again for the death I committed.

3  Q    But in El Salvador, before you left, what rank

4  were you in Coronados?

5  A    *Chequeo.*

6  Q    And then prior to the murder that you committed,

7  what was your rank in Coronados in Maryland?

8  A    A *chequeo.*

9  Q    At the time of the murder on New Year's Eve 2016,

10  you were a *chequeo* in the Coronados clique?

11  A    Yes.

12  Q    And what is your rank now?

13  A    Now I don't have any rank.

14  Q    Yesterday you talked about *paros* and that *paros*

15  did favors for the homeboys?

16  A    Yes.

17  Q    They basically did whatever the homeboys told

18  them?

19  A    Yes.

20  Q    Mainly, selling the drugs that the homeboys

21  purchased and gave them?

22  A    Yes.

23  Q    I want to talk a little bit about the Coronados

24  structure in the United States.  You said that Infierno

25  was the first word in the Coronados clique?

                    Blanco Torres - Cross

1   A    Yes.

2   Q    And I think it was el Cantinflas was the second

3   word.

4   A    El Cantinflas, yes.

5   Q    And then you were only in the gang for about ten

6   months -- let me strike that.

7        You were in the United States for ten months

8   before the murder on New Year's Eve 2016?

9   A    Yes.

10  Q    And you were in the Coronados clique the whole

11  time?

12  A    Yes, since I arrived from El Salvador.

13  Q    And in all that time, you only attended one clique

14  meeting?

15  A    Yes.

16  Q    And do you recall when about that was?

17  A    Like October.

18  Q    That was about six months after you arrived?

19  A    Yes.

20  Q    At that meeting, did you discuss the murder of

21  Christian Sosa Rivas?

22  A    No.

23  Q    That came after, when Katie Portillo said that he

24  threatened her?

25  A    That was before.

Blanco Torres - Cross

1   Q     She said before the meeting?

2   A     No.  She said it after.

3   Q     After.  That's what I thought.

4         So you didn't discuss the Sosa Rivas murder in the

5   October clique meeting?

6   A     No.

7   Q     After that, Katie Portillo told you that Christian

8   Sosa Rivas had threatened her?

9   A     Yes.

10  Q     That's when the plan to kill him began?

11  A     Yes.

12  Q     And there was an investigation conducted by the

13  Coronados into Christian Sosa Rivas?

14  A     Yes.

15  Q     And you conducted that investigation?

16  A     He already had a green light through the other

17  program, but I started investigating him on my own.

18  Q     At the time you began your investigation, you

19  didn't know that the East Coast Program had issued a

20  green light?

21  A     Well, yes.  But before I killed him, there were

22  two attempts on his life.

23  Q     By the East Coast Program?

24  A     Yes.

25  Q     Did you know that at the time you began your

                    Blanco Torres - Cross

1   investigation?

2   A     Yes.

3   Q     You've told us now that there's a green light

4   against you for testifying?

5   A     Yes, that's obvious.

6   Q     Who told you that there's a green light on you?

7   A     Well, specifically, nobody told me, but I know

8   it's happened.

9   Q     Just because in general, that's what would happen?

10  A     Yes.

11  Q     I want to talk about the murder on December 31,

12  2016.

13  A     Yes.

14  Q     You called Whisper to get permission to commit the

15  murder?

16  A     Yes.

17  Q     You did not talk to Infierno?  You did not speak

18  with Infierno?

19  A     No.

20  Q     And when you got permission, you made the plan to

21  lure him to the park?

22  A     Yes.

23  Q     And he was smoking marijuana with the girls?

24  A     Yes.

25  Q     And then you came up and asked him if he had

Blanco Torres - Cross

1   marijuana to sell?

2   A      Yes.

3   Q      You did that to lure him further into the park?

4   A      Yes.

5   Q      To a more secluded area?

6   A      Yes.

7   Q      And when the attack began, you knocked him down?

8   A      Yes.

9   Q      You hit him so he would fall to the ground?

10  A      Yes.

11  Q      To make it easier for everybody else to beat and

12  kill him?

13  A      Yes.

14  Q      And you yourself stabbed him?

15  A      I did not stab him.

16  Q      Did you use any weapons?

17  A      Rocks.

18  Q      You beat him with a rock?

19  A      Yes.

20  Q      And after you had killed him, you dragged his body

21  to the water?

22  A      Yes.

23  Q      Then after you dragged the body to the water, you

24  piled rocks on it?

25  A      Yes.

Blanco Torres - Cross

1    Q    And you piled rocks on it to hide the body?

2    A    Yes.

3    Q    And for that, you got a mandatory life sentence?

4    A    Yes.

5    Q    And you hope by telling us that you committed this

6    murder, you will get a reduced sentence?

7    A    Yes.

8    Q    And at no time during the planning of this murder

9    was Jose Rosales Juarez involved?

10   A    I don't know him.  I don't know that name.

11            MR. KRISCHER:  I have no further questions.

12            THE COURT:  All right.  Thank you.

13            Mr. Oates.

14                    CROSS-EXAMINATION

15   BY MR. OATES:

16   Q    Good morning, Mr. Torres.

17   A    Good morning.

18   Q    At the time on December 31, 2016, for the

19   Christian Sosa Rivas murder, how many members were

20   there in the Coronados clique?

21   A    Well, you take into account *paros* and *chequeos*,

22   there were 27.

23   Q    Okay.  And how many members -- of that 27, how

24   many people were there for the murder of Christian Sosa

25   Rivas?

Blanco Torres - Cross

1  A    Slaker, Rasta, Cannabis, myself, and Archangel.

2  Four from Coronados, one from Via Satellite.

3  Q    Okay.  So it's safe to say that not all 27 members

4  of the Coronados clique were involved?

5  A    No.

6  Q    Okay.  And just because you're a member of the

7  Coronados clique doesn't mean that you were involved

8  with the murder of Christian Sosa Rivas in 2016?

9  A    No.

10 Q    You indicated that MS-13's biggest rival was 18th

11 Street, correct?

12 A    Yes.

13 Q    Is 18th Street a violent gang?

14 A    Yes.

15 Q    And members of 18th Street try to attack members

16 of MS-13, right?

17 A    All the time, yes.

18 Q    And would you say it's important to know if there

19 are 18th Street members around?

20 A    Yes.

21 Q    It also serves the function to protect yourself,

22 right?

23 A    Yes.

24 Q    You talked a little bit yesterday about being

25 disciplined by the gang.

Blanco Torres - Cross

1   A    Yes.

2   Q    One of the things that the gang requires is for

3   members to participate generally?

4   A    Yes.

5   Q    Respond to text messages?

6   A    Yes.

7   Q    Answer phone calls?

8   A    Yes.

9   Q    And what happens or what could happen if somebody

10  doesn't participate in the gang?

11  A    Well, there are corrections.  If he doesn't want

12  to beat hard, we will beat him.  If he doesn't want to

13  participate, we do something.

14  Q    You say if he doesn't want to participate, you do

15  something.  What is that something?

16  A    We give him a *calenton*.

17  Q    So for a young man -- for example, say he was 18

18  years old -- who joins or begins the process of joining

19  MS-13, if he decides that it's not for him, how does he

20  get out?

21  A    It depends on the rank that the person has.

22  Q    Okay.  Can you tell me what happens to somebody if

23  they want to leave based on the different ranks?

24  A    Well, if the person doesn't want to stay in the

25  clique, they would kill him because they already given

Blanco Torres - Cross

1  that order against someone who wants to leave.

2  Q    So let's say this.  If a homeboy wants to leave

3  the gang, what happens?

4  A    Well, if he just leaves on his own, they are going

5  to kill him.

6  Q    Okay.  What about a *chequeo*?  If a *chequeo* wants

7  to leave the gang, what happens?

8  A    They also kill him.

9  Q    What about a *paro*?

10  A    They give him a very good beating.

11  Q    Have you ever heard of, like, a gang motto or

12  something that they go by, that MS-13 goes by?

13  A    Well, they like to treat each other like beasts.

14  Q    Is there a motto?  Is there some sort of

15  three-word motto that MS-13 has?

16  A    Well, I don't know what you mean.

17  Q    To the best your knowledge, does MS-13 have a

18  three-word motto?

19  A    I don't know.  Your question, I don't understand

20  it.

21  Q    Okay.  So it's safe to say that you've never heard

22  of a three-word motto that MS-13 goes by?

23  A    Homies, homeboy, La Mara Salvatrucha.  There are

24  many, many words.  I don't know which of the ones you

25  are looking for.

209

Blanco Torres - Cross

```
 1   Q    The rehabilitation that you did in El Salvador,
 2   did you do that voluntarily, or were you ordered to do
 3   that?
 4   A    Oh, on my own for my mom, for my family.
 5   Q    Okay.  And before you left, did you tell them that
 6   you had renounced gang life?
 7   A    Yes.
 8   Q    That, obviously, wasn't true, right?
 9   A    Well, I did give up on the gang, but when I was
10   going to church, they were following me.  They were
11   trying to kill me.
12   Q    And because you thought they were going to try and
13   kill you, you went back into the gang?
14   A    Yes.  I got tired that they were following me.
15   Q    Have you ever been a member of the GLCS clique in
16   Virginia?
17   A    No.
18   Q    Now, Mr. Krischer asked you several questions
19   about you testifying here and giving information
20   assisting the government because you are seeking to
21   reduce your life sentence.  Did you help provide
22   cooperation of the other people in the murder of
23   Christian Sosa Rivas?
24   A    Yes.
25   Q    You mentioned earlier that in the GLCS clique in
```

Blanco Torres - Redirect

1  El Salvador, you were a homeboy?

2  A    Yes.

3  Q    Have you ever told the government that you were

4  not a homeboy in the GLCS clique in El Salvador?

5  A    No.

6  Q    You've never told the government that you had some

7  other rank in GLCS in El Salvador?

8  A    No.

9          MR. OATES:  No further questions, Your Honor.

10          THE COURT:  All right.  Any redirect?

11          MR. PATTERSON:  Just a couple of quick

12  questions.

13          THE COURT:  All right.

14                  REDIRECT EXAMINATION

15  BY MR. PATTERSON:

16  Q    A minute ago you said there were 27 members of

17  Coronados when you were in it.

18  A    Yes.  The whole clique, yes.

19  Q    And you included *paros* and *chequeo*s in that 27?

20  A    Yes.

21  Q    Why did you include *paros* and *chequeos*?

22  A    Well, because they are part of the clique.

23  Q    Are they full members in the clique?

24  A    But they are not homeboys, not yet.  But they are

25  part of the clique.

1  Q     Thank you.

2        Are *observaciones* also a part of the clique?

3  A     Yes.

4  Q     And one last question:  What does the government

5  expect you to do with respect to your cooperation when

6  you testify?

7  A     To be correct, to be real with the transparency of

8  my testimony.

9  Q     To be honest?

10 A     Yes.

11        MR. PATTERSON:  Thank you.  I have no further

12 questions.

13        THE COURT:  All right.  The witness may be

14 excused?

15      (No response.)

16        THE COURT:  Mr. Torres, you're excused.  Do

17 not discuss your testimony outside of the courtroom

18 with any other witness.

19      (The witness stands aside.)

20        THE COURT:  The government will call its next

21 witness.

22        MS. LOWE:  The government calls Michael Furr.

23        THE COURT:  All right.  Mr. Furr will come

24 forward, please.

25        Mr. Furr, if you're vaccinated, you may

212

Furr - Direct

1   testify without your mask.

2              THE WITNESS:  Yes.  Thank you.

3              THE COURT:  Counsel.

4        MICHAEL FURR, GOVERNMENT'S WITNESS, AFFIRMED

5                  DIRECT EXAMINATION

6   BY MS. LOWE:

7   Q    Good morning.  Would you please state your full

8   name and spell it for the record.

9   A    Michael Furr, M-I-C-H-A-E-L, F-U-R-R.

10  Q    And where do you work, Mr. Furr?

11  A    Prince William County Police Department.

12  Q    How long have you worked for the Prince William

13  County Police Department?

14  A    A little more than ten years.

15  Q    What's your position there?

16  A    Currently I'm assigned as a crime scene technician

17  to the forensic services section.

18  Q    And what does a crime scene technician do?

19  A    We respond to major incidents that occur in the

20  county.  We document those scenes through advanced

21  evidence collection and scene documentation techniques.

22  These cases range from homicides, robberies, malicious

23  woundings, bank robberies, suspicious debts.  I guess

24  that's our main responsibility.

25  Q    And how long have you been a crime scene

1  technician?

2  A      Five years.

3  Q      Over your career, approximately how many crime

4  scenes have you processed?

5  A      Hundreds of crime scenes.

6  Q      What was your position before being a crime scene

7  technician?

8  A      I was a patrol officer.  I also served as a crime

9  scene technician handling some lower-level not as high

10 profile cases.

11 Q      In January 2017, were you a crime scene

12 technician?

13 A      Can you repeat the date there?

14 Q      In January 2017.

15 A      I was assigned as a crime scene investigator, not

16 a crime scene technician.

17 Q      And does the responsibilities of a crime scene

18 investigator -- are those the same as a crime scene

19 technician?

20 A      No, ma'am.  We're not responding to calls for

21 service typically.  It's when our CID unit calls us out

22 to respond to those major incidents, crimes that might

23 require advanced techniques that the typical patrol

24 crime scene technician is not equipped or trained to

25 handle.

214

Furr - Direct

1  Q    And you said CID.  Can you define what that is?

2  A    Our detectives, I guess.

3  Q    So I want to direct your attention to January 12,

4  2017.

5  A    Yes, ma'am.

6  Q    Were you working that day?

7  A    I was.

8  Q    While you were working that day, what location did

9  you respond to?

10  A    I responded just south of Tim's Rivershore

11  Restaurant for a report of a deceased male that was

12  floating on the shoreline in the Potomac River.  This

13  is at the end of Cherry Hill Road, which is in Prince

14  William County.

15  Q    And who was the man?

16  A    Christian Sosa Rivas.

17  Q    How many other crime scene technicians responded

18  to that scene?

19  A    Numerous.  It was a large scene.  I don't recall

20  the exact number.  We also had patrol officers and

21  detectives on scene as well.

22  Q    Who was the lead crime scene investigator?

23  A    I was.

24  Q    How was it determined that you would be the lead?

25  A    By my supervisor.

Furr - Direct

1  Q     Before we talk about what you did at the crime

2  scene, can you please describe for the jury what the

3  crime scene looked like?

4  A     Sure.  The scene itself is located -- as I

5  mentioned earlier, it was south of Tim's Rivershore

6  Restaurant.  Cherry Hill Road runs east directly

7  towards the Potomac River.  The road turns after

8  crossing a railroad track right at a gravel parking

9  lot.  The gravel parking lot overlooks a clearing that

10 you can see the Potomac River.  There's a wooden dock

11 that extends in the Potomac River, a T-shaped dock.  So

12 to the north of that dock was Tim's Rivershore, and to

13 the south of that dock was where the deceased male was

14 located.

15     He was floating in the water, but his shoulders

16 and his head had washed up on the shore.  The shoreline

17 was pretty rocky, not only with rocks but also with,

18 like, construction debris, concrete chunks and bricks

19 as well.  He was laying face up in the water.  He had

20 no shirt on.  He had a pair of sweatpants on, white

21 shoes.  There were numerous what appeared to be blunt

22 force and sharp force injuries to his face, to his

23 chest -- or to his hands and eventually through further

24 documentation and examining the body to his back as

25 well.

Furr - Direct

1        I think that describes the scene.

2   Q    What did you do with the body?

3   A    Initially, I took overall midrange and close-up

4   photographs of the decedent in the condition that he

5   was in when we arrived.  So partially in the water,

6   partially out of the water.  I focused on not only

7   capturing the overall condition, but focusing then on

8   several of the visible injuries that I could see from

9   the shoreline, also documenting some of the tattoos

10  that the individual had.  Eventually, the decedent was

11  removed from the water, pulled up on the shore for

12  additional photographs.  I believe an investigator with

13  the medical examiner's office responded as well.

14            MS. LOWE:  No further questions.

15            THE COURT:  All right.  Thank you.

16            Any cross?  Who is going to take the lead?

17            MR. WALSH:  No cross.

18            THE COURT:  All right.  Thank you.

19            Officer, you're excused.

20            THE WITNESS:  Thank you, sir.

21            THE COURT:  Do not discuss your testimony

22  outside of the courtroom with any other witness.

23       (The witness stands aside.)

24            THE COURT:  The government will call its next

25  witness.

217

Posthumus - Direct

1           MR. MURPHY:  The government calls Dr. Jocelyn

2   Posthumus.

3           THE COURT:  I'm sorry.  Who is it?

4           MR. MURPHY:  Dr. Jocelyn Posthumus.

5           THE COURT:  Dr. Jocelyn Posthumus will come

6   forward, please.

7           Dr. Posthumus, if you're vaccinated, you may

8   testify without your mask.

9           THE WITNESS:  Excuse me?

10           THE COURT:  If you're vaccinated, you may

11   testify without your mask.

12           THE WITNESS:  Is it okay if I leave it on?

13           THE COURT:  Yes.

14           THE WITNESS:  Okay.  Thank you.

15      JOCELYN POSTHUMUS, GOVERNMENT'S WITNESS, AFFIRMED

16                   DIRECT EXAMINATION

17   BY MR. MURPHY:

18   Q    Could you state and spell your name for the

19   record.

20   A    My name is Jocelyn Posthumus, J-O-C-E-L-Y-N,

21   P-O-S-T-H-U-M-U-S, and I'm assistant chief medical

22   examiner here in Virginia in the Northern District

23   office, which is located in Manassas.

24   Q    How long have you been the assistant chief medical

25   examiner here in Northern Virginia?

Posthumus - Direct

1   A     Nine years.

2   Q     Would you please describe to the jury your

3   educational background and professional training.

4   A     Certainly.  I received my medical degree at Robert

5   Wood Johnson, which is in New Jersey, followed by a

6   four-year combined residency in anatomic and

7   neuropathology at the University of Virginia,

8   subsequently followed by a one-year fellowship in

9   forensic pathology at Virginia Commonwealth University

10  here in Richmond, Virginia.

11  Q     Dr. Posthumus, what is your specialty?

12  A     My specialties are anatomic pathology,

13  neuropathology, and forensic pathology.

14  Q     What is forensic pathology?

15  A     Forensic pathology is the study of natural disease

16  processes and injuries as they pertain to the body in

17  order to determine a cause or manner of death.

18        (Reporter clarification.)

19  A     So forensic pathology is a study of natural

20  disease processes, as well as injuries, as they pertain

21  to the body in order to determine a cause or manner of

22  death.

23  Q     Are you a board certified forensic pathologist?

24  A     Yes.  I'm board certified in anatomic pathology

25  and neuropathology and forensic pathology.

Posthumus - Direct

1  Q    And, Dr. Posthumus, what are your primary duties
2  as an assistant chief medical examiner?
3  A    So my primary duties are to perform external
4  examinations and autopsies in order to determine a
5  cause or manner of death, writing death certificates,
6  issuing autopsy reports, and testifying in court as
7  needed.
8  Q    And how many autopsies have you performed during
9  your career?
10  A    I performed approximately 1,600.
11  Q    And approximately how many of those autopsies did
12  you determine that the manner of death was a homicide?
13  A    Approximately 400.
14  Q    Have you ever testified in court as an expert in
15  forensic pathology before?
16  A    Yes, I have.
17  Q    How many times?
18  A    At least 50.
19  Q    And in what courts have you testified as an expert
20  in forensic pathology?
21  A    I testified in federal courts, also local courts,
22  criminal and civil.
23  Q    Have you ever testified in this court as an expert
24  on forensic pathology?
25  A    Yes, I have.

220

Posthumus - Direct

1   Q    Dr. Posthumus, I'd like to have the court security

2   officer hand you now what's been marked as Government

3   Exhibit 59-4A.

4   A    Yes.

5   Q    Do you recognize that document?

6   A    Yes, I do.

7   Q    What is Government Exhibit 59-4A?

8   A    This is a copy of my CV.

9   Q    Does that CV contain your educational background

10  and professional training reflecting your experience as

11  a forensic pathologist?

12  A    Yes, it does.

13  Q    And does this CV accurately reflect your training

14  and experience?

15  A    Yes, it does.

16         MR. MURPHY:  Your Honor, at this time, I'd

17  ask that Government Exhibit 59-4A be admitted into

18  evidence.

19         THE COURT:  Any objection?

20         MR. WALSH:  No objection.

21         MR. KRISCHER:  No objection.

22         THE COURT:  Without objection, Government

23  Exhibit 59-4A is admitted.

24         MR. MURPHY:  Your Honor, at this time, the

25  government offers Dr. Jocelyn Posthumus as an expert in

Posthumus - Direct

1  forensic pathology.

2           THE COURT:  All right.  Any objection?

3           MR. WALSH:  No objection.

4           MR. KRISCHER:  No objection.

5           THE COURT:  All right.  Without objection,

6  the Court recognizes Dr. Posthumus as someone who may

7  express opinions based on her experience and training

8  in the area of forensic pathology.

9  BY MR. MURPHY:

10 Q    Dr. Posthumus, were you notified in January 2017

11 of a recovery of a body found washed up on the shore of

12 the Potomac River?

13 A    Yes, I was.

14 Q    What did you determine to do with that body?

15 A    It was determined that there was trauma to the

16 body.  Therefore, under the Virginia Code, it fell

17 under the jurisdiction of the medical examiner's

18 office.  So I accepted the case and performed an

19 autopsy the following day on January 13.

20 Q    Who authorized that?

21 A    I did.

22 Q    Now, who was the subject of that particular

23 autopsy?

24 A    It was Mr. Sosa Rivas.

25 Q    I'm going to show you now in that same exhibit

Posthumus - Direct

1  binder what's been marked for identification as

2  Exhibit 59-4B.

3  A    Yes.

4  Q    Do you recognize that document?

5  A    Yes, I do.

6  Q    What is Government Exhibit 59-4B?

7  A    This is a copy of my autopsy report on Mr. Sosa

8  Rivas, as well as including view diagrams.

9  Q    Does your signature appear on the bottom of page 1

10 of that report?

11 A    Yes, it does.

12 Q    When did you perform that autopsy?

13 A    I performed the autopsy on January 13, 2017.

14 Q    What did you determine the manner of death was?

15 A    The manner of death was homicide.

16 Q    What did you determine the cause of death was?

17 A    The cause of death was blunt force trauma to the

18 head and shoulders, injuries to the head, neck, and

19 back.

20         MR. MURPHY:  Your Honor, at this time, I'd

21 ask that Government Exhibit 59-4B be admitted into

22 evidence.

23         THE COURT:  Any objection?

24         MR. WALSH:  No objection.

25         MR. KING:  No objection.

1           THE COURT:  All right.  Without objection,

2    59-4B is admitted.

3    BY MR. MURPHY:

4    Q    Dr. Posthumus, how did you receive the victim's

5    body for examination?

6    A    Mr. Sosa Rivas was received in a sealed body bag

7    at our facility, which is located in Manassas.

8    Q    How was that body bag marked?

9    A    It was marked with a tag from law enforcement.

10   Q    What was the condition of the body when you

11   received it?

12   A    So after breaking the seal, the decedent was

13   received partly clothed with pants, sneakers, and

14   socks, and the body was wet and covered in debris.

15   Q    Dr. Posthumus, I'd like you to look at what's been

16   marked as Government Exhibit 59-5A.

17   A    Yes.

18   Q    Do you recognize that photograph?

19   A    Yes, I do.

20   Q    What does Government's Exhibit 59-5A depict?

21   A    This is a photograph taken at our facility of the

22   seal, the body bag seal and tag.

23   Q    Does the photograph in Government Exhibit 59-5A

24   fairly and accurately depict the body bag tag of the

25   body that you conducted the autopsy on?

224

Posthumus - Direct

1    A    Yes, it does.

2              MR. MURPHY:  Your Honor, I'd ask that

3    Government Exhibit 59-5A be admitted into evidence.

4              THE COURT:  Any objection?

5              MR. WALSH:  No objection.

6              THE COURT:  Government Exhibit 59-5A is

7    admitted.

8              MR. MURPHY:  I request to publish, Your

9    Honor.

10             THE COURT:  Yes.

11   BY MR. MURPHY:

12   Q    Dr. Posthumus, what's identified there with

13   respect to the name in Government Exhibit 59-5A?

14   A    So what you can appreciate in this photograph is a

15   ruler with the marking of NO13-17.  That is the

16   arbitrary autopsy number designated by my office, and

17   then you can appreciate the red seal at the top portion

18   of the picture and then the body bag tag from law

19   enforcement with the decedent's name.  I will note that

20   it is misspelled.  There's an extra S in this

21   photograph.

22   Q    Thank you, Dr. Posthumus.

23        Now, what decomposition, if any, did you note

24   during your examination of Christian Sosa Rivas' body?

25   A    So there were decompositional changes present,

Posthumus - Direct

1  fairly early stages, which included skin discoloration,

2  including marbling, which is just part of the

3  decomposition of the vessels in your body, as well as

4  what we call internal organ autolysis, which is your

5  internal organs breaking down from both enzyme

6  activity, your natural enzymes in your body, as well as

7  bacterial overgrowth.

8  Q    Now, did you observe any evidence of injury during

9  your autopsy to Mr. Sosa Rivas' body?

10 A    Yes, I did.

11 Q    Did you observe injuries specifically to his head

12 and neck?

13 A    Yes, I did.

14 Q    What kind of injuries did you observe to his head

15 and neck?

16 A    So to his head and neck, the blunt force trauma

17 and sharp force injuries.

18 Q    How many injuries did you observe specifically to

19 his head and neck?

20 A    To the head and neck, there were a total of 11

21 lacerations, which are tears to the skin.  There was a

22 single avulsion, which is a severe form of a laceration

23 basically extending through all tissues.  In addition

24 there were ten stab wounds, and there were seven

25 incised wounds to the head and neck region.

Posthumus - Direct

1  Q     Can you explain to the jury what an incised wound

2  is?

3  A     So an incised wound is an injury inflicted by a

4  sharp implement that cuts and divides tissue as it

5  penetrates.  The difference between an incised wound

6  and a stab wound is that an incised wound is longer

7  than it is in depth.

8  Q     Did you have an opinion as to -- or did you

9  formulate an opinion as to what caused the stab and

10 incised wounds that you observed to Christian Sosa

11 Rivas' head and neck?

12 A     So the sharp force injury was consistent with a

13 single-edged knife, something similar to a knife in the

14 kitchen block, your butcher block at home.

15 Q     Now, you testified that you observed blunt force

16 injuries to the victim's body.  Can you describe to the

17 jury what a blunt force injury is?

18 A     So a blunt force is a crushing or tearing injury

19 inflicted by a nonsharp object.  In this case, as I

20 mentioned, there were 11 lacerations or tears to the

21 head and neck region and then a single avulsion to the

22 head, which is just a severe form of a laceration

23 extending through all tissues and exposing skull.

24 Q     Did you observe any injuries to the victim's

25 brain?

227

1   A     Yes, I did.

2   Q     What were those injures?

3   A     So these blunt force injuries to the head and neck

4   region caused crushing of the skull.  There was

5   multiple fragmentation of Mr. Sosa Rivas' skull base,

6   which resulted in tearing of the brain itself.

7   Q     Did you observe any injures to Mr. Sosa Rivas'

8   torso area?

9   A     Yes, I did.

10  Q     What kind of injuries did you observe to his

11  torso?

12  A     The torso had 11 stab wounds to the back.

13  Q     Did you observe any injuries that you determined

14  to be defensive-type injuries on Mr. Sosa Rivas?

15  A     Yes.  Mr. Sosa Rivas had four sharp force injuries

16  to the hands, two perforated stab wounds to the right

17  hand and then two incised wounds.

18           MR. MURPHY:  Your Honor, at this time, I

19  would request to publish what's been entered already as

20  Government Exhibit 59-4B.

21           MR. WALSH:  Judge, I object.

22           THE COURT:  You want to publish portions of

23  it?

24           MR. MURPHY:  Yes.

25           MR. WALSH:  Judge, I'm going to object.

228

Posthumus - Direct

1          THE COURT:  Yes.

2          Go ahead.  You may.

3   BY MR. MURPHY:

4   Q     Dr. Posthumus, looking on the diagram on page 8 of

5   what's been entered as Government Exhibit 59-4B, can

6   you explain to the jury what evidence of injuries are

7   reflected here?

8   A     So this diagram -- first, let me try to explain

9   it.  This diagram is what is referred to as the skull

10  base.  So if you remove the top portion of your skull

11  and you're looking at it downwards towards your feet.

12  The black dark scribble lines are all fractures.

13        May I touch and show?

14  Q     Yes, you may.

15  A     The most significant is here to here if I draw a

16  straight line.  That's called a hinge fracture where

17  it's through and through the skull base to the point

18  where you can actually separate the skull into two

19  separate pieces.

20  Q     Now, looking at the diagram on the next page on

21  Government Exhibit -- or page 9 of this exhibit, can

22  you describe for the jury what evidence of injury is

23  depicted on this practitioner diagram?

24  A     So this diagram is the skeletal diagram of the

25  head and neck region.  What you can appreciate here is

1   on the sides of the head here and then here, there's

2   extensive fracturing where the skull is in multiple

3   pieces.

4   Q     And looking at the diagram on the next page,

5   page 10 of this exhibit, can you explain to the jury

6   what evidence of injury is depicted here?

7   A     So this is a body diagram, and it demonstrates

8   both injury as well as medical or identifying features.

9   First, to highlight, the letter T indicates a tattoo.

10        But to focus on the back, all of those letterings,

11  AC, AD, AF, those represent stab wounds, and those

12  letters correlate to the injury in the autopsy report.

13  Q     If we go to the next diagram, what evidence of

14  injury is depicted on this diagram?

15  A     So this is a diagram of the hand, and there are

16  two perforating stab wounds to the right hand, S and T,

17  which exit on the palmar surface here at U and V.

18  Again, these letters are for ease of reference for you

19  to correlate the location on a few diagrams to the

20  autopsy report.

21        Here on the left palmar surface is a very large

22  incised wound, and there's an additional injury here,

23  which is an incised wound on the right finger.

24  Q     And if we can go to the next diagram, what

25  evidence of injuries are depicted here, Dr. Posthumus?

Posthumus - Cross

1   A    So this is, obviously, the diagram of the head and

2   neck, including the skin.  Again, the letters will

3   designate sharp force and then blunt force injuries to

4   the head and neck region.

5   Q    Thank you, Dr. Posthumus.

6        Now, after you completed the autopsy, what did you

7   do with the victim's remains?

8   A    The remains do go back into the body bag and then

9   are released to the next of kin.  In this case, I did

10  retain the brain for further examination at a later

11  date, as well as a portion of the ribs, and ceded it to

12  law enforcement because there was toolmarkings on the

13  ribs.

14           MR. MURPHY:  Thank you, Dr. Posthumus.

15           No further questions for the witness at this

16  time, Your Honor.

17           THE COURT:  Thank you.

18           Any cross?

19           MR. WALSH:  Yes, Your Honor.

20                     CROSS-EXAMINATION

21  BY MR. WALSH:

22  Q    Good morning, Dr. Posthumus.

23  A    Good morning.

24  Q    So when we look at these diagrams, can you tell me

25  what is the first injury this person received?

Posthumus - Cross

1   A    I cannot tell you the order of the injuries, no.

2   Q    Can you tell me the duration of these injuries?

3   A    No, I cannot.

4   Q    So it's safe to say some of these injuries could

5   have happened at a later date?

6   A    Define "later date," please.

7   Q    Maybe the next day.

8   A    No.  All of these injuries were sharp force and

9   then the lacerations to the head occurred around the

10  time of death.

11  Q    When you say around the time of death, could that

12  be hours or not?

13  A    It could, yes.

14  Q    Okay.  And you said when you received the body, it

15  was wet, right?

16  A    Correct.

17  Q    I think you mentioned pooling of blood.  Was there

18  pooling of blood in a certain area of the body, or had

19  the body been moved around?

20  A    There was no residual blood within the body

21  cavities.

22  Q    So if a person is killed and falls down and it's a

23  homicide and stays in one position, the blood pools to

24  the lower end of it, correct?

25  A    Correct.  You're describing livor.

Posthumus - Cross

1   Q     Excuse me?

2   A     Livor, L-I-V-O-R.

3   Q     I couldn't think of the word.  That's right.

4         And there was none of that; is that correct?

5   A     Do you mind if I refer to the report?

6   Q     Please.

7   A     The document is indeterminate, which means I could

8   not appreciate the lividity pattern.

9   Q     What, if anything, did water do with this -- do

10  towards your autopsy?

11  A     Right.  So it's not uncommon, especially with a

12  prolonged submersion, that the livor pattern is

13  indeterminate because they are either floating in the

14  water or they're on the ground, let's say, on the river

15  bed.  So it's not uncommon that with prolonged

16  submersion that the livor pattern was indeterminate.

17  There's also the potential for animal predation and

18  then, of course, the decompositional changes we have to

19  take into consideration.

20  Q     Tell me about animal predation.

21  A     Animal predation?

22  Q     Yes, please.

23  A     So the body can be eaten by whatever organisms and

24  animals that are located in that natural body of water.

25  Q     So it's safe to say that when you receive the

1 body, it may not look exactly the same way it looked at

2 the time of death, correct?

3 A    It most definitely did not.

4         MR. WALSH:  Fair enough.  That's all the

5 questions I have.  Thank you.

6         THE COURT:  Any other questions?

7         MR. CONTE:  No questions, Your Honor.

8         MR. OATES:  No questions.

9         MR. KRISCHER:  No questions.

10        THE COURT:  All right.  Any redirect?

11        MR. MURPHY:  No, Your Honor.

12        THE COURT:  All right.  Thank you, Doctor.

13 You're excused.

14     (The witness stands aside.)

15     (The testimony of Claudio Saa is under separate

16     cover.)

17        THE COURT:  Ladies and gentlemen, we're going

18 to take our luncheon break.  We'll reconvene at 2:15.

19 Please do not discuss this case among yourselves during

20 the luncheon recess.

21     (The jury exits at 1:08 p.m.)

22        THE COURT:  Who is the government's next

23 witness?

24        MR. MURPHY:  Johnnie Benningfield, Your

25 Honor.

```
1              THE COURT:  All right.  The Court will stand
2    in recess.
3         (Recess from 1:08 p.m. until 2:20 p.m.)
4         (The jury is not present.)
5              THE COURT:  All right.  Anything before we
6    bring the jury out?
7              MR. MURPHY:  Not from the government.
8              THE COURT:  All right.  Let's bring the jury
9    out.
10        (The jury enters at 2:20 p.m.)
11             THE COURT:  Please be seated.
12             I'm pleased to tell you that Juror No. 8 has
13   reported that her rapid test has come back negative.
14   She's arranging to have a PCR test, and I'll keep you
15   posted.
16             Counsel.
17             MR. MURPHY:  Yes, Your Honor.  The government
18   calls Johnnie Benningfield.
19             THE COURT:  All right.  Mr. Benningfield.
20             Mr. Benningfield, if you're fully vaccinated,
21   you're welcome to remove your mask.
22             THE WITNESS:  Thank you, Your Honor.
23      JOHNNIE BENNINGFIELD, II, GOVERNMENT'S WITNESS,
24                           AFFIRMED
25                      DIRECT EXAMINATION
```

Benningfield - Direct

1  BY MR. MURPHY:

2  Q    Good afternoon, Mr. Benningfield.

3       Can you please introduce yourself to the Court and

4  please spell your name for the court reporter.

5  A    Good afternoon.  Yes.  My name is Johnnie Luther

6  Benningfield, II.

7       I'm a professional translator and interpreter.

8  That's what I do by profession.

9  Q    Can you spell your first and last names for the

10 court reporter?

11 A    Sure.  Johnnie, J-O-H-N-N-I-E, Benningfield,

12 B-E-N-N-I-N-G-F-I-E-L-D.

13 Q    What languages do you speak?

14 A    I'm certified as a professional translator and

15 interpreter for Spanish and English.

16 Q    What languages do you read?

17 A    Those two languages for sure.

18 Q    What was your first exposure to the Spanish

19 language?

20 A    From home, birth.  My mother was -- that was her

21 native language.

22 Q    How proficient are you in Spanish?

23 A    As proficient as I am in English.

24 Q    And what is your occupation?

25 A    I work as an interpreter and translator.  I am

Benningfield - Direct

1  certified as such by the Administrative Office of the

2  United States Federal Courts in accordance with

3  Title 28 of the United States Code, Section 1827.

4  Q    And are you certified as a Spanish language

5  interpreter for federal court proceedings?

6  A    I am.  All U.S. federal courts, yes.

7  Q    When were you first certified to work in courts as

8  an interpreter?

9  A    I was first certified in 1992 in New Mexico state

10  courts.

11  Q    Did you have to take a test to receive that

12  certification at that time?

13  A    I did.  I had to take two tests.  I had to first

14  take a written test, and then I -- upon passage of that

15  test, I was invited to take the oral test.  And upon

16  passing that test, I was certified to work the New

17  Mexico state courts.

18  Q    Now, when were you first certified as an

19  interpreter in federal courts?

20  A    I was first certified in the federal courts in

21  1998.  I took the written test in 1997, and later that

22  year in '97, I was invited to take the oral.  All the

23  paperwork and background, security, etc., wasn't done

24  until early 1998, when I received the certification.

25  Q    Okay.  Was there a written certification exam in

Benningfield - Direct

1  that process?

2  A    For the federal test, yes, there was a written

3  exam.  The test I took consisted of 160 different

4  questions, very similarly to a GRE, a Graduate Review

5  Exam.  The test does not test your ability -- the

6  written portion does not test your ability to translate

7  or interpret.  It tests your knowledge of each language

8  independently, your knowledge of English as a language

9  and your knowledge of Spanish as a language in itself.

10 Q    Have you previously prepared transcripts of

11 recorded materials in Spanish?

12 A    Yes.  I began working with transcripts probably

13 shortly after I was originally certified in New Mexico

14 state courts around 1993.

15 Q    And have you continuously prepared transcripts for

16 courts since that time?

17 A    I have.

18 Q    How many cases have you worked on that required

19 you to provide transcription services?

20 A    I haven't counted up the number of cases actually.

21 During the -- since certification in '92, which is

22 approximately 30 years ago, I've pretty much had

23 something going every year, sometimes two or three

24 cases that require some transcription; maybe a year in

25 which there wasn't.  But I could roughly and very

Benningfield - Direct

1  easily say between 60 to 100 cases.

2  Q    How many cases have you worked on that involved

3  the translation of wiretap evidence from English to

4  Spanish?

5  A    I haven't added that number up exactly either.  It

6  would have been after I was federally certified.  I

7  don't know the exact number, but it's been since '98 on

8  occasion.  Once every year or two there's been some

9  type of transcription going on with wiretaps.

10  Q    Have you been qualified as an expert witness in

11  matters of translations and transcriptions in the

12  Spanish language to the English language?

13  A    I have.

14  Q    And how many times have you testified as an expert

15  in court?

16  A    I haven't added up those numbers either.  I would

17  estimate somewhere between 15 and 20 times.

18  Q    And when was the last time you were qualified as

19  an expert in the Spanish language in court?

20  A    It was before the COVID pandemic.  At least a

21  couple of years ago.

22  Q    Which court was that?

23  A    It was either for the District of Maryland or the

24  Eastern District of Virginia, one of those two

25  districts.  It may have been here, or it may have been

Benningfield - Direct

1  in the District of Maryland.

2  Q    I'm going to have you, with the assistance of the

3  court security officer, look at what's been marked as

4  Government's Exhibit 18-31A.

5  A    Okay.  I have it.

6  Q    Do you recognize that document?

7           THE COURT SECURITY OFFICER:  Sir, 31A?

8           MR. MURPHY:  Yes, 18-31A.

9  A    Yes, I see it.

10  Q    Do you recognize that document?

11  A    Yes.  It's my CV.

12  Q    Does this CV contain your training,

13  certifications, publications, and experiences as a

14  Spanish-to-English-language professional translator?

15  A    It does.

16  Q    Does that CV contain a list of references to

17  courts and judges by whom you've been qualified as an

18  expert?

19  A    A limited list, yes.

20  Q    Does that CV accurately reflect your training and

21  experience?

22  A    Yes.

23           MR. MURPHY:  Your Honor, at this time, the

24  government would ask that Government's Exhibit 18-31A

25  be admitted into evidence.

240

Benningfield - Voir Dire

1          THE COURT:  Any objection?

2          MR. WALSH:  No objection.

3          THE COURT:  Without objection, Exhibit 18-31A

4    is admitted.

5          MR. MURPHY:  Your Honor, at this time, the

6    government would offer Mr. Johnnie Benningfield as an

7    expert in Spanish to English translations.

8          THE COURT:  Any objection?

9          MR. KRISCHER:  Can I voir dire, Judge?

10         THE COURT:  Yes.

11              VOIR DIRE EXAMINATION

12   BY MR. KRISCHER:

13   Q    Good afternoon, Mr. Benningfield.

14   A    Good afternoon.  How are you today?

15   Q    Very good.  Thank you.

16   A    Good.

17   Q    So you are a certified court interpreter; is that

18   correct?

19   A    That's correct.

20   Q    From English to Spanish and Spanish to English?

21   A    That's correct.

22   Q    And it looks like from your CV that the last time

23   that there was a certification was 2002.  Is that

24   correct?  Looking at your CV, Spanish language contract

25   interpreter, United States Department of State, 2002?

Benningfield - Voir Dire

1  A    Yes.   That was a separate test I took with the

2  State Department, yes.

3  Q    Do you have to take annual proficiency tests to be

4  an interpreter in federal court?

5  A    I have to take continuing education courses

6  annually, yes.  I have to take a course every year, and

7  I did not mention also teach a course every year for

8  the State of Texas.

9  Q    Is it fair to say that Spanish can vary from

10 region to region?

11 A    Certainly.

12 Q    You said you first learned Spanish from your

13 mother?

14 A    Yes, that's correct.

15 Q    And what region was she from that she had spoken

16 Spanish?

17 A    Mexico.

18 Q    Mexico.  And is that Spanish -- can that be

19 different from countries in Central America?

20 A    Yes.

21 Q    And from those regions, you might have different

22 interpretations for different words?

23 A    Certainly.

24 Q    And different slang you might also have for

25 different words?

1   A    Of course.

2   Q    Did you ever have any formal studies in Spanish?

3   A    Yes.

4   Q    And that was -- pardon me.  That was at the

5   University of Texas Pan American in Edinburg, Texas?

6   A    That's correct.

7   Q    And did that -- strike that.

8        So there are times then when you're translating

9   where perhaps the local dialect or region is unfamiliar

10  to you?

11  A    There's always an element of learning in all work

12  that we do always.

13  Q    And you also testified and have translated

14  wiretaps; is that correct?

15  A    That's correct.

16  Q    And those wiretaps are varying audio quality; is

17  that fair to say?

18  A    That is correct.

19  Q    Do you have any special training with regard to

20  deciphering the audio quality of a recording?

21  A    Special training?  I don't know if I have special

22  training.  I load the audio into different software

23  that we have, including Pro Tools and Scribe, which are

24  a couple of the software applications that we use.

25  Especially Pro Tools can give back a digital

1   calculation of quality of audio, etc.

2       So I don't know if you want to call it specialized

3   training.  I think a lot of my training has come from

4   work experience actually, on-the-job experience.  Once

5   you pass the test, you're kind of asked to take on a

6   lot of different tasks from a variety of different

7   countries.  Over the years, that experience adds to

8   your knowledge base.

9   Q    You mentioned the Pro Tools and it does an

10  analysis of the audio quality.  Does it also enhance

11  the audio quality?

12  A    If you ask it to, it can.

13  Q    So in some cases, it might alter the original file

14  to make it sound different?

15  A    If you ask it to, it will.

16  Q    You talked about -- there's two tests for some of

17  the certifications.  One was a written, and one was an

18  oral.  Correct?

19  A    That's correct.

20  Q    So the written portion just tests your

21  proficiency?

22  A    That's correct, and knowledge.

23  Q    And knowledge.  Thank you.

24       And the oral part, I assume that goes more towards

25  your ability to translate.

Benningfield - Voir Dire

1   A   Yes.   That actually does test your proficiency.

2   The oral portion is a mock trial, and it's recorded.

3   And three independent analysts analyze your rendition

4   and determine if your rendition racks up enough points.

5   The way it works is that the test has underlying

6   phrases that are worth so many points, and you have to

7   get each of those phrases correct in order to

8   accumulate the number of points to get an objective

9   score at the end of the test to pass the test.

10  Q   If you come across a word or phrase that's

11  unfamiliar to you, what do you do?

12  A   I may research it.   I may leave it in its source

13  form and just put it in italics.   I may put it

14  something as -- something that I did not comprehend,

15  that was unintelligible for me.

16  Q   Sometimes do you put in multiple possibilities of

17  what the translation could be?

18  A   That's not if you don't understand.   If you put in

19  multiple possibilities, that means that if something

20  was written out with an accent mark that normally would

21  have been written there but the writer did not write it

22  because of -- just frequently in text messages, people

23  are not assuring the accent marks are in the correct

24  spots.

25      You say, Okay, this could mean this.   Had an

Benningfield - Voir Dire

1 accent mark been included over this, that could mean

2 that.

3      So if you find in some of the work that you may

4 see in this case, it could be this or it could be that,

5 it's simply because of the limited context that I was

6 given and the possibility of an accent mark that should

7 have been there that wasn't.  It's one of those two

8 possibilities.  So if you see that, that's what that

9 means.

10      It does not mean, I guess it might be this, and I

11 guess it might be that.  That's not what that means.

12 Q    But it could be multiple meanings?

13 A    It could be either of what I have offered in my

14 analysis.

15 Q    When you do transcriptions of wiretaps, are you

16 only given the information -- in other words, are you

17 only given the recording, and then you just send back

18 your work product, or is there any more interaction

19 with whomever you are translating for?

20 A    The way it normally works is I receive an audio

21 file from the government website that I download.  I

22 will take that file, and I usually do not work alone on

23 these projects.  I have other certified interpreters

24 and specialists that work with me.  A transcription

25 will be made first of the audio.  That transcription

Benningfield - Voir Dire

1   will be reviewed by another member of the team and

2   verified.  And once it's verified, in this particular

3   case, I personally did all of the English translation

4   for all of the Spanish language columns that you have.

5   Q    But as far as any information that you received

6   from your customer, we'll say, is it just the audio

7   file?

8   A    Yes, generally speaking.

9            MR. MURPHY:  At this point, the government

10  would object.  Counsel has asked to *voir dire* the

11  witness concerning his expertise for which he's been

12  offered, which is to translate from --

13           THE COURT:  I understand.

14           MR. MURPHY:  -- the Spanish to English

15  language.  These questions are not directed towards

16  that, Your Honor.

17           THE COURT:  All right.  I'll let you do a

18  little more on this.  It is getting to the merits, I

19  think, of what you want to do.

20           MR. KRISCHER:  Thank you, Judge.

21  BY MR. KRISCHER:

22  Q    My last question would be:  You're court

23  certified, but you are a private translator?

24  A    I work with both.  I do some work in the courts.

25  I also do quite a bit of private work as well.  I work

Benningfield - Direct

1   for the federal public defender, for attorneys

2   appointed under the Criminal Justice Act.  I work for

3   private entities, commercial organizations.  I do a

4   wide variety of work.

5           MR. KRISCHER:  Thank you, sir.  I have no

6   further questions for *voir dire*.

7           THE WITNESS:  All right.  Thank you, sir.

8           THE COURT:  Is there any objection to

9   Mr. Benningfield's qualifications?

10          MR. KRISCHER:  No, Judge.

11          THE COURT:  All right.  The Court is going to

12  recognize Mr. Benningfield is qualified as a Spanish to

13  English and English to Spanish translator.

14          Ladies and gentlemen, as I indicated earlier

15  with an earlier witness, I'm qualifying this witness

16  because of his specialized experience and knowledge.

17  To the extent there are any factual issues as to any

18  specific translations, you will be the ultimate decider

19  of the facts based on the evidence that's presented.

20                  FURTHER DIRECT EXAMINATION

21  BY MR. MURPHY:

22  Q    Mr. Benningfield, were you hired by the government

23  to provide transcripts and translation services in this

24  particular case?

25  A    I was.

Benningfield - Direct

1   Q    What specifically were you asked to do?

2   A    I was asked to render a number of services, which

3   included analyzing audio files, providing a

4   word-for-word Spanish transcription of those audio

5   files, and then providing an English translation of the

6   transcription.

7        I was also requested to analyze a number of text

8   messages or written messages and provide an English

9   translation of those written messages.  I think that's

10  the bulk of what I was requested to do.

11  Q    Can you please explain to the jury the process

12  that you use to prepare a Spanish to English

13  transcript?

14  A    Yes.  So upon reception of an audio file, a

15  recording, that recording is loaded into the computer.

16  We will generally listen to the entire recording.  As a

17  matter of fact, if it's multiple recordings, we will

18  try to put the recordings in chronological order.

19  That's the way they are time-stamped, we are usually

20  able to do that.  And as we listen, we're able to try

21  to build a chronology and an understanding of context

22  within what we're given.

23       It's common in this type of work for translators

24  and interpreters and transcribers to work in teams.  So

25  on this particular assignment, I worked with a team,

Benningfield - Direct

1  another court certified interpreter in Arizona.  He
2  would listen to the audio recording.  He would prepare
3  a draft transcription and send me the draft
4  transcription.  I would listen to the draft
5  transcription carefully and compare what I'm hearing on
6  the audio with his transcription and decide if there's
7  any corrections or any additions or anything that needs
8  to be finalized in the left-hand column, the Spanish
9  column.
10      Once that's done, I go back with the audio again,
11  once again, with my headsets on because this is
12  performed at a computer with headsets on.  I have a
13  foot pedal that allows me to turn the audio on and off.
14  My hands are free on the keyboard.
15      As I listen to the audio, I'm also reading the
16  Spanish transcription.  And I do that because when I
17  listen to the audio, I understand what's being said.
18  But also, as I read the transcription, I have in
19  written format before me also what was being said.
20  It's a way of, once again, verifying that left-hand
21  Spanish column, and it's also a way of assuring that's
22  what being written down in the right-hand English
23  column fits not only with what's on the written page in
24  black and white but also with the information of what
25  speakers are saying as they speak.  Because sometimes

Benningfield - Direct

1  what you simply see in black and white is complemented

2  with what you hear on the audio.  And so the English

3  column is prepared in that fashion.

4      Once it's prepared, I go back once again and

5  review the document to assure accuracy of the document,

6  of the transcription and translation.

7      That's how the transcriptions were prepared.

8  Q    Thank you.

9      Now, were you familiar with any of the individuals

10 on the recordings or documents you received before you

11 began your transcriptions and translations?

12 A    No.  I still don't know any participants today.

13 Q    Prior to beginning your work to translate or

14 transcribe information that you were provided in this

15 case, did you receive a debrief from the case agents or

16 the prosecutors involved in the case or anyone else

17 regarding the specific details of the case?

18 A    No.

19 Q    Now, what did you receive in physical form in

20 order to begin your work?

21 A    Well, I don't think I received anything in

22 physical form.  I received digital materials on the

23 website, and I downloaded those from the website and

24 began working on it.

25 Q    What digital materials did you receive?

Benningfield - Direct

1  A     Audio recordings of intercepted telephone

2  conversations, text messages, Facebook messages,

3  Telegram messages, communications of other sorts.

4  Q     Okay.  Have you ever seen the Indictment in this

5  case?

6  A     I never have.

7  Q     Do you know what the charges are against the

8  defendants in this case?

9  A     I don't.

10 Q     Do you believe that the transcripts that you

11 prepared accurately reflect the utterances that are

12 heard on the recordings and the statements that were

13 written in the documents that you received?

14 A     I do.

15 Q     Approximately how many hours did it take you and

16 the others that you were working with to prepare the

17 transcripts for this case?

18 A     I just added that up last week, the actual

19 numbers.  We have spent more than 1,200 hours preparing

20 this information.

21 Q     How many of those hours were spent transcribing

22 audio and video recordings?

23 A     That part I didn't break down.  Maybe close to

24 half of that.

25 Q     Okay.  And what is your hourly fee to do that

Benningfield - Direct

1  work?

2  A    I normally charge $190 an hour for this type of an

3  assignment.  I do a lot of different type of work

4  assignments.  And so my professional fees can vary

5  depending on the skill sets that are necessary

6  according to the work assignments I'm given and asked

7  to do.  But for this type of work, I normally charge

8  $190 an hour.  However, due to the volume of materials

9  in this case, I agreed to work at a reduced

10 professional fee of $120 an hour, which I don't believe

11 I'll be agreeing to again, but I did in this case.

12 Q    We appreciate that.

13      With respect to just the audio and video

14 recordings in this case, did you personally identify

15 the voices on the transcripts?

16 A    No.

17 Q    Do you know whether excerpts of Spanish language

18 and audio and video recordings and documents have been

19 marked as evidence in this case?

20 A    I believe they have.

21 Q    Does each Spanish language audio and video

22 recording and document that has been marked as an

23 exhibit in this case have a corresponding transcript

24 that was prepared by you if it was a Spanish language

25 audio, video, or document?

Benningfield - Direct

1  A    Yes.

2  Q    Generally speaking, how have these transcripts

3  that you have prepared been marked?

4  A    To be honest with you, I'm not sure how they're

5  marked.  I don't know the exact marking system that the

6  U.S. Attorney's Office is using.

7  Q    Have you verified the transcripts that you

8  prepared in this case from the audio and video

9  recordings that you received in this case are, in fact,

10 accurate and complete with respect to the information

11 and materials that you received?

12 A    Yes, that I have done.

13 Q    All right.  Now, I'd like for you to look at

14 what's been marked as Government's Exhibit 18-1 to

15 18-30A.

16 A    What are those numbers again?

17 Q    18-1A to 18-30A.

18 A    Okay.  I'm on 18-1A.  I'm going through them all.

19 I'm on 18-6 now.  Do you want me to look at each page

20 of these 18 series?

21 Q    I just would like for you to familiarize yourself

22 with Exhibits 18-1A to 18-30A.  Once you do, can you

23 let the jury know whether or not those are transcripts

24 and exhibits that you prepared in this case.

25 A    Yes.  I see my initials on the last page of each

                    Benningfield - Direct

1  exhibit.

2  Q    And what do those initials that you see there

3  reflect?

4  A    My initials, J.B.  Which I see other initials J.B.

5  with a date on them, but those are not my initials, the

6  block letter J.B.  But the cursive letter star J.B. are

7  my initials, and those reflect my initials that I've

8  reviewed these very articles of exhibits.

9  Q    Okay.  And, Mr. Benningfield, if you could, please

10 look now at what's been marked as Government's

11 Exhibit 19-1A through 19-16A.  If you could, also

12 review those exhibits and let the jury know whether or

13 not those are transcripts and materials that you

14 prepared in this case.

15 A    So 19-1A through?

16 Q    To 19-16A.

17 A    Okay.  I see here 19-1A through 19-14A.

18 Q    Did you prepare the exhibits in 19-1A to 19-14A?

19 A    It appears that -- I do see my initials on the

20 last page of what I'm looking at, yes.

21 Q    Do those initials indicate that you reviewed those

22 transcripts as accurate?

23 A    Yes.

24 Q    And if I can have you now look at what's been

25 marked as Government's Exhibit 20-2B and 20-3B.

Benningfield - Direct

1             THE COURT:  I'm sorry.  What's the exhibit

2    number?

3             MR. MURPHY:  20-2B and 20-3B.

4    A    Exhibit 20-2B, yes, has my initials.  That's

5    correct.

6    Q    And so does 20-3B?

7    A    Yes.

8    Q    Are those both exhibits that you prepared as

9    transcripts in this case?

10   A    They are.

11   Q    And, Mr. Benningfield, if I can have you look at

12   what's been marked as 21-3B, 21-4B, and 21-5B.

13   A    Exhibit 21-3B, yes, that is correct.  My initials

14   are there.

15   Q    And 21-4B?

16   A    They are there as well, yes.

17   Q    And 21-5B?

18   A    Yes.

19   Q    Are these each transcripts that you prepared in

20   this case?

21   A    They are.

22   Q    If I can have you look at what's been marked as

23   22-4B, 22-5B, 22-6B, 22-7B, 22-8B, 22-9B, 22-10B,

24   22-11B, 22-12B, and 22-14B.

25   A    Yes.

Benningfield - Direct

1   Q    Are those each exhibits that you transcribed and
2   prepared transcripts for in this case?
3   A    They are.
4   Q    Do they each all reflect your initials?
5   A    They do.
6   Q    If I could now have you look at 23-3B and 23-4B.
7   A    Yes, 23-3B -- yes, my initials are there as well.
8   Q    Are those both transcripts that you prepared in
9   this case?
10  A    They are.
11  Q    And if I can have you look at what's been marked
12  as 25-4B, 25-5B, 25-6B, 25-7B, 25-8B, 25-9B, 25-10B,
13  25-11B, and 25-12B.
14  A    Yes, I'm seeing my initials on these as well.
15  Q    Is that because those were each exhibits and
16  transcripts that you prepared in this case?
17  A    Yes, that's correct.
18  Q    If I can have you look at 26-4B, 26-5B, 26-6B,
19  26-7B, 26-8B, 26-9B, 26-10B, 26-11B, 26-12C, 26-12D,
20  26-13B, 26-14B, 26-15B, 26-17B, 26-18B, 26-19B, and
21  26-20B.
22          THE COURT:  I don't have 26-20B listed.
23          MR. MURPHY:  The Court's indulgence, Your
24  Honor.
25          Excuse me, just to 26-19B.

257

Benningfield - Direct

1           THE COURT:  All right.

2    A    Yes.

3    Q    Do each one of those transcripts and exhibits

4    contain your initials?

5    A    They do.

6    Q    Is that because those are transcripts that you

7    prepared in this case?

8    A    I did.

9    Q    If I can have you look at 27-3B, 27-4B, 27-5B,

10   27-6B, 27-7B, 27-8B, 27-9B, 27-10B, 27-11B, 27-12B, and

11   27-13B.

12           THE COURT:  You said to 13?

13           MR. MURPHY:  Correct.

14   A    Yes.

15   Q    Do each of those contain your initials?

16   A    They do.

17   Q    Is that because those are transcripts that you

18   prepared as evidence in this case?

19   A    They are.

20   Q    If I can have you now look at 28-3B, 28-4B, 28-5B,

21   28-7B, 28-8B, 28-9B, and 28-10B.

22   A    You said 28-9B?

23   Q    Yes, 28-9B.

24   A    I see 9B here, but I don't see my initials on it.

25   Q    What about 28-10B?

Benningfield - Direct

1    A     I also see it here, but I don't see my initials.

2    I do recognize the documents, though, as work that I

3    have done.

4              MR. MURPHY:   The Court's brief indulgence.

5    BY MR. MURPHY:

6    Q     With respect to 28-9B and 28-10B, are those

7    exhibits that you prepared?

8    A     They certainly appear to be, yes.

9    Q     If you can, please take a brief moment to review

10   28-9B and 28-10B and confirm whether or not those are

11   exhibits that you prepared in this case.

12   A     9B is, and 10B is as well.

13   Q     Have you looked at 28-9B and 28-10B?  Do you have

14   any corrections or changes that you believe need to be

15   made to either exhibit based on your review of those

16   exhibits?

17   A     I don't.

18   Q     Looking at 29-3B --

19   A     My initials are on them, yes.

20   Q     Is that because that's an exhibit that you

21   prepared as a transcript in this case?

22   A     Yes.

23   Q     Looking at 30-1B --

24   A     Yes.  Yes, my initials are on 30-1B.

25   Q     Because that's a transcript that you prepared as

Benningfield - Direct

1    an exhibit in this case?

2    A    Yes.

3    Q    Looking at 31-2B --

4    A    Yes.

5    Q    Do your initials appear on that exhibit?

6    A    They are.

7    Q    Is that because this is a transcript that you

8    prepared as an exhibit in this case?

9    A    This was not a transcript.  This was a translation

10   of a letter that had been written in Spanish.  This is

11   not a transcript.  It's a translation.

12   Q    Thank you for the clarification.

13        Looking at 37-10B and 37-11B --

14   A    37-10B, I'm there.  Yes, my initials are on it.

15        And what was the other one?

16   Q    37-11B.

17   A    Yes.

18   Q    Do your initials appear on both of those exhibits?

19   A    They do.

20   Q    Is that because those are exhibits that you

21   prepared as evidence in this case?

22   A    Yes.

23   Q    Looking at 38-B1 and 38-B2 -- excuse me, 38-8B1

24   and 38-8B2.

25   A    So I have 38-8B1 in front of me right now.  I

Benningfield - Direct

1   apparently checked this one twice because my initials

2   are on it twice.

3   Q    What about 38-8B2?

4   A    The same thing.  My initials are on it twice.

5   Q    Is that because those are exhibits that you

6   prepared as evidence in this case?

7   A    Yes.

8   Q    Looking at 38-9A to 38-15A --

9   A    Yes.  Yes, my initials are on each one of those.

10  Q    Is that because those are exhibits that you

11  prepared as evidence in this case?

12  A    That's correct.

13  Q    Looking at 39-7B --

14          MR. CONTE:  What was that again?

15          MR. MURPHY:  39-7B.

16  A    I don't know if I have a 39-7B in front of me.

17  Oh, okay.  I have 39.

18  Q    39-7B?

19  A    Okay, I'm sorry.

20  Q    No worries.  Take your time.

21  A    Yes, my initials are there.

22  Q    Is that because that's a transcript that you

23  prepared as an exhibit in this trial?

24  A    It's a translation.  Once again, there's nothing

25  transcribed here, but there was a translation here,

Benningfield - Direct

1  yes.

2  Q    Of WhatsApp messages?

3  A    Yes.

4  Q    Looking at 41-10B, 41-11B, 41-12B --

5  A    41-10B does have my initials, yes.  41-11B, yes.

6  Q    What about 41-12B?

7  A    Yes.

8  Q    Those all contain your initials?

9  A    They do.

10 Q    That's because each contains translations that you

11 prepared as evidence in this case?

12 A    Yes.  These are translations, not transcriptions.

13 That's correct.

14 Q    Looking at 42-11B, 42-12B, and 42-14A to 42-14C --

15 A    I'm sorry.  Let me catch up with you.  So what was

16 the first number?

17 Q    Sure, 42-11B, 42-12B, and 42-14A to 42-14C.

18 A    42-11B, yes.

19       What was the next one after 11B?

20 Q    42-11B, 42-12B.

21 A    Okay, 12B.  I have a 42-12B in front of me, but

22 this particular one does not have my initials on it.

23 Q    Can you take a moment to review it, and can you

24 confirm whether or not that's an exhibit that you

25 prepared as evidence in this case?

262

Benningfield - Direct

1   A      Certainly.  It's a long document.  From what I'm

2   seeing, yes, everything appears to be work that I

3   rendered.

4   Q      Take your time and take a look at it.

5   A      All right.

6          Yes, sir.

7   Q      Is that a translation of WhatsApp messages that

8   you prepared as evidence in this case?

9   A      It is.

10  Q      Having reviewed that document, were there any

11  errors or corrections that you noted needed to be

12  changed with respect to those translations?

13  A      Not that I've seen.

14  Q      And looking at what's been marked as 42-14A,

15  42-14B, and 42-14C --

16  A      Okay, 42-14C.  Where was this?  No.  That was B.

17  Let me look at C.  Yes, 14C is my work.

18  Q      What about 42-14A and 42-14B?

19  A      Yes, they were as well.

20  Q      Do your initials appear on those documents?

21  A      They didn't appear on B.  I can put them on B if

22  you want.

23  Q      Do they appear on A and C?

24  A      They do on A and C, yes.

25  Q      If you can, look at 42-14B, and can you confirm

1   that that is a document that you prepared as an exhibit

2   in this case?

3   A     Your question?

4   Q     Is that a document you prepared as an exhibit in

5   this case?

6   A     The 42-14B?

7   Q     42-14B, correct.

8   A     It is.

9   Q     Having looked at that document, are there any

10  corrections or changes that you need to make to that

11  document?

12  A     Not that I'm aware of.

13  Q     Okay.  And if I can now have you look at what's

14  been marked as Government's Exhibit 43-8B, 43-9B,

15  43-13D, 43-13E, and 43-13F.

16  A     Okay.  43-8B, yes, that's my work.

17  Q     And 43-9B?

18  A     Yes.

19  Q     Do your initials appear on both of those

20  documents?

21  A     They do.

22  Q     Is that because you prepared both of those

23  documents as evidence in this case?

24  A     Yes, that's correct.

25  Q     And if you can, look at 43-13D, 43-13E, and

Benningfield - Direct

1  43-13F.

2  A     Yes, 43-13D and 43-13E and 43-13F contain my

3  initials.

4  Q     Is that because you prepared each of those

5  documents as translation exhibits in this case?

6  A     Yes, that's correct.

7  Q     And, Mr. Benningfield, if you can, look at 43-17.

8  A     Okay, I have it.  Yes, it has my initials.

9  Q     Is that because this is a translation exhibit that

10  you prepared as evidence in this case?

11  A     That's correct.

12  Q     Mr. Benningfield, if I can have you look at what's

13  been marked as 44-9A to 44-9E.

14  A     44-9A has my initials because I prepared this

15  document, 9B as well, and 44-9C and 44-9D as well.

16  Q     What about 44-9E?

17  A     Yes, the same.

18  Q     Is that because you prepared each of those

19  exhibits as translation exhibits in this case?

20  A     That's correct.

21  Q     And, Mr. Benningfield, if I can have you look at

22  44-5A, 44-5B -- excuse me -- 45-5A, 45-5B, and 45-5C.

23  A     All right.  You might have to give me those

24  numbers one at a time, though, so I can make sure I'm

25  with you.  So 45-5A was your first one?

Benningfield - Direct

1  Q    Yes.

2  A    44-5A is here.  My initials are not on it, but it

3  certainly appears to be work that I rendered.

4  Q    Is that 45-5A?

5  A    Yes, 45-5A.

6  Q    You said your initials do or do not appear on that

7  document?

8  A    My initials do not appear on 45, not the copy that

9  I'm looking at.  I recognize the document from working

10 on it, but on this particular copy, I don't see my

11 initials on it.  I can initial it if that will help.

12 Q    Can you review that document and please let the

13 Court know if there are any changes or additions that

14 you believe need to be made to that document?

15 A    Yeah.  I don't see any errors.

16 Q    What about 45-5B?  Do your initials appear on that

17 document?

18 A    Yes, they do.

19 Q    What about 45-5C?  Do your initials appear on that

20 document?

21 A    They do not.

22 Q    Can you please take a moment to review that

23 document and please let the Court know if that's a

24 document you prepared as an exhibit in this case?

25 A    It is.

Benningfield - Direct

1  Q    Can you take a look at that document and let the
2  Court know if there are any changes or additions that
3  you believe need to be made to the translation on that
4  document?
5  A    I believe it's in correct order.
6  Q    Looking at 45-6B --
7  A    I see 45-6B, and I recognize the document.  This
8  particular copy that I have in front of me, I don't see
9  my initials.
10 Q    Is that a document that you prepared as evidence
11 in this case?
12 A    Yes, it is.
13 Q    Can you take a look at that document and let the
14 Court know whether or not there are any changes or
15 revisions that you believe need to be made to the
16 translations in that document?
17 A    Everything looks to be in good order.
18 Q    Mr. Benningfield, looking at 46-2B and 46-3B --
19 A    46-2B is a document I recognize.  On this
20 particular copy, I don't see my initials.  I do
21 remember initialing my work on this document, though.
22 Q    Is that a document that you prepared as an exhibit
23 in this case?
24 A    It is.
25 Q    Do you observe any revisions or changes to the

Benningfield - Direct

1   translations that need to be made?

2   A     I don't see anything that's been altered.  Okay.

3   Q     What about 46-3B?

4   A     This document does have my initials, yes.

5   Q     Is that because that's an exhibit that you

6   prepared translations for in this case?

7   A     That's correct.

8   Q     And looking at 47-3 --

9   A     47?

10  Q     Dash 3.

11  A     Dash 3, okay.  Yes, it has my initials.

12  Q     Is that because that's a translation that you

13  prepared as an exhibit in this case?

14  A     It is.

15  Q     And looking at 48-2A and 48-3A --

16  A     And just -- 47-3 is actually a transcription, not

17  a translation.  So the next one?

18  Q     48-2A and 48-3A.

19  A     2A and 3A, okay.  2A has my initials, yes.  That's

20  48-2A.  And 48-3A, yes.

21  Q     Does that contain your initials?

22  A     It does.

23  Q     Is that because those are both exhibits that you

24  prepared as evidence in this case?

25  A     That's correct.

Benningfield - Direct

1  Q    If I can have you now look at 51-1B.

2  A    Yes.

3  Q    Does that exhibit contain your initials?

4  A    It does.

5  Q    Is that because that's a translation and

6  transcript that you prepared as an exhibit in this

7  case?

8  A    Yes, that's correct.

9  Q    If I can now have you look at 62-7B.  Excuse me.

10 Before we change binders, can I actually have you look

11 at 52-1B?

12 A    Sure.  52-1B?

13 Q    Yes.

14 A    Yes, it contains my initials.

15 Q    Is that because that's a transcript and

16 translation that you prepared as an exhibit in this

17 case?

18 A    It is, sir.

19 Q    Now if I can have you look at 62-7B.

20 A    Yes.

21 Q    Does that exhibit contain your initials?

22 A    It does.

23 Q    Is that because that exhibit is a translation that

24 you prepared of WhatsApp messages as evidence in this

25 case?

269

Benningfield - Direct

1    A    That's correct.

2    Q    Now, Mr. Benningfield, when did you finalize the

3    transcripts in this case?

4    A    Well, I've been working on it for about a year.  I

5    have continued to review this material pretty much -- I

6    guess up to coming in here today.

7    Q    Okay.  Now, when you reviewed those transcripts,

8    if you found any errors in them, what did you do?

9    A    If I find an error, I make it known.  If I become

10   aware of an error -- sometimes because of context, an

11   error can happen.  You can be working on something and

12   understand context to mean something.  As you work

13   through a case, your context develops more and more.

14   That context that I understood has now been developed

15   now more, and what I understood is not exactly what I

16   thought it was.  Then a modification needs to go here.

17   Q    Did you correct those errors?

18   A    Certainly, I would.

19   Q    How did you correct those errors?

20   A    I would make a change in the transcription.  If a

21   change is made, I would bring it to the U.S. Attorney's

22   Office's attention.

23   Q    Now, with respect to each and every exhibit number

24   that we just discussed here this afternoon, do those

25   transcripts accurately reflect the utterances that were

Benningfield - Direct

1  made by the speakers on the corresponding recordings in

2  Spanish or that were written in the original source

3  material that you received?

4  A    Yes.

5  Q    Now, with respect to each and every exhibit that

6  we just went through, do the transcripts reflect an

7  accurate translation of what was said by the speakers

8  or written in the Spanish original source document?

9  A    They do.

10 Q    And did you receive Title 3 wiretap audios in this

11 case to translate from Spanish to English?

12 A    I did.

13 Q    And do your transcripts for the Title 3 wiretap

14 audios contain or identify a file source?

15 A    They do.

16 Q    What does the file source refer to?

17 A    Well, it refers to the number of the file.  So the

18 way I receive these files loaded into a government

19 website, I'll go into that website, download the files,

20 and those files will have a serial number that will

21 usually identify -- they are identifying numbers that

22 identify date and time stamps and serial numbers.  And

23 so when the transcript is prepared, that particular

24 serial number of that recording is used for that

25 transcript.

Benningfield - Direct

1  Q     And where does the file source appear on the

2  transcripts that you prepared in this case?

3  A     Typically, normally, they will appear at the

4  beginning at the top of each transcription.

5  Q     Did you change any of the file source names in the

6  material that was given to you?

7  A     No, sir.

8  Q     And why did you include the file source

9  information on the transcripts?

10  A     For identifying purposes.  We actually have to do

11  that in our office.  Because for us to know what we're

12  working on, we want to be able to refer to the actual

13  source, the audio source.  We want all of the documents

14  to be tagged to the correct source.

15  Q     Do some of the recordings and documents that you

16  translated in this case contain slang terms or Spanish

17  words that have various meanings?

18  A     Yeah.  I don't know what people always mean when

19  they say slang.  The way I view and probably most

20  professional interpreters and translators view spoken

21  speech is simply communication.  We don't necessarily

22  think of it as slang.  It's just people are

23  communicating, and our focus is on what are they

24  saying.  So yes, there are a variety of ways many

25  concepts are expressed through different speakers.

Benningfield - Direct

1  Q    Now, when you encounter a situation in which a

2  word or term has various meanings, can you explain to

3  the jury how it is that you determine which specific

4  meaning to attribute to that word in your transcripts?

5  A    Once again, the way we do our work is this:  We

6  listen to what's in an audio recording or we read

7  carefully what's on the written page.  When you listen

8  to spoken language, you can usually get a basic idea of

9  the region from where that spoken source is coming

10 from.

11      For example, when you listen to people from New

12 Jersey, you hear a New Jersey accent.  When you listen

13 to people from Texas, you hear a Texas accent.  When

14 you listen to people from South Carolina, you hear that

15 southern accent.  And you can kind of get a basic idea

16 of where people are from; although, they all speak

17 English.  When you hear people from Australia, you can

18 still hear that Australian accent.  It's still English.

19      Spanish is the same way.  Spanish is spoken all

20 over the world.  And you can usually listen to it, and

21 you can identify a basic region from where that Spanish

22 is from, whether it's from Iberian Peninsula, Spain, if

23 it's from Equatorial Guinea in Africa.  If it's from

24 Central America, it has a certain sound to it.  It's

25 usually spoken in *bozal*.  It usually uses *voseo* as the

Benningfield - Direct

1  form of address instead of *tu*.

2        (Reporter clarification.)

3  A     *Voseo* is V-O-S-E-O.   That's a style of address.

4  So *voseo* is the pronoun that's usually used for --

5  V-O-S is the pronoun that's used with it.

6        Mexican Spanish has its sound, and even within the

7  nation of Mexico, the northern Mexicans sound a little

8  different than the southern Mexicans.   They all have

9  their own sound.   Argentina has its sound.   Most

10  countries have their sound.   You can kind of listen,

11  and you can identify a basic region from where that

12  spoken language is from.   In Spanish, definitely so.

13  Cuba has its sound.   The Caribbean has its sound, and

14  you can identify these sounds.

15        So once we identify the basic idea of where that

16  language is from, that also gives us a whole source of

17  reference of typical linguistic style of speech and

18  typical words that are used in communication for that

19  region and the way people tend to utilize the Spanish

20  language in that region.

21        So I can't necessarily expect for people from

22  El Salvador or Honduras to sound like people from Cuba.

23  They don't even use the same vocabulary for everything.

24  They have different vocabulary sets a lot of times for

25  things they want to describe.

Benningfield - Direct

1    We bear that all in mind.  We don't enter this
2  work blindly and dumbly think, If it says this, then
3  it's got to be that.  No.  Our focus is on what are
4  people saying when they use expressions.  And after
5  working in this work for 30 years, you start to
6  identify and know typical common expressions of certain
7  regionalistic expressions and the way people tend to
8  talk in those regions.

9    So when we listen to the recorded material, we
10  typically are able to identify the basic region.  That
11  sets off a whole number of cues that we know the type
12  of vocabulary that typically is used for those
13  speakers, and we understand what they're saying when
14  they speak.

15    And then when we understand what they're saying,
16  we write that down in English so that any English trier
17  of fact can read it as well.  And our objective -- the
18  theory behind good translation is that the trier of
19  fact will walk away from the experience with the exact
20  same mental and emotional impact had there not been a
21  need for the translator to begin with.  That's our
22  objective.  That's the theory behind good translation,
23  and that's what we try to do.
24  Q    Now, are you familiar with slang terms that are
25  used by Central American gangs?

Benningfield - Direct

1   A     Yes.

2   Q     How so?

3   A     I started working with translational gang

4   communication around 2002.  So approximately 20 years

5   I've been working with specifically -- mostly with

6   MS-13 and 18th Street gangs for about 20 years.  So

7   especially for many years I did a lot of work with

8   attorneys appointed under the Criminal Justice Act and

9   would spend many days in the jails talking to gang

10  members.  After many, many days of speaking with them,

11  interviewing them with their attorneys and sometimes

12  with the federal public defenders, that communication

13  and style of speech is very well understood after

14  interviews.

15        There was a time in my life where I said, I'm

16  going to spend my whole adult life in jail, you know,

17  in the jails interviewing and talking with these folks.

18  I did spend many years doing that, yes.

19  Q     Despite the experience that you just relayed, did

20  you at times find it challenging in this case to

21  translate some of the conversations concerning gang

22  interactions?

23  A     There's always a challenge.  In all work

24  assignments, there's a challenge.  So yes.

25  Q     Why was it challenging?

1   A    Well, what I'm provided with is a snapshot a lot

2   of times.  If I get a recording, it's basically a

3   snapshot of something that's said, and I have a limited

4   context.  I have the four corners, so to speak, of the

5   page or the recording that I'm getting.  I don't have

6   knowledge of what was before that or what was after

7   that.  I do have knowledge of all the recordings I'm

8   given.  I can try to lay them out in chronological

9   order and develop a context, but I'm not living in the

10  moment with the folks that are doing the communication.

11       So I must observe and make a conclusion based on

12  the context that I'm given, and context affects our

13  communications.  As we speak here and we're all in the

14  same room, we understand the concept.  We understand

15  what's going on.  So when I speak, you realize those

16  factors are also playing in your decision as to what

17  I'm saying.

18       I don't have that luxury when I'm given a

19  recording.  I just have the recording sometimes a year

20  or two after it was stated.  So my context is limited,

21  and I have to base my decision based on what I have

22  within the context that I'm given.  That's why it's a

23  challenge sometimes.

24  Q    Mr. Benningfield, I would like for you to look at

25  what's been marked for identification as Government

Benningfield - Direct

1    Exhibit 18-25A.

2    A    What number was that?

3    Q    18-25A.

4    A    Almost there.  All right.  I have it.

5    Q    Do your initials appear in two places on this

6    exhibit?

7    A    Yes, they appear on the next-to-the-last page on

8    Entry No. 60 and on the last page under Entry 61.

9    Q    And that's because that's an exhibit you prepared

10   as evidence in this trial?

11   A    That's correct.

12   Q    Do you recognize this document?

13   A    I do.

14   Q    Is this a Title 3 audio conversation between two

15   individuals?

16   A    It is.

17   Q    Okay.  Now, I'd like for you to look at Box 11 of

18   this exhibit.  Do you see that?

19   A    Okay.

20   Q    It goes from the first page to the second page.

21   A    Yes.

22   Q    There's a term in that exhibit "*son*," S-O-N, that

23   you translated in this exhibit.  Do you see that?

24   A    I do.

25   Q    What does the word *son*, S-O-N, mean in English?

Benningfield - Direct

1  A    Do you want all possible meanings?  Because it can

2  be a noun.  It can also be a verb.  Do you want to just

3  limit to what's here?

4  Q    Let me ask you this.  In this particular context

5  in this conversation, is that word being used as a noun

6  or a verb?

7  A    It's being used as a verb.

8  Q    What are the translations for the word "*son*,"

9  S-O-N, as used as a verb?

10 A    Okay.  *Son* is conjugation of the verb say.

11      So to help you understand this, *ser* --

12      (Reporter clarification.)

13 A    Thank you, and I'm sorry.

14      *Ser*, S-E-R.  So *ser* is the same as in English to

15 be, T-O, B-E.  And with all verbs -- or we frequently

16 tend to conjugate them.  If we don't remember what

17 conjugation was, conjugating is simply assigning a verb

18 concept from its infinitive form to a person and a

19 time.  So when we conjugate a verb, we will add a

20 pronoun, and we'll also make a time.  It's called a

21 tense.  We have, for example, present tense, past

22 tense, future tense, etc.  *Son* here is the conjugation

23 of the Spanish verb *ser*, which is to be.

24      And in Spanish, when verbs are conjugated,

25 pronouns are not always included because the pronoun is

Benningfield - Direct

1  incorporated into the word as it's used.  There are

2  some exceptions to this, however.  When we use second

3  person and third person pronouns, they're not always

4  used and the verb is sometime the same in Spanish.

5       So Spanish relies on context.  It relies on

6  familiarity between the people and the dialogue knowing

7  their subject matter to make a conclusion.  It's

8  understood or implied as to who the pronoun was.

9       When we talk about pronouns, we're talking about

10 words like I, you, she, or he.  Those are all pronouns,

11 and they assign action to verbs.  The pronouns can be

12 singular, or they can be plural.  So if we take them

13 from the singular and put them into plural, we have

14 "we."  That's first person plural.  We have "you guys,"

15 you plural.  That's second person plural.  We have

16 "they."  That's third person plural.

17      *Son* is a conjugation that will apply to both

18 second person, "you guys," and will also apply to third

19 person, "they."

20      Does that help respond to what *son* can be?  It can

21 be second person, "you guys," or it can be third

22 person, "they," as the pronoun that would be used.

23 English uses pronouns.  Spanish doesn't always.

24 Q    That's very helpful.

25      Can you explain what pronoun you assigned to the

Benningfield - Direct

1    word *son* in this context?

2    A    I assigned the word "they," the pronoun "they."

3    Q    Why did you assign the word "they" to the pronoun

4    *son* in this context?

5    A    Because as I continued to read through and analyze

6    the conversation, you notice in Entry No. 11 you have a

7    person identified as Tovar.

8         (Reporter clarification.)

9    A    Tovar, T-O-V-A-R.  That makes this statement

10   that's made in Entry No. 11.  In Entry 12, you have a

11   person --

12            MR. OATES:  Objection, Judge.

13            THE COURT:  I'm sorry?

14            MR. KRISCHER:  May we approach?

15            MR. MURPHY:  Your Honor --

16   Q    Can you respond to the question without

17   identifying the individuals listed on the documents?

18   A    Sure.  So your question was why did you assign the

19   third person plural?  Basically, because of this:  If

20   you follow through, *son* comes up again.  It's tagged to

21   a group of people in fairly close proximity.  Actually,

22   it comes up again in Entry No. 21.  You will see in

23   Entry No. 21 on the Spanish side -- should I read the

24   Spanish?

25        Okay.  I'll just read it in English.  The English

Benningfield - Direct

1   side says, "Better not come saying now that they're

2   friends, that they're your friends."

3       Now, "your," once again, is a pronoun, and it's a

4   possessive pronoun.  It's second person singular, and

5   second person singular does not omit second person

6   plural at the same time.  This pronoun helps identify

7   who *son* is.  *Son* is third person plural.

8       And as you follow on down, the pronouns continue

9   to identify more clearly.  On Entry No. 27, there is,

10  "You threaten them too.  Tell them...."  The "them" is

11  very clearly -- and if you want to know what pronoun

12  that comes from, if you look at the second word on the

13  Spanish side that ends in L-O-S, that L-O-S is a

14  pronoun, and it's third person plural.  The pronouns of

15  the conversation always direct -- and even when *son*

16  comes back up, it clearly indicates third person

17  plural.

18      So as a translator, what I have to do is, once

19  again, look at context and make a determination.

20  According to context and proximity of what was being

21  stated here, are the pronouns tagged to a second person

22  or a third?  In this case, at least on the face of this

23  document, they're tagged to third person plural, and

24  that's why I chose to use.

25  Q   Did you also review the audio to make that

Benningfield - Cross

1   contextual decision?

2   A    I did.

3           MR. MURPHY:  No further questions for the

4   witness at this time, Your Honor.

5           THE COURT:  All right.  Any cross?  Who wants

6   to go?

7           MR. WALSH:  I'll go.

8           THE COURT:  All right.

9                   CROSS-EXAMINATION

10  BY MR. WALSH:

11  Q    Good afternoon, Mr. Benningfield.

12  A    Good afternoon, sir.

13  Q    So you were a -- you testified as a professional

14  or an expert, right?

15  A    I have.

16  Q    How many?  Numerous times did you say?

17  A    I don't know if I would call it numerous.  So 15

18  or 20 times.

19  Q    And you testified in those 15 to 20 times for the

20  government, correct?

21  A    Excuse me?

22  Q    Let me say it this way:  Have you ever testified

23  for the defense?

24  A    I believe I have.

25  Q    Do you know when?

Benningfield - Cross

1    A    Well, I've been testifying for almost 30 years.

2    So I can't tell you exactly when.  That would be pretty

3    good.  But I'll just say this:  I've rendered a lot of

4    opinions.  I've been asked to render an opinion.

5    Q    I mean testify in court.

6    A    That's what I'm saying, in court.  I'm saying in

7    court.  I've been asked to testify rendering an opinion

8    in court at least 15 or 20 times.  How many times for

9    defense attorneys?  I don't know.

10   Q    It's safe to say it's usually for the government?

11   A    In more recent years, I would say yes.  In prior

12   years, I wouldn't necessarily make that conclusion.

13   Q    And you're paid by the government, correct?

14   A    I am.

15   Q    I've got to ask you a question here.  Some of the

16   exhibits -- we went through those pretty quickly.

17   A    Yes.

18   Q    I appreciate that.

19        Some of the exhibits didn't have your initials on

20   them?

21   A    That's right.

22   Q    Then counsel asked you to review them to see if

23   there's any changes or revisions that need to be done,

24   correct?

25   A    That's correct.

Benningfield - Cross

1   Q    But if I understand correctly, you get these

2   things from a file from the government on a website,

3   correct?

4   A    That's correct.

5   Q    Then you download it, correct?

6   A    Yes, that's correct.

7   Q    So when you say there's no changes that need to be

8   made, you don't have the original?

9   A    Well, there's no changes -- here's what I'm

10  saying.  I'm saying I don't see any changes that need

11  to be made.  I'm saying, I look at this document.  I

12  recognize it.  I remember working on it.  From what I'm

13  reading, I don't see any changes to the work that I

14  did.

15  Q    When you say changes, a typographical error or

16  something along those lines, right?

17  A    I don't see anyone that's come behind me to alter

18  the work that I did.  That's what I'm saying.

19  Q    Well, you wouldn't know that because you don't

20  have the original file with you, correct?  Well, you

21  have the original file downloaded, and then you're

22  looking at something from that and saying there's no

23  changes.  But you don't have the original to compare it

24  to, correct?

25  A    From what I'm looking at on the document I have, I

Benningfield - Cross

1    don't see any changes.

2    Q    I wasn't very good in English, pronouns and things

3    of that nature.  When you talk about regions and things

4    like that, that's subjective, correct?  When I say

5    objective, in your training and your experience, you're

6    trying to -- it's not objective.  It's subjective.

7    It's in whatever your interpretation is, correct?

8    A    Yeah.  I guess it's about as subjective as yours

9    is when you hear someone speaking and you say, oh,

10   that's a southern accent.  That's subjective and not

11   subjective.

12   Q    So by that subjective nature, you then try to

13   determine the region and then apply what you think the

14   context is, correct?

15   A    Not the context, no.  When you determine a

16   speaker's region, you have an idea of how those

17   speakers tend to speak and the vocabulary they tend to

18   use.

19   Q    You agree with me that speakers move from region

20   to region, correct?

21   A    Oh, of course.

22   Q    They could be proficient in one region and also in

23   another region?

24   A    Yeah.  They don't lose proficiency just because

25   they move.

Benningfield - Cross

1  Q    Right.  And they don't always talk or speak in

2  that original region that you think they're from?

3  A    That can happen.

4  Q    So knowing that and then trying to identify a

5  region, subjectively, you're putting in what you feel

6  it is the best you can, correct?

7  A    No, not what you feel it is.  It's really not.

8  It's like this.  When you listen to someone speak

9  English -- you're listening to me right now.  If I were

10 to ask you to explain to me what I just told you, you

11 could probably do it because you have just listened to

12 me.  You heard what I said, and you understand what I'm

13 saying.

14      That's the same thing when we transcribe or

15 translate.  We listen to what's said.  We hear what's

16 said, and we're told, Okay.  Take that from Spanish and

17 put that into English.  Don't add to it and don't

18 subtract from it and do an objective job.  Make a

19 service here that you would want to receive also if

20 your words were being translated.

21 Q    But you said you don't have the context before or

22 after?

23 A    That's correct.

24 Q    You've never spoken to that person before?

25 A    That's correct.

Benningfield - Cross

1  Q    You don't know what kind of language -- when I say
2  language, you don't know if they use proper -- I'll use
3  it in English.  They might not use the proper pronoun
4  or verb or adjective, correct?
5  A    Yeah.  We don't think in -- I don't think in those
6  terms of proper or improper when I do --
7  Q    So someone could say one word and mean another
8  word, correct?
9  A    Yes.  I could say the sky is green, and I actually
10 mean it's blue.  I could do that.
11 Q    And that could apply.  While that's going on,
12 you're trying to figure out exactly what they're saying
13 when they're using slang, correct?
14 A    I don't understand exactly what you're asking.
15 Here's the process.  I listen to what's said.  If I
16 understand what's said, I put it in English.  If I
17 don't understand what's said, I can't do anything with
18 it.
19 Q    Sure.  And if you think you understand it, you put
20 it in English?
21 A    Of course.
22 Q    And that could not be correct?
23 A    It could not be.  Are you asking, "Are you capable
24 of making a mistake?"  Sure, I'm capable of making
25 mistakes.

Benningfield - Cross

1           THE COURT:  Thank you, Mr. Walsh.

2           We're going to take our afternoon recess at

3   this time.  We'll take a 20-minute recess.

4           You're excused to the jury room.  Please do

5   not discuss this case among yourselves during the

6   recess.

7       (The jury exits at 3:46 p.m.)

8           THE COURT:  Mr. Benningfield, do not discuss

9   your testimony during the recess.

10          The Court will stand in recess.

11      (Recess from 3:47 p.m. until 4:10 p.m.)

12      (The jury is not present.)

13          THE COURT:  All right.  Ready to proceed.

14          Bring out the jury.

15      (The jury enters at 4:11 p.m.)

16          THE COURT:  Please be seated.

17          Mr. Walsh.

18              FURTHER CROSS-EXAMINATION

19  BY MR. WALSH:

20  Q    Just briefly.  Mr. Benningfield, will you please

21  turn to 19-4A?

22  A    Yes.

23  Q    The last page -- oh --

24  A    19-4A?

25  Q    Yes, please.

Benningfield - Cross

1   A      Yes, sir, I have it.

2   Q      All right.   On its last page, I think you

3   testified those are your initials.   They are different

4   from all the other ones?

5   A      Yes, that's correct.   Those are different.

6   Q      Are they your initials?

7   A      Yes, these are my initials.

8   Q      It's safe to say -- just safe to say you don't

9   know who the speakers were, as Mr. Murphy said,

10  correct?

11  A      Correct, sir.

12  Q      You just hear two voices or three voices, and you

13  transcribe?

14  A      In fact, when we transcribed this, we just

15  transcribed as Voice 1, Voice 2, Voice 3.   We don't

16  know who the speakers are.

17  Q      But on these document, who puts the name in then?

18  A      The office, the case agents, or whoever does that

19  part is responsible for that.   I'm not responsible for

20  identifying the speakers.

21  Q      So the documents you looked at, they have names on

22  them?

23  A      Yes, that's correct.

24  Q      You did not put those names there?

25  A      No, I don't put the names.

                    Benningfield - Cross

1    Q    So the documents after you've made them or

2    produced them, they've been modified?

3    A    The names have been -- so you understand how this

4    works, we prepare most of these documents in order.  If

5    you'll look at the beginning of the document, I see --

6    on 19-4A, I see the name Kevin Castro.

7    Q    I don't need to know that.

8    A    Okay.  So normally, I don't have these -- the

9    document I prepared doesn't have these names in it.

10   Q    As I said, the document you prepared doesn't have

11   names, and then it's modified with names; is that

12   correct?

13   A    That's correct.

14            MR. WALSH:  That's all I need to know.  Thank

15   you very much.

16            THE WITNESS:  Thank you, sir.

17            THE COURT:  Any other counsel?

18            Mr. Krischer.

19            MR. KRISCHER:  The Court's indulgence.  I'm

20   sorry.

21                    CROSS-EXAMINATION

22   BY MR. KRISCHER:

23   Q    Good afternoon again.

24   A    Good afternoon, sir.

25   Q    All right.  Mr. Benningfield, if I could direct

Benningfield - Cross

1 you to Government's Exhibit 18-24A.

2 A    18-24A.

3 Q    And if you would, turn to the last page of 18-24A.

4 A    Yes, sir.

5 Q    All right.  I think you previously testified that

6 the cursive initials on that page are yours; is that

7 correct?

8 A    That's correct, sir.

9 Q    All right.  Then underneath the chart that's on

10 there, there's some other handwriting, correct?

11 A    Yes.

12 Q    And that's not handwriting that you wrote?

13 A    You're correct, sir.  That's not my handwriting.

14 Q    And that handwriting wasn't on this document at

15 the time you submitted it to the government?

16 A    I don't believe it was.

17 Q    Let's just talk briefly again about the names.

18        MR. KRISCHER:  And I apologize to the jury

19 for talking about things they can't see.

20 BY MR. KRISCHER:

21 Q    Without talking about the content, but on most of

22 these documents with these translations and

23 transcriptions, you have four columns, correct?

24 A    Yes, that's correct.

25 Q    All right.  The heading of one is Entry Number;

Benningfield - Cross

1  two is Voice Number; three is Transcription; and four

2  is English Translation?

3  A    That's correct, sir.

4  Q    So when you submit this to the government, are

5  there four columns?

6  A    Yes.

7  Q    Okay.  And then under voice, you typically use V1

8  or V2?

9  A    That's exactly right.

10  Q    So you send this to the government, and then the

11  government -- if it doesn't say V1 or V2 or any number,

12  if there's a name in there, that's information that was

13  altered and put in by the government?

14  A    That's information the government has put in.

15  Q    Okay.  Again, without talking about much of the

16  content, as far as your forming the document, the file

17  source on top, that's what you put in there?

18  A    Yes, that's correct.

19  Q    And then the legend, that's what you put in there?

20  A    That's correct, sir.

21  Q    All right.  And then you've got something -- an

22  explanation about pronunciation?

23  A    That's correct.

24  Q    And then underneath of that, if there are any

25  names, actual names, the government put those there

Benningfield - Cross

1  too?

2  A    That's correct, sir.

3  Q    All right.  I want to talk a little bit about

4  conjugation again if we could.

5  A    Sure.

6  Q    Now, when we were talking about *son*, what you said

7  was it could be you plural, you-all?

8  A    Yes.

9  Q    Or they?

10 A    That's correct.

11 Q    What does *sos* mean?

12 A    *Sos* means you.

13      (Reporter clarification.)

14 Q    And that would be singular?

15 A    Yes.

16 Q    Okay.  And so when you are transcribing, you are

17 listening to the audio?

18 A    That's correct, I am.

19 Q    And to the best of your ability, you put down the

20 Spanish if it's Spanish; you put down the word you

21 think you hear?

22 A    That's correct.

23 Q    Okay.  But if you're mistaken about the word that

24 you hear, then the translation is going to be

25 necessarily incorrect?

294

Benningfield - Cross

1   A     That's correct.

2   Q     So if in the section we already talked about the

3   word was --

4              THE COURT:   Which section are we talking

5   about?

6              MR. KRISCHER:   Oh, I'm sorry, Judge.   It's

7   Exhibit 11-25A [sic], and it's the witness' previous

8   testimony about No. 11, which travels onto the second

9   page.

10             THE COURT:   All right.   Hold on.

11  A     The number of the exhibit you're referring to?

12  Q     18-25A.

13             THE COURT:   18-25A?

14             MR. KRISCHER:   Yes.

15  A     I have 18-25A, yes.

16  Q     So previously on direct examination, you talked

17  about Entry 11 on 18-25A.

18  A     Yes.

19  Q     And specifically, you talked about why you

20  believed *son* translated as they and not you plural?

21  A     That's correct.

22  Q     But if the word was "*sos*," that would change the

23  translation; would it not?

24  A     If the word was "*sos*," that would change it.   Yes,

25  if it was, it would change it.

Benningfield - Cross

1  Q    And that would be singular you?

2  A    That's correct, sir.

3  Q    But you listened to this, and your best guess was

4  it was *son*?

5  A    My best guess?  If you guess when I tell you yes

6  that I'm saying yes, then yes.

7  Q    Okay.  But you weren't there?

8  A    I was there to listen to the recording.  I was not

9  physically present when the folks were speaking.

10 Q    Correct.

11 A    But if you have the recording and you want to play

12 it, you probably will not have a doubt if you listen to

13 it.  You will hear *son*, and you will not hear *sos*.

14 Q    And you'd agree, though, that I'm kind of at the

15 mercy of the quality of the recording?

16 A    Yes.

17 Q    You also talked about -- I think we were talking

18 about slang, but let's talk about idioms.

19 A    Yes.

20 Q    So by that, I'm talking about when we say one

21 thing and definitely mean another.

22 A    Right.

23 Q    In some of those circumstances, it could mean

24 literally the words of the idiom, and other times it

25 may just be the expression.  So let me give an example.

Benningfield - Cross

1  You listen to a recording, and the person says, "My

2  dogs are barking."

3  A    Okay.

4  Q    So it could mean literally someone's dogs are

5  barking, or some people would say it means my feet are

6  tired or I'm tired or something like that.  Is that

7  fair to say?  Have you ever heard that phrase before?

8  A    In English, I have not.

9  Q    You have not.  All right.  So how then would you

10  translate that into Spanish?  Would you assume that it

11  was a literal:  I really meant that my dogs were

12  barking?

13  A    So here's what we do with idiomatic phraseology.

14  If we understand it's a common expression -- let's say

15  in English we say, "That's a horse of a different

16  color."  That's an example.  I cannot take those words

17  and put them in Spanish and it mean something.  It

18  doesn't mean anything.  But we do have another saying

19  in Spanish that means the same thing.  So for idiomatic

20  expressions, we use a meaning-based translation to

21  convey, once again, the exact same mental and emotional

22  impact so that the native listener in that language

23  walks away with the same understanding.

24  Q    So it's not going to be a literal translation?

25  A    On idiomatic expressions, it's not always literal.

Benningfield - Cross

1  Some of them can be.  Some of them cannot be and convey

2  meaning.  We always have to convey meaning.  And so

3  there could be a time and a source recording that you

4  may hear an idiomatic expression.  And if you don't

5  understand it, you may leave it at its source, you may

6  put in an explanation of what it could be.  There are

7  various ways you could handle that situation if you are

8  a translator and you don't understand the source.

9  Q    And it's fair to say you're not going to recognize

10 all idioms?

11 A    No.

12 Q    And you're fluent in English?

13 A    I hope -- well, I don't know how fluent I am

14 because I'm here on the stand.  If you understand me --

15 I hope you've understood me thus far.

16 Q    Good enough to be a certified court interpreter?

17 A    That's correct, sir.

18 Q    You're fluent in English, but you had not heard

19 the phrase or the idiom, "My dogs are barking today"?

20 A    I have not.

21 Q    In 30 years of translating?

22 A    In 55 years of life, I have not heard that phrase.

23 Q    Now you know for the next time.

24 A    Okay.  I appreciate it.  Thanks.

25 Q    Let's talk a little bit about education.

1   A    Okay.

2   Q    So I think we talked about that as well, that some

3   people -- even native speakers, if they're not

4   educated, they may conjugate things incorrectly?

5   A    They could.  That's possible.

6   Q    So they may say you singular when they mean you

7   plural?

8   A    That's possible.

9   Q    And then there are other times when people just

10  get the phrase wrong.  So let me give you an example.

11  For all intents and purposes or for all intensive

12  purposes.  So I would suggest in both of those a person

13  means the same thing, whatever they think it means, but

14  if you were to translate word for word, it would be a

15  different translation in each case, correct?

16  A    That's correct.

17  Q    But you would listen to it and try to understand

18  the meaning to make sure the listener understood.  And

19  so you would pick the one that was most consistent with

20  your understanding?

21  A    I can only go off of what was said.  That's all I

22  can go off of.

23       MR. KRISCHER:  Thank you very much.  I have

24  no further questions.

25       THE WITNESS:  Thank you, sir.  I appreciate

Benningfield - Cross

1   your work.

2           THE COURT:  Any other counsel?

3           Mr. Oates?

4           MR. OATES:  Yes, Your Honor.

5                   CROSS-EXAMINATION

6   BY MR. OATES:

7   Q    Okay.  Thank you for your time today,

8   Mr. Benningfield.

9   A    Yes, sir.

10  Q    I have just a couple of questions about the

11  process and how you get the materials and then

12  translate it.

13  A    Okay.

14  Q    So you testified earlier that the government sends

15  you material through, I guess, a server or through a

16  website?

17  A    That's correct.

18  Q    Okay.  And then what happens?  So you get an email

19  notifying you there's material to translate?

20  A    That's right.

21  Q    Okay.  And then what happens?

22  A    Then I download that material, and I start working

23  on it.

24  Q    Okay.  I think you said earlier that you work on a

25  team with somebody.  Right?

Benningfield - Cross

1   A    That's correct.

2   Q    Okay.  Is that person -- are you guys in the same

3   office?

4   A    No.  He's in Arizona.  I don't always work with

5   the same people.  Different work assignments I may have

6   different collaborators on it.  But I typically will

7   have a core of two or three or four people that I've

8   worked with over the years whose quality of work I've

9   come to appreciate and trust and will collaborate

10  frequently with -- you know, there are six or seven

11  people.  Of those six or seven, I really work with

12  three or four of them.

13  Q    And this person is somebody that you know and you

14  trust?

15  A    Yes.  I've worked with them since 2008.

16  Q    Okay.  And I'm going to focus first on the voice

17  recordings, you know, the wiretaps that you guys

18  translated.

19       How does that work?  Who listens to the recording

20  first?

21  A    Who listens at first is there's not a rule as to

22  who listens first.  It can vary with every case.  It

23  can even vary in the same case.  So there's not a rule

24  of who listens to the recording first.  I may listen to

25  a recording first.  Maybe a member that works with the

Benningfield - Cross

1  team listens to the recording first.

2      In this particular case, if you want to know, many

3  of the transcripts were first -- the left-hand column,

4  a draft was prepared by Fernando, a person that works

5  with me.  And so the original draft transcription of

6  the Spanish was prepared by Fernando Hurtado.

7  Q    Okay.  And Fernando is the person you worked with

8  in this case?

9  A    Yes.

10 Q    He's the person in Arizona?

11 A    That's correct.

12 Q    So when you first get a recording, Fernando would

13 listen to it, correct?

14 A    Well --

15 Q    Or sometimes would you listen to it?

16 A    We may listen to it at the same time.  I may be

17 listening, and I haven't even received a word from him

18 yet.  And I've already listened to it and formed an

19 opinion on it.  So who listens to it first?  There's

20 not a rule as to who listens to something first.

21 Q    Okay.  So there are some times that you would

22 check Fernando's work, right, where Fernando listens to

23 something?

24 A    I always check Fernando's work.

25 Q    He translates it, right, and then you check to see

Benningfield - Cross

1  if the translation -- not translation -- transcribes

2  it.

3  A     Correct.

4  Q     So Fernando listens, transcribes it, and then

5  sends it back to you, correct?

6  A     That's the way it was done on this project, yes.

7  Q     And then you check the transcription?

8  A     I check the transcription and also the

9  translation; that's correct.

10 Q     Okay.  Were there ever any instances where vice

11 versa happened, where you transcribe it -- yes, where

12 you listen, you transcribe, and then Fernando checks

13 your work on the transcription?

14 A     Limited on this case, yes.

15 Q     Okay.  But there were some instances of that?

16 A     Yes.

17 Q     Whenever you're checking somebody's work, there

18 are, you know -- like anything, there are edits or

19 differences that -- or changes that you make, right?

20 A     Yes.

21 Q     Okay.  Approximately how many times -- or, you

22 know, I know your breadth on this work has been

23 enormous.  What percentage of time do you think you

24 were checking Fernando transcribed first and you

25 checked his work?

Benningfield - Cross

1  A      The only part of this work that Fernando worked on

2  was the transcription -- for the most part was the

3  transcription.  He did not do translation of Facebook.

4  For the most part, I think he did do a limited

5  Facebook.  Most of Fernando's work, just so you'll

6  know, is transcription of the audio.  And he probably

7  initially did a good 70 to 80 percent of the draft

8  transcriptions that simply come with the left-hand

9  column draft transcription.

10 Q      So if Fernando did 70 to 80 percent of the drafts,

11 that means the other 20 to 30 percent you did the

12 drafts and then Fernando checked your work?

13 A      Right.

14 Q      Okay.  And then one -- do you know -- is there a

15 way to tell, like, which of the voice transcripts --

16 which is which?  Like, which one you did a first draft

17 or which one Fernando did a first draft?

18 A      No, I do not keep a record of that.

19 Q      Okay.  And then after they would do -- and then

20 after there would be a final draft -- I guess that's

21 been drafted by either you or Fernando and then checked

22 by either you or Fernando -- you did the translation?

23 A      Yes.  Okay.  And even once the translation is

24 done, we still go back and review the document again.

25 Q      Who goes back and checks it after the translation

Benningfield - Cross

1    has been done?

2    A    That would be me.

3    Q    You did 100 percent of it?

4    A    Yes.

5    Q    And the text messages, were those all translated

6    by you?

7    A    Yeah, for the most part.

8    Q    But Fernando -- I think you said the Facebook

9    messages.

10   A    I think he did a few Facebook pages, not that

11   many, but he did a few, I believe.  That was almost a

12   year ago.  I think that was some of the first part of

13   the work he did on this case, some of the early

14   Facebook messages.

15   Q    Facebook stuff that was received over a year ago?

16   A    About that time frame.

17   Q    Okay.  And for those Facebook messages, the ones

18   that he started, did you check his work?

19   A    Yes, all of his documents.  I checked all of them.

20   Q    Okay.  The phone calls that Fernando helped you

21   with, how does he get a copy of the file?

22   A    I put them on a website drive, and he has access

23   to them off of the website, Dropbox basically.

24   Q    Okay.  So you would send them to him via Dropbox?

25   A    Yes.

Benningfield - Cross

1  Q    Okay.  And does he have -- you mentioned that he

2  uses some software that helps you?

3  A    I think he -- he doesn't use Pro Tools.  He uses

4  Scribe, and I also use Scribe.  For this project, I

5  think most of what we used -- we did use various

6  software applications, but most of the software we used

7  for transcription was Scribe.

8  Q    What was the other one?  Pro Tools?

9  A    Pro Tools.  Actually, it's software that was

10 developed for recording studios.  It does amazing

11 analysis on sound, etc., etc.  You can speed up or slow

12 down without changing the pitch of what is said.  It's

13 amazing software.  But most of the work -- most of the

14 software used was Scribe.

15 Q    Okay.  For when you use Scribe, does that come

16 with -- when you use Scribe, does that -- when you use

17 Scribe, does that -- like, what sort of functions does

18 it have to help you do it?  Like, can you speed

19 something up or slow something down?

20 A    You can do all of that.  You load the audio file

21 into Scribe.  Scribe allows you to use a foot pedal to

22 play, to rewind.  You can set the settings so that when

23 you let go of the foot pedal, it rewinds 3 seconds so

24 that you pick back up.  If it's a video recording,

25 which some of the materials here were video recordings,

Benningfield - Cross

1  it plays the video as well.  Scribe is software that's

2  developed for transcribers.

3  Q    Sure.  Like, if a video or a recording is long,

4  can you cut -- can you cut parts of it out to really

5  get to the -- can you cut parts of it out or edit parts

6  of it?

7  A    We don't do that.  If it's long, we just work --

8  we can save our -- Scribe allows you to save your spot

9  wherever you leave off working, and you can pick back

10  up there.  We don't cut the materials, no.

11  Q    Does Scribe give you -- and I'm not saying that

12  you did, but does Scribe have a function that would

13  allow you to cut materials?

14  A    If it does, I'm not familiar with that function.

15  Q    Okay.  Does the software -- I guess when you're

16  speeding it up or slowing it down, does that -- it's

17  like an alteration of the audio file, correct?

18  A    It doesn't alter the file.  The file is a series

19  of ones and zeros.  It doesn't change those numbers.

20  Those binary numbers don't change.  It simply allows

21  you to speed up the audio or slow it down.  Pro Tools

22  allows you to do that without changing the pitch.

23  Scribe will change the pitch.

24  Q    Scribe changes it.  Okay.

25          MR. OATES:  The Court's brief indulgence.

Benningfield - Cross

1        (Counsel confer.)

2    BY MR. OATES:

3    Q    I think you testified earlier that for the most

4    part, you did all of the text messages, right?

5    A    Yes.

6    Q    Were there some text messages that Fernando did?

7    A    Yes, Telegram.  Some of the Telegrams he did

8    towards the end.

9    Q    Okay.  What percentage -- well, let me ask you

10   this:  Were you guys checking one another's work when

11   you did the Telegrams?

12   A    So here's what the Telegrams were.  I believe the

13   government did a video of the Telegram messages, and we

14   were sent that video.  You actually had to transcribe

15   from the video onto the written page what appears in

16   the Telegram message.  And so that was done.  And yes,

17   that was checked, and I did the translation of the

18   Spanish side.

19   Q    Of the final?

20   A    Yes.

21   Q    And was it the same thing?  Like, you did roughly

22   70 to 80 percent of the editing or the first draft --

23   no, I'm sorry.  That Fernando did 70 to 80 percent of

24   the first draft, and you did -- you split it up that

25   way?

Benningfield - Cross

1  A    The material I was referring to, Fernando did all

2  of the left-hand column of taking the Telegram messages

3  and putting them into the written format on the page.

4  He did all of that.

5  Q    And then you translated it?

6  A    Yes.  I go back and verify that what appears on

7  the written page is actually what appears on the video

8  and then that the English translation is a correct

9  translation.

10  Q    Okay.  The software that you used, does it have

11  any ability to edit the audio file?  Can you edit the

12  audio file with it?  Do you know?

13  A    Scribe will not edit audio files.  If you wanted

14  to, you might be able to edit audio files with Pro

15  Tools.  None of these files were edited if that's what

16  you're asking.

17  Q    Pro Tools has an ability to edit these files?

18  A    I believe Pro Tools has the ability to edit files.

19  Q    Okay.

20  A    I don't use it for that, but I believe that

21  function exists in the software.

22  Q    Do you know whether or not that function exists in

23  Scribe?

24  A    I don't believe it exists in Scribe.

25  Q    Okay.  Obviously, Fernando is in a different part

1    of the country, right?

2    A    Yes.

3    Q    So you guys weren't sitting in the same room

4    together when he was doing his work?

5    A    No, not at all.

6    Q    Okay.  Does he have Pro Tools as well?

7    A    No, he does not use Pro Tools.  He only uses

8    Scribe.

9    Q    Okay.  How do you know he doesn't use Pro Tools?

10   A    I've talked to him about the application he's

11   using.

12            MR. OATES:  Okay.  I have no further

13   questions, Your Honor.

14            THE COURT:  All right.  Mr. Conte, anything?

15            MR. CONTE:  No, Your Honor.

16            THE COURT:  Any redirect?

17            MR. MURPHY:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. MURPHY:

20   Q    Mr. Benningfield, I want to talk with you a little

21   bit -- you were asked questions about information that

22   the government added to the exhibits.  Do you recall

23   those questions?

24   A    Yes.

25   Q    What category of documents or transcripts or

Benningfield - Redirect

1  exhibits does that refer to in this case?

2  A    The transcriptions.

3  Q    Transcriptions of the audios or transcriptions of

4  actual documents?

5  A    I'm not sure I understand what you're asking.

6  Q    Let me ask you this:  When you put Voice 1,

7  Voice 2, Voice 3, for example, what category of

8  documents did those voices apply to?

9  A    Are you asking those were the A?  Is that what

10 you're asking?

11 Q    Whether it be A or B, what kind of documents were

12 you adding --

13 A    Oh, in Word.  Yes, they were Word documents.

14 Q    When I say documents, I mean what kind of material

15 were you adding Voice 1, Voice 2, Voice 3 for?  Were

16 they audio files or, for example --

17 A    Yes, audio files.

18 Q    -- Facebook messages?

19 A    Well, let's see.  I believe -- I mean, in all of

20 this, unless someone self-identifies on the --

21 sometimes on Facebook or a Telegram, someone may

22 self-identify, and that's possible.

23 Q    When you say self-identify, what do you mean?

24 A    They may identify who they are.  They may use

25 their name.  They may use their nickname.

Benningfield - Redirect

1  Q    So if they used their nickname or self-identified

2  in the Facebook message, did you translate what that

3  name was?

4  A    We don't usually translate nicknames.  Sometimes

5  we'll -- I mean, we'll -- sometimes we'll take -- if

6  there's a name that's applied to someone in Spanish, we

7  will usually leave it in its source in its original

8  format.  Sometimes we will put brackets next to it,

9  what the English translation of that nickname means.

10 Q    So let me give you an example.  If, for example,

11 there was a Spanish translation on Facebook that

12 included the name John, would you translate or

13 transcribe John onto the English side of the document?

14 A    If it's in the source text, then John will be over

15 in the translation side too.

16 Q    So if it was in the source text for any written

17 material in this case, did you include the names used

18 in the source text?

19 A    Yes.  Everything in the source text goes over into

20 the translation side.

21 Q    Did the government add any names to any source

22 text to any written documents in this case?

23           MR. WALSH:  Judge, I object to that.

24 Speculation.

25           THE COURT:  Well, he can tell from the

Benningfield - Redirect

1    translation.

2              Go ahead.  You may answer.

3    A    I'm not aware of anyone altering these documents

4    or doing anything nefarious with the documents.

5    Q    Now, with respect to the audio file -- so, for

6    example, the T-3 audio files, did the government ask

7    you to identify anyone's voice on those documents?

8    A    No.

9    Q    Did the government ask you to name anyone in those

10   documents?

11   A    No.

12   Q    If a government witness identified a voice in

13   those documents, did you receive those documents back?

14   A    I may -- it's possible that when I put my initials

15   on some of the documents, some of the identifying

16   information of the speakers may have been on there.

17   Q    And if identifying information for a speaker was

18   made, was that document provided back to you to review

19   by the government?

20   A    Yes.

21   Q    And what did you do when you received that

22   document back from the government with the identifying

23   names?

24   A    So the document, before I put my initials on it, I

25   go back and review everything with the document, the

                    Benningfield - Redirect

1   audio.  We review the source.  We review the

2   translation.

3        And it's true.  One of the attorneys brought up

4   today:  Hey, you went through these kind of fast when

5   your initials weren't on there.  I'm trying to respect

6   the jury and everyone's time.  The reality is in my

7   office, each page is analyzed in accordance with the

8   source material, and the translation has been rendered.

9   I don't want to put my initials on any document until

10  I'm satisfied that the document accurately represents

11  what's on the source material so that the

12  English-speaking trier of fact receives the source

13  material in the English language.

14  Q    And were you asked to rereview and re-initial

15  documents that had names added to remove, for example,

16  Voice 1 to identify the name of Voice 1?  When that

17  occurred, were you asked to rereview those documents?

18  A    Yes.

19  Q    Go ahead.

20  A    So my initials represent that I verified and I'm

21  responsible for the text.  I don't take responsibility

22  for identification of the speakers.  That's not me.

23  That's not my job.  My job is to take the text, process

24  it, and put it into the English language.  That I'm

25  responsible for.

Benningfield - Redirect

1    Q    So were there occasions when you had already

2    translated text and identified different speakers by

3    Voice 1, Voice 2, Voice 3, and so forth?

4    A    Yes.

5    Q    And were there cases where that same text that you

6    had translated was sent back to you after the speakers

7    had been identified?

8    A    Yes.

9    Q    And what did you do when those materials were sent

10   back to you?

11   A    Review.

12   Q    And did you initial those materials when they were

13   sent back to you?

14   A    I did.

15   Q    Now, did you confirm, when you reviewed those

16   materials, the accuracy of the translations within

17   those materials?

18   A    Yes.

19   Q    Some of the documents that you discussed earlier

20   during your direct testimony did not have your

21   initials, and you reviewed those documents.  Did you

22   observe any issues with respect to the translations in

23   those documents?

24   A    I did not, and I recognize --

25   Q    Now, the documents that did not contain your

Benningfield - Redirect

1   initials, did you produce those documents with your

2   initials in this case?

3   A    I did produce them.

4   Q    So you initialed all of the transcripts that you

5   produced in this case?

6   A    Yes.

7   Q    Now, with respect to specifically -- if I can have

8   you look at 19-4A for a moment.

9            THE COURT:  19-4A?

10            MR. MURPHY:  Yes.

11   A    Yes, I have it.

12   Q    Okay.  I believe you were asked a question by

13   counsel about whether or not those were your initials.

14   How many sets of initials, first of all, appear on that

15   document?

16   A    There are two different sets of initials.

17   Q    Which one of those sets of initials is yours?

18   A    The ones furthest to the right.

19   Q    Okay.  You were asked a question about whether or

20   not those were your initials.  Do you recall that?

21   A    Yes.

22   Q    Can you explain -- do those initials appear the

23   same as the other initials that you provided for

24   documents you reviewed in this case?

25   A    No.  They have a physical appearance.

Benningfield - Redirect

1  Q     Why do these initials appear different?

2  A     Because these initials were placed by my own hand.

3  Q     How did you place the other initials?

4  A     I used a digital signature.

5  Q     Now --

6  A     You can tell the handwriting is not that good.

7  Q     Now, looking at Exhibit 18 dash -- you were asked

8  specifically about Exhibit 18-24A?

9  A     Yes.

10  Q    And you were asked specifically with respect to

11  this exhibit -- well, first of all, how many sets of

12  initials appear on 18-24A?

13  A     There are two sets.  Two distinct, separate

14  individuals have put their initials on here.

15  Q     Now, you were asked specifically about -- I

16  believe the term used was "alterations" by the

17  government with respect to names on that exhibit.

18  A     Right.

19  Q     Consistent with questions that I asked earlier,

20  was 18-24A specifically provided to you after names

21  were added to the exhibit?

22  A     Yes, it was.

23  Q     And what did you do when you received it?

24  A     I placed my digital initials, J.B., on there.

25  Q     Does that reflect that you rereviewed to confirm

Benningfield - Redirect

1    that that exhibit accurately transcribed the text of

2    that exhibit?

3    A    It does.

4    Q    Now, you were asked some questions about the

5    assistance that Fernando provided you with respect to

6    this case.

7    A    Yes.

8    Q    I believe you testified earlier that your team

9    spent 1,200 hours on this case.

10   A    We spent a little over 1,200 hours.

11   Q    Is that something you could have done by yourself?

12   A    Maybe I could have.  I don't normally do

13   translation work by myself.  I almost always, whether

14   it's for a commercial enterprise or for whoever it is

15   for -- translation in the professional world is

16   typically done in teams.  It's not done by an

17   individual.  There may be some occasions that it is,

18   but on many occasions, especially on larger -- projects

19   of larger magnitude, translators work in teams, not as

20   lone wolves.

21   Q    Did Fernando do any work to assist you in this

22   case that you yourself did not ultimately check and

23   review?

24   A    Absolutely not.

25   Q    Who is responsible for finalizing ultimately the

Benningfield - Redirect

1    transcriptions made for each one of the exhibits we

2    discussed in this case?

3    A    I am.  I'm responsible for all of this work.

4    Q    Does that include the audio files?

5    A    It does.

6    Q    Does that include the Facebook files?

7    A    It includes all the work.

8    Q    I have a couple of final questions here.  With

9    respect to Exhibit 18-25A, you were asked some

10   questions about *son*.  Did you listen to the audio?

11   A    I did.

12   Q    How many times did you listen to the audio

13   associated with that exhibit?

14   A    I didn't take a count of that particular exhibit,

15   how many times I listened to the audio.  I can tell you

16   with all of these audio files, they have received --

17   just on my end, they have received at least four or

18   five reviews, audio reviews and sound reviews.  That

19   doesn't count what Fernando has done.

20        So I have no doubt in my mind -- and if you have a

21   recording and want to play it, I don't think anyone

22   would mishear it.  You can hear *son* very clear.

23             MR. MURPHY:  No further questions, Your

24   Honor.

25             THE COURT:  All right.  Thank you.

319

Benningfield - Redirect

1           Mr. Benningfield, thank you.  You're excused.

2    Do not discuss your testimony outside of the courtroom

3    with any other witness.

4           THE WITNESS:  Thank you, Your Honor.  I

5    appreciate serving the court.

6           THE COURT:  Thank you.

7        (The witness stands aside.)

8           MR. KRISCHER:  May we approach?

9           THE COURT:  Yes.

10       (Conference at the bench, as follows:)

11          THE COURT:  What's up?

12          MR. KRISCHER:  Given that none of his

13   exhibits were introduced --

14       (Reporter clarification.)

15          MR. KRISCHER:  I'm sorry.  Given that none of

16   the exhibits prepared in part by Mr. Benningfield have

17   been admitted, I would like him to be subject to

18   recall.

19          THE COURT:  All right.  If you would, let him

20   know he may be recalled.

21          He is local?

22          MR. MURPHY:  Yes.

23          MR. KRISCHER:  The Court already instructed

24   him not to discuss this.

25          THE COURT:  All right.

1          MR. MURPHY:  Just one note before we proceed.

2    The government's next witness will be Walter Amaya.  He

3    is an individual involved directly with the 2017

4    charged murder.  The government anticipates he will be

5    the lengthiest exam we have had thus far.  I wanted to

6    inquire whether or not that's something the Court wants

7    to start now.

8          THE COURT:  Let's start.  How long do you

9    think you'll be with him?

10          MR. MURPHY:  An hour and a half.

11          THE COURT:  Okay.  We'll go until 5:30,

12    quarter to six.

13          MR. MURPHY:  All right.

14          MR. KRISCHER:  Thank you, Judge.

15          THE COURT:  Okay.

16       (Proceedings continued in open court, as follows:)

17          THE COURT:  The government will call its next

18    witness.

19          MR. MURPHY:  Yes, Your Honor.  The government

20    calls Walter Amaya.

21          THE COURT:  All right.  Mr. Amaya will come

22    forward, please.

23          Mr. Amaya, if you are vaccinated, I would

24    like you to testify without your mask.

25          MR. MURPHY:  I just wanted to confirm that

Amaya - Direct

1    Ms. Horvath has already been sworn in.

2            THE COURT:  Yes.  We put on the record

3    earlier that all of the interpreters remain under oath.

4            MR. MURPHY:  Okay.

5     WALTER ARGUETA AMAYA, GOVERNMENT'S WITNESS, AFFIRMED

6                    DIRECT EXAMINATION

7    BY MR. MURPHY:

8    Q    Good afternoon, Walter.  Can you please introduce

9    yourself to the Court and spell your name for the court

10   reporter?

11   A    My name is Walter Antonio Argueta Amaya.

12   Q    Can you spell Argueta Amaya for the court

13   reporter?

14   A    A-R-G-U-E-T-A, and Amaya is A-M-A-Y-A.

15   Q    How old are you?

16   A    Twenty-four years old.

17   Q    And where were you born?

18   A    In El Salvador.

19   Q    When did you come to the United States?

20   A    2013.

21   Q    How old were you when you came to the United

22   States?

23   A    Sixteen years.

24   Q    And when you first came to the United States,

25   where did you go?

Amaya - Direct

1   A      Maryland.

2   Q      Why did you go to Maryland?

3   A      Because my parents lived there.

4   Q      How long did you live with your parents in

5   Maryland?

6   A      About two years.

7   Q      Where did you live after that?

8   A      In Virginia.

9   Q      Where in Virginia?

10  A      Manassas.

11  Q      How far did you go in school before you came to

12  the United States?

13  A      Eleventh grade.

14  Q      When you came to the United States, did you

15  continue in school here?

16  A      No.

17  Q      Did you work?

18  A      Yes.

19  Q      What kind of job did you have?

20  A      Landscaping and restaurant work.

21  Q      Walter, have you ever been in a gang?

22  A      Yes.

23  Q      Which gang?

24  A      MS-13.

25  Q      What's the full name of MS-13?

Amaya - Direct

1    A    Mara Salvatrucha.

2    Q    How old were you when you joined MS-13?

3    A    I was about 8 or 9 years old.

4    Q    Where did you live when you joined MS-13?

5    A    In El Salvador.

6    Q    Within MS-13, what clique were you a part of when

7    you left El Salvador?

8    A    Guanacos Lil Cycos.

9    Q    What is the nickname for that clique?

10   A    GLCS.

11   Q    What rank in MS-13 were you before you came to the

12   United States?

13   A    *Observacion*.

14   Q    What is your current rank in the clique?

15   A    Homeboy.

16   Q    Is the GLCS clique present in Virginia?

17   A    Yes.

18   Q    What areas of Virginia does the GLCS clique

19   control?

20   A    Manassas, Falls Church, Fairfax, Alexandria, and

21   Woodbridge.

22   Q    Is the GLCS clique present in other parts of the

23   United States?

24   A    Yes.

25   Q    Where else is the clique present in the United

Amaya - Direct

1   States?

2   A    New Jersey, New York, and Florida.

3   Q    Walter, generally speaking, when a person joins

4   the MS-13 gang, are they given a nickname?

5   A    Yes.

6   Q    What is your nickname?

7   A    Belial.

8   Q    Can you spell that for the court reporter?

9   A    B-E-L-I-A-R.

10  Q    Is it R or L?

11  A    L.

12  Q    Belial?

13  A    Yes.

14          THE INTERPRETER:  So it's B-E-L-I-A-L.

15  BY MR. MURPHY:

16  Q    Have you had any other nicknames in the GLCS

17  clique?

18  A    Yes.

19  Q    What other nickname?

20  A    Stricky or Pensamientos.

21  Q    Can you spell the second one for the court

22  reporter?

23  A    So it would be P-E-N-S-A-M-I-E-N-T-O-S, and the

24  other word would be N-E-G-R-O-S.

25  Q    What does that mean?

1  A      Well, a person who only has dark thoughts.

2  Q      Why did your nicknames change in the clique?

3  A      Well, it changes every time you go up in rank.

4  Q      Do MS-13 members typically know each other's real

5  names?

6  A      No.

7  Q      Why not?

8  A      Because once we join the gang, the name they give

9  us, that would be our name, and that's how we would be

10 known from there on.

11 Q      Walter, are you currently incarcerated?

12 A      Yes.

13 Q      Are you in prison for pleading guilty to

14 first-degree murder, gang participation, and abduction?

15 A      Yes.

16 Q      Did you plead guilty to those charges, Walter, in

17 2018?

18 A      Yes.

19 Q      Did you plead guilty to those charges in state

20 court in Albemarle County, Virginia?

21 A      Yes.

22 Q      Did you commit that murder by yourself, Walter?

23 A      No.

24 Q      Did you commit that murder with other MS-13 gang

25 members?

Amaya - Direct

1   A    Yes.

2   Q    What other MS-13 gang members did you commit that

3   murder with?

4   A    Anticristo, Flaco, Little Boy, and Charlie.

5   Q    How do you spell Flaco?

6   A    F-L-A-C-O.

7   Q    And how do you spell Anticristo?

8   A    A-N-T-I-C-R-I-S-T-O.

9   Q    Now, were all the individuals that you just

10  stated, were they all in GLCS?

11  A    No, not all of them.

12  Q    Who was not in GLCS of the individuals you just

13  stated?

14  A    Charlie belonged to Normandy.

15  Q    Is Normandy MS-13?

16  A    Yes.

17  Q    Did you know Charlie before you committed the

18  murder?

19  A    No.

20  Q    When did you first meet Charlie?

21  A    The day of the murder.

22  Q    Who authorized that murder?

23  A    Fearless.

24  Q    Who was --

25           MR. CONTE:  I would like some foundation for

Amaya - Direct

1  that, Your Honor.

2  BY MR. MURPHY:

3  Q    Were you involved in the murder, Walter?

4  A    Yes.

5  Q    Did the murder require authorization?

6  A    Yes.

7  Q    Did you speak directly to the individual who

8  authorized the murder?

9  A    Yes.

10  Q    Who was that individual?

11  A    Fearless.

12  Q    Who is Fearless?

13  A    He is the first word of the Guanacos Lil Cycos.

14  Q    Where did this murder occur, Walter?

15  A    Charlottesville, Virginia.

16  Q    When did the murder occur?

17  A    July 3, 1917 [sic].

18  Q    Is it 2017?

19  A    2017.

20  Q    Okay.  And at the time of the murder, where were

21  you living?

22  A    In Manassas.

23  Q    Have you been sentenced for that murder, Walter?

24  A    Yes.

25  Q    What sentence did you receive?

Amaya - Direct

1  A     Thirty years.

2  Q     And as a result of your guilty plea, did you enter

3  into a Plea Agreement with the Albemarle County

4  Commonwealth's Attorney's Office?

5  A     Yes.

6  Q     Walter, with the assistance of the court security

7  officer, I'm going to have you look at what's been

8  marked as Government Exhibit 58-4.

9        Can you take a look at that document?  Are you

10 familiar with that document?

11 A     Yes.

12 Q     Does your signature appear on the last page of

13 that document?

14 A     Yes.

15 Q     Is that the Plea Agreement you signed in Albemarle

16 County?

17 A     Yes.

18          MR. MURPHY:  Your Honor, I ask that

19 Government's Exhibit 58-4 be admitted into evidence.

20          THE COURT:  Any objection?

21          MR. WALSH:  No objection, Judge.

22          THE COURT:  Without objection, Government

23 Exhibit 58-4 is admitted.

24 BY MR. MURPHY:

25 Q     Walter, you can close it.

Amaya - Direct

1    Walter, when you pled guilty, did you agree to

2 cooperate in related proceedings here in Virginia?

3 A    Yes.

4 Q    What does the government expect you to do with

5 respect to your cooperation in this case?

6 A    To tell them the truth about what happened.

7 Q    Okay.  Walter, have you ever testified at trial

8 before?

9 A    No.

10 Q    Do you hope that your sentence will be reduced

11 down from 30 years?

12 A    Yes.

13 Q    Has anyone made you any promises, Walter, other

14 than the terms that were written into your Plea

15 Agreement that you just reviewed?

16 A    No.

17 Q    If you cooperate with the United States and

18 testify truthfully, Walter, what do you hope will

19 happen?

20 A    Well, to obtain a reduction in my sentence.

21 Q    What do you understand would happen if you were to

22 testify falsely?

23 A    Well, they could add new charges, and I would not

24 get my time reduced.

25 Q    Has anyone promised you or made any guarantees to

Amaya - Direct

1  you that you would receive a reduction in your sentence

2  by testifying before the jury?

3  A     No.

4  Q     Walter, who will actually determine what your

5  sentence will be?

6  A     The judge.

7  Q     The judge in Albemarle County?

8  A     Yes.

9  Q     Do you understand that the judge in your case in

10  Albemarle County will ultimately determine whether or

11  not any reduction in your sentence is appropriate?

12  A     Yes.

13  Q     Walter, can you tell the jury a little bit about

14  why you joined the MS-13 gang?

15  A     Well, I started when I was about eight or nine

16  years old because I could see everybody who was part of

17  the gang, and I wanted to be one of them.

18  Q     Before you joined MS-13, did you know about any

19  criminal activity that the gang was involved in?

20  A     Yes.

21  Q     What did you know about crimes that the MS-13 gang

22  committed before you joined?

23  A     Extortion, they stole things.  They murdered, and

24  they also sold drugs.

25  Q     How did you know that the MS-13 gang committed

Amaya - Direct

1  those crimes before you joined?

2  A    Well, because I did hang out with them, and they

3  are from the area where I am from.

4  Q    Walter, can you tell the jury a little bit about

5  what are the ranks from top to bottom of the MS-13

6  clique?

7  A    The first is a *paro*.  Second is *observacion*.  Then

8  homeboy and then first word and second word.

9  Q    Walter, is there anything that comes in between

10 *observacion* and a homeboy?

11 A    *Chequeo*.

12 Q    What is a *paro*?

13 A    Well, it is the first step for those who want to

14 be part of the gang.  And what they do is they look and

15 survey the area, and they also sell drugs.

16 Q    What about an *observacion*?  What do they do?

17 A    Well, it's almost the same thing as the previous

18 one.  But in this case, the homies, they trust them

19 more.

20 Q    What about a *chequeo*?  What is a *chequeo*?

21 A    Well, it's when you committed the first murder,

22 maybe a couple.

23         MR. OATES:  Objection, Your Honor.

24         THE COURT:  I'm sorry.  What's the question?

25         MR. OATES:  May we approach, Your Honor?

Amaya - Direct

1            THE COURT:  Yes.

2        (Conference at the bench, as follows:)

3            THE COURT:  All right.  I'm sorry.  What was

4    the question about?

5            MR. OATES:  What does a *chequeo* do, and he

6    said you have to commit, I think, at least one murder

7    in order to be up to a *chequeo*.

8            MR. MURPHY:  He has never told that to me

9    before.

10            THE COURT:  I know you weren't expecting

11    that.

12            MR. MURPHY:  If it's okay, I would like to

13    just correct him as to different activities that the

14    *chequeo* might do that doesn't include murder and have

15    him respond.  If I can just lead him with respect to

16    the specific activities that the *chequeo* participates

17    in so we don't get the murder.

18            MR. OATES:  I would like to ask the Court to

19    strike that for the jury.

20            THE COURT:  All right.  I'll strike that last

21    answer, and I want you to rephrase the question for

22    him.  All right.

23            MR. MURPHY:  Yes.  I will just ask him

24    specific activity a *chequeo* is involved in in the

25    clique.

Amaya - Direct

1           THE COURT:  Without asking him what's

2    required to become a *chequeo*.

3           MR. MURPHY:  Correct.

4           THE COURT:  All right.

5           MR. OATES:  Okay.  Thank you.

6           THE COURT:  All right.

7      (Proceedings continued in open court, as follows:)

8           THE COURT:  The Court is going to strike the

9    witness' last answer.

10          Mr. Murphy.

11   BY MR. MURPHY:

12   Q    Walter, does a *chequeo* -- is he in charge of the

13   *paros* and *observaciones* in the clique?

14   A    Yes.  They supervise them, and they try to make

15   sure that they are selling the drugs or follow their

16   instructions.

17   Q    When you say instructions, what are you referring

18   to?

19   A    Well, they have to survey the area, and they have

20   to let know the *chequeo*s if there is something

21   different in the area or whether there is something

22   happened in the area.

23   Q    Walter, where do the *paros* get the drugs that they

24   sell?

25          MR. OATES:  Objection.

Amaya - Direct

1          THE COURT:  Why don't you lay a foundation.

2  BY MR. MURPHY:

3  Q    Who in the clique sells drug, Walter?

4          THE INTERPRETER:  Excuse me?

5  BY MR. MURPHY:

6  Q    Who in the clique sells drugs?

7  A    Basically, everybody.

8          MR. OATES:  Objection, Your Honor.  I'm

9  sorry.  May we approach again?

10          THE COURT:  I'm going to overrule the

11  objection.

12          Go ahead.

13          MR. OATES:  Your Honor, it's --

14          THE COURT:  Go ahead.  Why don't you ask the

15  question.

16  BY MR. MURPHY:

17  Q    Who in the clique sells drugs?

18  A    *Paros*, *observaciones*, and the *chequeo*s.

19  Q    Is there someone in the clique who supplies drugs

20  to *paros*, *observaciones*, and *chequeos* that they sell?

21          MR. OATES:  Can we have some foundation, Your

22  Honor?  Your Honor, I'm sorry.

23          THE COURT:  Let me see counsel.

24      (Conference at the bench, as follows:)

25          MR. OATES:  Your Honor, my objection is to

Amaya - Direct

1   foundation and speculation and that he's essentially

2   giving opinion testimony as to the function of the

3   gang.  My understanding was that Mr. Amaya was a fact

4   witness to describe the murder that happened in 2017,

5   but he's sort of rehashing all the stuff that we

6   actually let them do with Mr. Torres and Sergeant Saa

7   already, you know, gotten into -- if they are just

8   going to rehash the entire what's the gang and what's

9   the function --

10          THE COURT:  Well, he is a homeboy who had a

11   position of authority.  He, obviously, can factually

12   say how the clique was run and who was doing what.  I

13   see this as factual, not opinion.

14          MR. MURPHY:  Correct.

15          MR. CONTE:  Still no foundation.

16          THE COURT:  If you want to lay a foundation,

17   that's fine, asking him how he knows and was he

18   familiar with the source of the drugs.  A foundation is

19   pretty easy to lay.  I'm not sure laying a foundation

20   helps anybody.  If you want a foundation, I think you

21   can give a pretty good foundation.

22          MR. MURPHY:  Okay.

23          THE COURT:  All right.

24       (Proceedings continued in open court, as follows:)

25

Amaya - Direct

1  BY MR. MURPHY:

2  Q    Walter, did the GLCS clique deal drugs when you

3  were in GLCS?

4  A    Yes.

5  Q    Did you deal drugs on behalf of GLCS?

6  A    I did not sell them, but I obtained them and gave

7  them to the *paros* and *observaciones* so that they would

8  sell them.

9  Q    What kind of drugs did you obtain for *paros* and

10 *observaciones* and *chequeos* in the clique to sell?

11        MR. OATES:  Objection.  That wasn't his

12 answer.  He said *paros* and *observaciones*.

13 BY MR. MURPHY:

14 Q    *Paros* and *observaciones* to sell?

15 A    Marijuana.

16 Q    Okay.  Who had the connection in the clique to

17 obtain marijuana for individuals in the clique to sell?

18 A    Fearless, Fire, and then after he introduced us to

19 the persons who were getting the drugs, then I would be

20 the one obtaining the drugs.

21 Q    Now, are you familiar with how the money was

22 raised or obtained to purchase the drugs?

23 A    Yes.

24 Q    How was the money obtained to purchase the drugs

25 for the clique?

Amaya - Direct

1    A     So every *paro*, *chequeo*, *observacion*, they -- each

2    one of them had to contribute with some money once a

3    month to the clique.

4    Q     Okay.  Walter, what does it mean -- are you

5    familiar with the term "patrol"?

6    A     Yes.

7    Q     What does it mean to patrol in MS-13?

8    A     Well, we have to survey the area that our clique

9    controls so that *paros*, *observaciones*, and *chequeos* are

10   the ones who control the area.  If anything happens in

11   the area, they have to tell the homeboys, and then

12   homeboys will make the decisions.

13   Q     What is a homeboy?

14   A     A homeboy is a member of the gang who already

15   classifies as such because of the murders he committed

16   or whatever was requested him to do.

17   Q     What is the initiation process for a homeboy in

18   the gang?

19   A     Well, first of all, they have to commit the

20   murders that each clique wants them to do.  Then once

21   they committed the murder, the first word decides

22   whether the person is ready to be jumped into the gang.

23   Q     Can you tell the jury what you mean by jumped in?

24   A     Well, it's sort of a ceremony where four homeboys

25   and three of them are counting -- oh, one is counting.

Amaya - Direct

1    Excuse me, correction.  One is counting, and the other

2    three are beating during 13 seconds that person.

3    Q    Is that how you were received as a homeboy in

4    GLCS?

5    A    Yes.

6    Q    Generally speaking, who are the leaders of a

7    clique?

8    A    Fearless and Fire are the leaders of Guanacos Lil

9    Cycos Salvatrucha.

10   Q    Did they have a specific rank in the clique,

11   Fearless and Fire?

12   A    Fearless is first word, and Fire is the second

13   word.

14   Q    Are you familiar with the term "green light"?

15   A    A green light is applied to one member of the gang

16   who for some reason did not obey the rules, did not

17   want to participate, doesn't want to stay inside the

18   clique, or made mistakes.  So they decide to murder

19   him.

20   Q    Can the green light be applied to people who are

21   not in the clique?

22   A    Yes.

23   Q    Walter, where are the main high-level leaders of

24   MS-13 located?

25   A    In El Salvador.

1 Q    Are you familiar with the term "East Coast

2 Program"?

3 A    Yes.

4 Q    Can you tell the jury what the East Coast Program

5 is?

6 A    Well, it has all the cliques that are in the area,

7 like Maryland, Virginia, all the states that are on the

8 eastern part of the United States.

9 Q    Was GLCS in the East Coast Program?

10 A    No.

11 Q    Why not?

12 A    Well, because Fearless said that we do not have to

13 be followers and that since Guanacos Lil Cycos started

14 in El Salvador, it was an independent clique.

15 Q    Do MS-13 gang members sometimes speak in code

16 words?

17 A    Yes.

18 Q    And are you familiar with the code words used by

19 MS-13 gang members?

20 A    Yes.

21 Q    Why do MS-13 gang members sometimes use code

22 words?

23 A    So that other persons who are not a member or not

24 members of a gang cannot understand what we are talking

25 about.

Amaya - Direct

1  Q    And what are some of the code words that MS-13

2  gang members use to refer to bullets?

3  A    The word is *frijoles*, which means beans.

4  Q    What are some of the code words that MS-13 gang

5  members use to refer to cocaine?

6  A    *Nieve*, *polvo*.

7        (Reporter clarification.)

8  A    *Nieve*, which means snow; *polvo*, which means

9  powder.

10 Q    Can you spell those for her?

11        THE INTERPRETER:  *Nieve*, N-I-E-V-E, and *polvo*

12 is P-O-L-V-O.

13 BY MR. MURPHY:

14 Q    Walter, do you know what a zone is?

15        THE INTERPRETER:  Excuse me?

16 BY MR. MURPHY:

17 Q    In reference to MS-13, do you know what a zone is?

18 A    Yes.

19 Q    What is a zone?

20 A    It's the area that belongs to each clique.

21 Q    You earlier testified that GLCS had its own

22 specific zones?

23 A    Yes.

24 Q    And what were those zones?

25 A    Manassas, Falls Church, Fairfax, Alexandria, and

1  Woodbridge.

2  Q    What would happen if a clique were to operate

3  outside of this given zone?

4  A    Well, there is always a conflict with other

5  cliques.  So whenever we leave our area, there are

6  other cliques controlling.

7  Q    Did GLCS have clique meetings?

8  A    Yes.

9  Q    How often did GLCS have clique meetings?

10 A    Normally, it is once a month.  But if there is a

11 conflict, then we have to do it more often, maybe once

12 a week or every two weeks.

13 Q    I believe that you earlier testified that GLCS

14 required its members to pay dues.

15 A    Yes.

16 Q    Can you explain to the jury what you mean by pay

17 dues?

18 A    Well, it says that every member of the clique has

19 to pay once a month a certain amount of money, and that

20 money would be used either to buy drugs, to buy

21 weapons, or to send the money to El Salvador.

22 Q    Who was responsible for collecting the money in

23 GLCS?

24 A    I was.

25 Q    At the time of the murder you pled guilty to in

Amaya - Direct

1  this case and at the time of your arrest -- before that

2  time, were you using a phone to communicate with other

3  members or associates of GLCS?

4  A     Yes.

5  Q     With the assistance of the court security officer,

6  I'd like for you to look at what's been marked as

7  Government Exhibit 37-9B.

8        Walter, do you recognize the photo in Government

9  Exhibit 37-9B?

10 A     Yes.

11 Q     Where did this photo come from?

12 A     From my telephone.

13 Q     What is depicted in this photograph?

14 A     Those are notes of members of the clique, of money

15 they owed to the clique.

16 Q     Does the photograph in Government's Exhibit 37-9B

17 fairly and accurately depict a photograph of

18 individuals in the clique and money owed to the clique?

19 A     Yes.

20           MR. OATES:  Objection, Judge, foundation.

21           THE COURT:  Overruled.

22           MR. MURPHY:  Your Honor, I would ask that

23 Government's Exhibit 37-9B be admitted into evidence.

24           THE COURT:  Any objection?

25           MR. OATES:  Yes, objection to foundation and

343

Amaya - Direct

1   hearsay.

2          THE COURT:   All right.   Over objection,

3   Government Exhibit 37-9B is admitted.

4          MR. MURPHY:   Your Honor, I would request that

5   that exhibit be published.

6          THE COURT:   Yes.

7   BY MR. MURPHY:

8   Q    Walter, looking at Government's Exhibit 37-9B, can

9   you read for the jury the names that are listed on that

10  exhibit?

11  A    The first one says Fear, which is for Fearless.

12  The second one is Refi, which is for Fire, and the last

13  one or third one is Gova, which means Vago.

14  Q    Are those actual gang names as listed on the

15  notebook?

16  A    Well, those are actually codes so that the real

17  nicknames would not show up.

18  Q    Did you send that photo to anyone?

19  A    Yes.

20  Q    Who did you send that photo to?

21  A    I sent it to Fearless so that he would know who

22  owed money to the clique.

23  Q    What are the numbers that are listed beside the

24  names on that exhibit?

25  A    Fearless, $130; Fire, $100; Little Vago, $100.

344

1  Q    Is that money they paid to the clique or owed to

2  the clique?

3  A    That's money they owed to the clique.

4  Q    What would you do with the money that you

5  collected for the clique?

6  A    I would buy drugs and give it to the *paros*, so

7  they would sell it and obtain more money for the

8  clique.  And some other times, when the first word

9  wanted the money to go to leadership to El Salvador,

10  then we would send it to El Salvador.  Sometimes they

11  decided we needed more weapons, and it would be used to

12  buy more weapons.

13  Q    I want to talk about the money that was sent to

14  El Salvador by the clique.  Did you send money on

15  behalf of the clique to El Salvador?

16  A    Yes.

17  Q    How would you send the money to El Salvador?

18  A    Through Western Union.

19  Q    With the assistance of the court security officer,

20  I'd like for you to look, Walter, at what's been marked

21  as Government Exhibit 37-9C.  Do you recognize that

22  photograph, Walter?

23  A    Yes.

24  Q    Where did that photograph come from?

25  A    From my telephone.

Amaya - Direct

1  Q     Who took that photograph, Walter?

2  A     I took it.

3  Q     What did you do with the photograph after you took

4  it?

5  A     I sent it to the person in El Salvador so that

6  person could obtain the code and get the money.

7  Q     What is in that photograph?

8  A     It is a receipt from Western Union.

9  Q     Does the photograph in Government Exhibit 37-9C

10 fairly and accurately depict a photograph of a Western

11 Union receipt that you took and sent?

12 A     Yes.

13            MR. MURPHY:  Your Honor, at this time, I'd

14 ask that Government's Exhibit 37-9C be admitted into

15 evidence.

16            THE COURT:  Any objection?

17            MR. OATES:  Objection, hearsay.

18            THE COURT:  Over objection, Government

19 Exhibit 37-9C is admitted.

20            MR. MURPHY:  Your Honor, I request to

21 publish.

22            THE COURT:  Yes.

23 BY MR. MURPHY:

24 Q     Walter, looking at Exhibit 37-9C, can you tell the

25 jury who the sender of the funds is on that receipt?

1  A    Kelly Rivas.

2  Q    Do you know who Kelly Rivas is?

3  A    She was my girlfriend when I was outside.

4  Q    Do you know if she had any affiliation with MS-13?

5  A    Yes.

6  Q    What affiliation did she have with MS-13?

7  A    She was the first word of the Hollywood Locos.

8  Q    Looking at the receipt in Government

9  Exhibit 37-9C, who was the recipient of the funds?

10 A    Yeimi Elizabeth Merlos.  That was the person in

11 El Salvador.

12 Q    So the individual who received those funds lived

13 in El Salvador?

14 A    Yes.

15 Q    What is the date that those funds were sent?

16 A    May 20, 2017.

17 Q    Who asked you to have this money sent to that

18 individual?

19 A    Fearless.

20 Q    Who was responsible for buying the guns in the

21 clique?

22 A    Fearless and Fire, they would decide, and they had

23 the contacts to purchase the guns.

24 Q    Who kept the guns?

25 A    Fearless and Fire would keep them most of the

Amaya - Direct

1  time, but we would rotate the possession of the guns

2  among ourselves.

3  Q    Does MS-13 have rules, Walter?

4  A    Yes.

5  Q    Do you know those rules?

6  A    Yes.

7  Q    How did you learn MS-13's rules?

8  A    I learned about them when I started being a member

9  of the gang.

10 Q    Does GLCS have rules?

11 A    Yes.

12 Q    Do you know GLCS's rules?

13 A    Yes.

14 Q    How did you learn GLCS's rules?

15 A    When I became a member of that clique, then the

16 homies started teaching me the rules of the clique.

17 Q    What is the most important rule in GLCS?

18 A    La Mara first and always La Mara.

19           THE COURT:  Thank you, Mr. Murphy.

20           Ladies and gentlemen, we're going to adjourn

21 for the day.  We will reconvene tomorrow again at 9:30.

22 Again, please do not discuss anything about this case

23 outside of the courtroom, and you're excused until

24 tomorrow morning.

25      (The jury exits at 5:48 p.m.)

348

Amaya - Direct

1          THE COURT:  Mr. Amaya, you're excused until

2   tomorrow morning.  Do not discuss your testimony with

3   anyone during the evening recess.

4        (The witness stands aside.)

5          THE COURT:  All right.  I've learned that we

6   may have some issues in terms of coverage for the

7   entire day tomorrow with interpreters.  We're trying to

8   focus on that now.  So I think we'll be good at least

9   through a large portion of the day.

10       (The Court confers with the clerk.)

11         THE COURT:  All right.  Well, we'll proceed.

12   At 9:00 I'll see counsel.

13          All right.  Stand in recess.

14      -----------------------------------
                   Time:  5:49 p.m.
15

16

17

18

19

20

21
         I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                                   /s/
25                         Rhonda F. Montgomery, CCR, RPR